UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KEESHA ANDERSON,

                                          **Case No. 1:23-cv-8347**

Plaintiff,

                                          **JURY TRIAL DEMANDED**


    -against-


AMAZON.COM, INC., STEVE BOOM, *individually*,
And RYAN REDINGTON, individually,                         **COMPLAINT**

                      Defendants.
------------------------------------------------------------------X

## NATURE OF ACTION

1. Plaintiff, Keesha Anderson ("Plaintiff"), by her attorney, Jessie M. Djata, d/b/a, JMD Law Group, brings this action against Amazon.com, Inc. ("Amazon"), Steve Boom ("Boom") and Ryan Redington ("Redington") (collectively "defendants") because defendants (a) retaliated against Plaintiff after she made complaints about racially discriminatory and hostile behavior by her manager; (b) endorsed, accommodated, abetted and coerced disparate treatment against Plaintiff; c) subjected Plaintiff to a retaliatory hostile work environment by stripping her supervisory responsibilities, cutting her budget, marginalizing her role, taking numerous actions to get her to resign and unfairly targeting her for termination by placing her in Pivot; and d) deliberately and intentionally limited Plaintiff's advancement opportunities within the organization - - all of which caused Plaintiff extreme stress, anxiety, pain and discomfort, thereby, leading to her constructive discharge in February 2022. Defendants' actions were in violation of 42 U.S.C. §1981 *et seq*.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec.

Law §§296 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq*.

## PARTIES

2.  Plaintiff is a Black/African American female currently residing in New York City, County of Richmond. Plaintiff began her employment with Amazon Music on August 19, 2019 as a Senior Event & Experiential Marketing Specialist - - a Level 6 (L6) position. Plaintiff remained in this job title until her constructive discharge on February 15, 2022 when, after enduring defendants discriminatory treatment for over two years, Plaintiff was forced to resign.

3.  Defendant Amazon is a multinational technology company that, *inter alia*, operates Amazon Music, a music streaming platform and online music store. Its main offices are located in Seattle, Washington. Amazon also maintains various satellite offices throughout the United States including one on 34th Street in New York, New York and another on Kent Avenue in Brooklyn, New York.

4.  Defendant Boom was VP, Amazon Music when Plaintiff was first employed. Defendant Boom is currently Vice President Audio, Twitch & Games and continues to serve as the head of Amazon Music. Though he works out of an Amazon satellite office in San Francisco, California he is still primarily affiliated with Amazon headquarters located in Seattle, Washington.

5.  Defendant Redington, who reports directly to Defendant Steve Boom, was Director of Amazon Music when Plaintiff was first employed. Defendant Redington is now Vice President, Amazon Music, Music Industry and works out of Amazon headquarters located in Seattle, Washington.

## INTRODUCTION

6.   After making multiple complaints about her manager's racially motivated behavior, Amazon Music's leadership, including Steve Boom and Ryan Redington, labeled Ms. Anderson a "problem employee" and targeted her for termination.

7.   Within weeks of her last complaint, Defendants stripped Ms. Anderson of her supervisory responsibilities, and soon thereafter cut her operational budget by two-thirds. These were the initial steps used to kick off an insidious "discrimination laundering" strategy where they directed their racially biased and discriminatory decisions and practices through the use of "straw managers" of the same or similar racial backgrounds to Ms. Anderson.

8.   This discrimination laundering scheme allowed the leadership to direct and orchestrate Ms. Anderson's termination from behind the scenes whilst providing themselves with a means to conceal their involvement.

9.   Through a series of unlawful  actions where they harassed, intimidated, belittled and ridiculed Ms. Anderson, these managers tried to get Ms. Anderson to resign. When these efforts failed, the leadership directed that they place Ms. Anderson in "Pivot", which, upon information and belief, is a mechanism routinely misused by the company to get rid of "problem employees" under the pretense of poor performance.

10.  In an effort to save her job, Ms. Anderson was forced to enter a performance improvement plan (PIP) that she quickly realized was so onerous, it all but guaranteed her termination. Just two weeks shy of Plaintiff's impending deadline, however, one of the straw managers backed out of the plan, rescinded Ms. Anderson's PIP and directed that she resume her normal work responsibilities. Soon thereafter, that very manager transferred to another group within the company.

11. Although Ms. Anderson's job was spared in that instance, the second manager continued with efforts to oust her. Resuming a campaign of intimidation and belittlement, this manager worked to further diminish Ms. Anderson's material responsibilities and consistently declined to assist Ms. Anderson with efforts to either grow a team or advance within the organization - - making clear to Ms. Anderson that her career at Amazon would not only stall, but, in fact, regress.

12. Ms. Anderson suffered emotionally and physically as a result of the discriminatory treatment that she endured at Amazon. Ultimately, defendants' scheme worked. Between the efforts being made to get Ms. Anderson to leave combined with her growing health concerns resulting from the retaliatory hostile work environment created by Defendants' behavior, Ms. Anderson was left with no viable alternative and forced to resign from the company. Ms. Anderson's constructive discharge occurred on February 15, 2022.

## JURISDICTION AND VENUE

13. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1343. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. §1367.

14. Venue is proper in the Southern District of New York pursuant to 29 U.S.C. §1391(b)(2).

## FACTUAL ALLEGATIONS

15. Plaintiff joined Amazon with a college degree and over 15 years relevant experience as an event and experiential marketing expert. While at Amazon, Plaintiff was a hard-working, productive employee routinely praised by colleagues and clients alike for her work ethic, leadership skills, ability to work well with others and her capacity to get the job done. Prior to joining Amazon Music, Plaintiff acquired significant experience

managing both the experiential function and a team of as many as seven (7) reports. Finally, Plaintiff also had direct live streaming experience.

16. Amazon hired Ms. Anderson to help expand Amazon Music's presence within the experiential marketing space under the representation that the company was ready to invest in and build an experiential team to support this effort. Thus, when Plaintiff was first hired, Josh Fien, the Senior Manager Marketing & Acquisition and Plaintiff's intended manager, informed Plaintiff that she would have an opportunity to manage her own team (with 1 to 2 reports) and be given leeway to expand Amazon's presence and "go big" within the experiential marketing space.

17. Though Josh Fein hired Plaintiff to work as part of the Global Brand Marketing Music group run by Tami Hurwitz, by the time Plaintiff accepted the offer, Mr. Fein informed her that due to some reorganizing within the Company, he would no longer be her direct manager. Defendants ultimately reassigned Plaintiff to report directly to Abigail Akzin, Brand Leader, Amazon Music Growth and Marketing, who was also part of Ms. Hurwitz's team.

**Abigail Akzin's Racial Bias Created a Hostile Work Environment**

18. Abigail Akzin served as Ms. Anderson's direct manager from August through December 2019. While Ms. Akzin had a reputation for being difficult to work with, upon information and belief, she was known to be tougher on people of color. Consistent with her reputation, Ms. Akzin's behavior towards Plaintiff seemed heightened in comparison to the more favorable treatment she offered non-minority team members.

   a. Ms. Akzin subjected the Plaintiff to repeated incidents of harassment, bullying and intimidation motivated by her racial bias.

b.  Ms. Akzin routinely precluded Plaintiff from participating in planning meetings and/or the preparation for various strategies and initiatives being implemented by her team.

c.  Ms. Akzin limited Plaintiff's access to marketing events for which someone in her role should have been present. On occasion, team members would ask Plaintiff why she was not present at certain meetings/events, causing Plaintiff to feel marginalized and humiliated.

d.  Even after Ms. Akzin acknowledged that she had limited experience in the area of experiential and would need to rely on Plaintiff's expertise, Ms. Akzin made it a practice of rejecting Plaintiff's recommendations for experiential ideas/events and routinely put up roadblocks to almost every idea that Plaintiff proposed. Even more, almost anytime Plaintiff presented ideas, Ms. Akzin would become argumentative, further straining an already increasingly difficult relationship.

e.  Ms. Akzin's confrontational nature habitually left Plaintiff feeling nervous, anxious and apprehensive whenever they were scheduled to meet. What's more, with Ms. Akzin routinely rejecting Plaintiff's ideas and recommendations about events and other initiatives in experiential, Ms. Akzin ultimately used that as a basis to spend what was left of Plaintiff's $3.0 million budget for the year, without even notifying her.

f.  As an additional example of the disparate treatment she was subjected to, in or about October 2019, Ms. Akzin asked Plaintiff to prepare an Experiential Marketing 2020 Strategy Doc ("doc"). This is a document very specific to Amazon that upon information and belief, is typically developed with guidance

from other more experienced and long-term Amazon employees who have a deep understanding of the inner workings of the organization, who are internally referred to as *Amazonians*. Ms. Akzin, however, provided Plaintiff with very little to no support. Meanwhile, Ms. Akzin convened a team to assist Shelby Case, a Caucasian female from her team who was also a Level 6 employee, with the tenets portion of her doc. Though Ms. Case was new to Ms. Akzin's group, she already had over a year with Amazon at the time. She, nevertheless, received significantly more support and guidance from Ms. Akzin than Plaintiff who had just joined the Company only a few months earlier.

g.  As an additional example of Ms. Akzin's racially motivated behavior, in late October 2019, she approved a requisition for a Level 5 position to support all efforts related to the Hip-Hop genre for the experiential team. This individual was expected to report directly to Plaintiff as the head of experiential. Instead, after hiring Philicia Darns, an African American female, to fill the position, for no apparent reason, Ms. Akzin notified the Plaintiff that she (Ms. Akzin) would retain Ms. Darns as one of her own direct reports. And, although Ms. Darns would still be a part of the Plaintiff's experiential team, Ms. Akzin also blocked Plaintiff from any participation with Ms. Darn's onboarding process and attempted to thwart Plaintiff from having any interaction or contact with Ms. Darns for the first one to two weeks of her employment at Amazon.

h.  Upon information and belief, some time in early December 2019, Ms. Akzin made a comment to Ms. Darns about Plaintiff's preference in music. Amazon hired Ms. Darns to handle the Hip-hop genre, which is a genre of music known

for having its origins from inner city African Americans and Latino Americans. Ms. Akzin apparently went on to say…

> ***"Let me know if there is an issue with Keesha allowing you to take over as she seems to have a passion-point for hip-hop."***

    i.    Ms. Akzin's comment was insensitive, derogatory and presumptive, particularly given that Plaintiff had never discussed her music preferences with Ms. Akzin or anyone else at Amazon. Additionally, even prior to Ms. Darns' hire, it was decided that the individual filling the position would handle the Hip-hop genre. Her request, therefore, that Ms. Darns let her know if Plaintiff had an issue with it seemed even more misplaced.

19. Beginning in November 2019, Ms. Anderson made a series of complaints about Ms. Akzin's behavior, including to Mark Dizon, the Senior Human Resources Partner for Amazon's music group at the time, Defendant Boom and Defendant Redington. In fact, between November and December 2019, Ms. Anderson had at least three (3) conversations with Mark Dizon, alone, wherein she complained to him about Ms. Akzin's harassing, bullying and retaliatory behavior towards her as well as her belief that Ms. Akzin's behavior was racially motivated.

20. In or about December 2019, Plaintiff learned that Jenny Levine, a Caucasian employee on Ms. Akzin's team, had personally and repeatedly observed the way Ms. Akzin treated Plaintiff and reported what she observed to Human Resources.

**Plaintiff Engaged in Statutorily Protected Activity**

<u>Complaints to Mark Dizon</u>:

21. The Plaintiff made complaints to Mark Dizon about Ms. Akzin's behavior on at least three different occasions including on <u>November 11, 2019</u>, <u>December 2, 2019</u> and

<u>December 9, 2019</u>. On each occasion, Plaintiff reported the hostile and bullying behavior that she was subjected to by Ms. Akzin (*i.e.*, excluding her from meetings, constantly rejecting her ideas and shutting projects down that she had previously authorized, etc.).

22. Among the Plaintiff's complaints to Mr. Dizon were several regarding her belief that Ms. Akzin created a toxic environment where Plaintiff felt constantly ridiculed and undermined. The Plaintiff also expressed her belief that Ms. Akzin's treatment was racially motivated, in support of which she reported the following:

   a. Plaintiff described an incident that occurred on her first day of work where Ms. Akzin brought Terika Palmer, the only other African American in her group, to her welcome meeting with Plaintiff. Plaintiff reported that since Ms. Palmer would not have any involvement with experiential, it was obvious that Ms. Akzin requested her presence based on nothing more than their shared racial characteristics - - they were both Black.

   b. Plaintiff also complained to Mr. Dizon about how Ms. Akzin had treated Shelby Case (a Caucasian) more favorably by providing her with legitimate assistance and support for her doc in comparison to Ms. Anderson for whom, despite being new to Amazon, she provided little support.

   c. Plaintiff also reported Ms. Akzin's remark about the Plaintiff allegedly having a ***"passion point for Hip-Hop"***, explaining that Ms. Akzin had obviously made the assumption that - - because Plaintiff is Black, she must like Hip-Hop music.

   d. Plaintiff also specifically reported how she felt offended when Ms. Akzin prevented her from being involved with Ms. Darn's onboarding and how she ultimately kept Ms. Darns as her own report, thereby depriving Plaintiff the ability to expand her team as planned.

   e. Plaintiff also reported her concerns over a complaint made by Ms. Akzin to HR about Terika Palmer that Plaintiff believed to be unfair. Upon information and belief, although HR never conducted an investigation into the issue, Ms. Palmer was forced to apologize to each member of the team, including Plaintiff, who was not even present when the alleged incident occurred.

f.  Plaintiff further reported how she felt that ordering Ms. Palmer to apologize under those circumstances seemed designed to debase and humiliate her. Plaintiff also expressed concern over how the HR department had dealt with the issue, even asking Mr. Dizon, "is this how people of color are treated here" and expressing her belief that if Ms. Palmer was Caucasian, she would not have been asked to issue a broad-based apology.

g.  The Plaintiff also reported that as a result of her hostile and racially biased behavior, each time she needed to speak to or interact with Ms. Akzin, Plaintiff would feel sick and anxious.

Complaint to Defendant Boom:

23. On November 13, 2019, Plaintiff met with Defendant Boom. During the meeting, Plaintiff had an opportunity to discuss many of the ideas that she had presented to Ms. Akzin, including a Beatles song idea. Plaintiff reported how Ms. Akzin routinely rejected her ideas out of hand. Mr. Boom expressed how impressed he was with many of her ideas and encouraged Plaintiff to pursue them. During the meeting, Mr. Boom also gave his approval to proceed with the Beatles song idea.

24. During her meeting with Defendant Boom, Plaintiff also reported her frustrations with the team and Ms. Akzin, specifically, given her apparent unwillingness to "go big" as it related to experiential marketing. Plaintiff also informed him how she felt stymied by Ms. Akzin's actions to limit her progress within the group. Plaintiff also informed Defendant Boom how, as a result of Ms. Akzin's treatment, she was considering leaving Amazon altogether since the position she was hired to fill didn't seem to be panning out as she expected.

25. After Plaintiff's meeting with Defendant Boom, Ms. Akzin continued to be dismissive of her ideas and recommendations. In fact, Ms. Akzin's behavior towards Plaintiff worsened. Even more, despite Defendant Boom's recommendation that they move

forward with the Beatles inspired campaign, after much effort was put in to try and produce an activation to support it, Ms. Akzin ultimately decided not to proceed and shut down the effort.

Complaints to Defendant Redington:

26. During November and December 2019, Plaintiff also had a number of conversations with Defendant Redington regarding Ms. Akzin's hostile behavior and treatment. On November 22, 2019, Plaintiff informed Mr. Redington about the challenges she was having with Ms. Akzin, including the limited support she received on her doc and the anxiety that it caused her. The Plaintiff also explained how Ms. Akzin's vitriol and demeaning attitude had reached a point where Plaintiff was so distressed and felt so antagonized by Ms. Akzin's conduct that she would arrive at work feeling sick, in anticipation of the drama that would unfold.

27. On December 9, 2019, Plaintiff met with Mr. Redington again to discuss the challenges she was having with Ms. Akzin. She explained, ***"I get physically sick to my stomach"*** and also informed him of the angst she felt whenever she saw, spoke to or even received an email from Ms. Akzin. On the verge of tears, Plaintiff also informed Defendant Redington, ***"I can't take it anymore"****,* referring to working with Ms. Akzin, and explained that it might be better for her if she simply resigned. Defendant Redington encouraged her to hang on and informed her that Defendant Boom was ***"working on making changes to the organization"***.

28. In or about December 2019, Plaintiff began noticing some hair loss. She ultimately went to see a dermatologist who advised that hair loss is more often than not caused by stress.

She ultimately referred the Plaintiff to a hair loss specialist who also confirmed that her sudden hair loss was likely the result of undue stress.

29. On December 17, 2019, about a week after Plaintiff's last complaint to Defendant Redington, Ms. Akzin informed Plaintiff that the experiential team would be moving to the Artist Marketing group, run by Defendant Redington. This meant that Ms. Anderson would no longer report to Ms. Akzin and would instead, be reporting directly to Defendant Redington.

**Defendants Retaliate Against Plaintiff**

30. The experiential team, which included the Plaintiff and Philicia Darns at the time, ultimately transitioned to defendant Redington's group in early January 2020. At that point, the Plaintiff began reporting directly to Defendant Redington which lasted for approximately two months, from mid-January to early March 2020.

Plaintiff's Supervisory Responsibilities Removed, Without Explanation (Retaliation):

31. With the transition, Plaintiff believed that Ms. Darns would begin reporting to her as originally planned. However, a few days after joining the team, Defendant Redington informed Plaintiff that she would not be receiving any reports to grow an experiential team, effectively stripping the Plaintiff of her supervisory responsibilities. This occurred several weeks after Plaintiff's last complaint and Defendant Redington did not provide the Plaintiff with any kind of explanation for the decision.

32. Removing Plaintiff's supervisory responsibilities did not only significantly change the structure of the Plaintiff's role, it adversely impacted her ability to promote to the next level (Level 7), which was critical to her advancement within the organization.

33. On February 20, 2020, Plaintiff met with Mark Dizon to, among other things, discuss concerns she had about her transition to Defendant Redington's group. During their conversation, Plaintiff explained that while she greatly appreciated that Ms. Akzin was no longer her manager, it still seemed unfair that she lost the ability to grow an experiential team with the change. Mr. Dizon appeared to acknowledge her dilemma but then expressed a sentiment like, "we can't always have it all," which, Plaintiff took to mean that losing the ability to grow a team was the price Plaintiff had to pay for complaining about Ms. Akzin.

Plaintiff's Budget Cut, Without Explanation (Retaliation):

34. Additionally, about a month or so later Plaintiff learned that her budget for the 2020 year would be approximately ⅓ the budget she had received for 2019 - - reducing her budget from $3 million to about $1 million. This would significantly impact Plaintiff's ability to put on events. Once again, Plaintiff was given no explanation for the change.

Amazon Engages in 'Discrimination Laundering' Scheme (Retaliation):

35. On March 13, 2020, Plaintiff learned that two women of color had just been hired into Defendant Redington's group: Kirdis Postelle (hereinafter, Ms. Postelle), an African American female, who would serve as Global Head of Artist Marketing, and Tatiana Oliviera Simonian (hereinafter, Ms. Simonian), an Hispanic female, who joined as Global Head of Cross Category Marketing, Live Streaming & Experiential.

36. Defendant Redington then reassigned Plaintiff and Philicia Darns to work under these managers. Thus, while Plaintiff was still a part of Defendant Redington's team, Ms. Simonian became Plaintiff's Direct Manager and Ms. Postelle became Plaintiff's Skip-Level Manager (*i.e.*, her manager's manager)

37. Upon information and belief (and unbeknownst to Plaintiff at the time), within a week of joining Amazon, Defendant Redington advised both Ms. Postelle and Ms. Simonian that Plaintiff was a "problem employee" that they needed to "Focus"[1] with the goal of terminating her.

38. Plaintiff was unaware that Defendants considered her a "problem employee" or had targeted her for termination. Additionally, no one had ever expressed any concerns about Plaintiff's performance. If anything, the feedback Plaintiff received was positive.

39. During the time that Plaintiff worked under Defendant Redington, who was more open to hearing her ideas, she had the opportunity to produce several events that were viewed favorably both internally and outside of Amazon. Plaintiff also received positive feedback from colleagues including Defendant Redington on the success of those events. Here is a representative sample of the feedback Plaintiff received directly from Defendant Redington regarding Plaintiff's performance between January and March 2020:

   - January 24, 2020 - *"I was impressed. I think the seed that you all planted will begin to sprout. Many thanks!"* - Ryan Redington

   - February 4, 2020 - Regarding Grammy events… *"All - great work pulling this together!"* - Ryan Redington

   - February 15, 2020 - Re: Showfields Events… *"Thanks for this, heard the event on Thursday went well."* - Ryan Redington

   - February/ March 2020 - *"Keesha, your superpower is the ability to just get things done. You are a fast mover and can navigate through ambiguity well. You have also done a good job of compiling your prior experiences and relationships to push Amazon Music into a new space (events/experiential)."* - Ryan Redington

40. Upon information and belief, however, assigning Plaintiff to work under these managers of color was part of a larger plan Defendant Redington had alluded to when he informed

---

[1] Focus is a tool used at Amazon to address performance issues.

Plaintiff in December 2020 that Defendant Boom was ***"working on making changes to the organization."*** With this maneuver, these managers of color became the "face" of any discriminatory conduct that would ultimately be taken against Ms. Anderson. In other words, while the decision to terminate Plaintiff in retaliation for her complaints about Ms. Akzin came from above, in order to minimize Defendants' exposure, the plan was to have these "straw managers" be the face of Plaintiff's termination.

41. Significantly, Ms. Postelle, Plaintiff's skip-level manager, all but confirmed the leadership's 'discrimination laundering' scheme during one of her first one-on-one meetings with Plaintiff.

42. During this virtual meeting, Ms. Postelle began by explaining to Plaintiff that she was the first person Ms. Postelle had heard about when she joined the company. Ms. Postelle said she had ***"been dying to meet"*** Plaintiff and had ***"heard so much about"*** her. Then, later on in the conversation, Ms. Postelle acknowledged that she was aware that things had ***"been hard"*** for Plaintiff and knew that Plaintiff had been bounced around (*i.e.* to different managers). Then, Ms. Postelle made a comment about there being ***"a lot of people"*** at Amazon, while facing her palm to the screen. Plaintiff took her gesture to mean that Ms. Postelle was referring to there being a lot of "white" people employed at Amazon. Shortly thereafter, Ms. Postelle rather carelessly made the following statement, completely out-of-context:

> ***"You don't want it to be that the Black girl [Ms. Postelle] has to <u>fire</u> the black girl [Plaintiff]. They knew what they were doing when they put the black girl [Plaintiff] on the team with the other black girl [Ms. Postelle]."***

43. Plaintiff was completely taken aback by Ms. Postelle's comment, particularly given her specific reference to having to ***"fire"*** (*i.e.*, terminate) Plaintiff. Hearing this statement

was disconcerting and, naturally, caused Plaintiff to wonder what would have precipitated such a comment in the first place. Though Ms. Postelle had mentioned that she had ***"heard so much about"*** Plaintiff, given that she had no history with Ms. Postelle and had only worked under her for a few weeks by that point, her statement seemed completely out of place. Of course, Plaintiff was unaware at the time of Defendant Redington's instructions to Ms. Postelle that she and Ms. Simonian take steps to get rid of her.

44. While Ms. Postelle never explained what she meant by her *Freudian slip*, upon information and belief, it was a clear reference to the leadership's desire to ***"fire"*** Ms. Anderson and the efforts they were taking to avoid liability for retaliating against her.

45. Further, Ms. Postelle's assertion that ***they knew what they were doing*** when they put the ***"black girl"*** (Plaintiff) on the team with the **"*other black girl*"** (Ms. Postelle), not only confirmed that race was an integral part of their "discrimination laundering" scheme, it also demonstrated how the leadership had strategically placed Plaintiff on her team so that if (or when) she terminated Plaintiff, as a person of the same/similar race and gender, they believed Plaintiff would not be able to successfully allege a claim for discrimination.

46. Similarly (unbeknownst to Plaintiff), less than 2 months after Ms. Postelle's comment (in May 2020, around the time of the George Floyd incident), it was reported that Ms. Simonian, Plaintiff's direct manager, had complained that while the company publicly supported protests surrounding the George Floyd incident, "they" (in reference to the leadership) were simultaneously directing that she ***unfairly fire a black employee",*** in reference to Plaintiff.

47. Ms. Simonian's statement not only highlights the fact that she was being "directed" or forced to "terminate" Plaintiff by the leadership - - meaning, it was not her decision - - by

saying "unfairly," it also made clear that such an action was unwarranted or undeserving. Moreover, similar to Ms. Postelle's comment, her reference to "a black girl" also makes clear that race was a consideration in the decision.

48. These statements by Ms. Postelle and Ms. Simonian, respectively, not only substantiates that the leadership had targeted Plaintiff for termination, they also demonstrate how Plaintiff was strategically placed by the leadership under these "straw managers" to terminate her as part of their "Discrimination Laundering" scheme - - to have these managers of color handle Plaintiff's termination which, in reality, was being orchestrated behind the scenes by the leadership.

49. Wittingly or not, through a series of unlawful actions against Plaintiff, Ms. Simonian and Ms. Postelle carried out the leadership's discriminatory initiatives with the ultimate goal of ousting Plaintiff from her position.

50. On April 8, 2020, Plaintiff contacted Mark Dizon to discuss her concerns about her new managers and how her relationship with Ms. Simonian seemed strained from the start. Plaintiff also conveyed how in some ways, Ms. Simonian's actions towards her were reminiscent of Ms. Akzin's behavior and explained ***"it feels retaliatory"***. Plaintiff also informed Mr. Dizon about the comment that Ms. Postelle made about ***"firing the black girl"***. Though Mr. Dizon asked whether Plaintiff wanted to report her complaints to the leadership, Plaintiff told him that she didn't want to speak to management for fear that she would be regarded as the ***"problem black girl"*** and subjected to further retaliation.

<u>Ms. Simonian's Efforts to Get Plaintiff to Resign Through Mistreatment & A Retaliatory Hostile Work Environment (Retaliation)</u>:

51. From the point that Ms. Postelle and Ms. Simonian took over in March 2020, Plaintiff became the subject of a consistent barrage of adverse actions waged against her in retaliation for the complaints of discrimination she had made.

52. Similar to the behavior Plaintiff was subjected to by her first manager, Abigail Akzin, Plaintiff's new managers intimidated and belittled her, marginalized her role and consistently denied her equal and fair treatment while simultaneously making every effort to pave the way for the advancement of similarly situated non-protected co-workers.

   a. Ms. Simonian deliberately excluded Plaintiff from meetings and events involving experiential, undermining her authority and causing her unnecessary embarrassment.

   b. Ms. Simonian limited the work she assigned to Plaintiff and, on many occasions, made requests that she support the group by handling administrative (including Level 5) tasks like budgeting and tracking financial data.

   c. Plaintiff was often asked by Ms. Simonian to provide support to Jamie Fullen, a Caucasian Level 5 employee on the team, who was put in charge of livestreaming events. Despite being the more senior employee at a Level 6, Plaintiff would be asked to assist Ms. Fullen with random tasks to ensure Ms. Fullen had the ***"support she needed"***. For example, in a text message to Plaintiff on April 21, 2020, Ms. Simonian stated:

   > ***"Also, when you meet with Jamie today have her go through that checklist and see what she thinks you can <u>help out on</u> (emphasis added), she's just doing way more on her own than she needs to but I feel like she needs a little nudge from someone senior… My***

> *big concern is that if she's ever sick or goes anywhere, <u>we have no back up.</u>"* **(Emphasis added)**

d. While Ms. Simonian acknowledged that Plaintiff was the more senior individual in this message, her focus was still on having Plaintiff ***"help"*** Ms. Fullen ***"out"*** and be ready to serve as a ***"back up"*** in the event Ms. Fullen became unavailable.

e. Rather than assigning Plaintiff responsibilities consistent with her skill sets, level and abilities that would further her career progression (*i.e.*, Level 6 and 7 responsibilities), she was effectively being asked to assist Ms. Fullen, a lower level employee, with her advancement in the company.

f. As Plaintiff took on more administrative and supportive Level 5 tasks, she performed less in the area of experiential, events and Level 6 work. At that point, the pandemic understandably impacted her ability to put on in-person events. However, Plaintiff did not receive much support (if any) for ideas she proposed for virtual events in the area of experiential.

g. Although it was part of Plaintiff's role to propose ideas that could increase Amazon Music's brand awareness through experiential, Ms. Simonian often dismissed Plaintiff's ideas outright, even telling Plaintiff on one occasion, ***"I don't need ideas from you"*** and directed that Plaintiff just do as she asked.

h. On April 22, 2020, Ms. Simonian notified Plaintiff via an email that she would no longer be representing the experiential team on the *"Genre Lead or Pod Calls."* Ms. Simonian sent the email to the entire team without providing Plaintiff with advanced notice of the change. Removing Plaintiff from the calls further eroded her responsibilities as the head of experiential and unnecessarily humiliated her in front of the entire team.

i. There were also occasions when Ms. Simonian seemed to be deliberately trying to confuse Plaintiff with inconsistent instructions and mixed messages, further straining their relationship and causing Plaintiff unnecessary distress.

    i. For example, at one point, Ms. Simonian accused and reprimanded Plaintiff for discussing a possible event with individuals outside the team prior to discussing it with her. In reality, however, the individuals had reached out to Plaintiff and Plaintiff had responded with an email recommending that they follow up with Ms. Simonian directly, which she also sent to Ms. Simonian.

    ii. On another occasion, in an obvious effort to make Plaintiff appear incompetent in front of colleagues, Ms. Simonian called Plaintiff out for researching agencies for an upcoming event. In an email to Plaintiff where several colleagues were copied, Ms. Simonian questioned why Plaintiff would have done so. Meanwhile, Ms. Simonian was the one who had suggested that she do the research in the first place.

    iii. On yet another occasion, Ms. Simonian unjustifiably reprimanded Plaintiff and forced her to apologize for a comment she made to Jamie Fullen during a meeting about the fact that she would not be checking her emails. At a team meeting the following week, Ms. Simonian brought up Plaintiff's comment at which point Plaintiff explained that there were no ill feelings behind the statement. Despite Ms. Fullen informing Ms. Simonian that she, herself, had told Plaintiff that she would not be checking emails that day and was not offended, Ms. Simonian still insisted

that Plaintiff apologize. Ms. Simonian was effectively harassing Plaintiff on behalf of Ms. Fullen over an innocent statement that Ms. Fullen found no issue with.

53. Plaintiff spoke to Mark Dizon again on April 24, 2020. During their conversation, Plaintiff reported issues she had concerning how Ms. Simonian continued to treat her, including the fact that Ms. Simonian was giving her inconsistent instructions, sending mixed messages and reprimanding her without cause. Plaintiff also expressed the frustration and anxiety she felt over the situation since Ms. Simonian seemed to have an issue with her despite having only just met her barely a month earlier. Mr. Dizon agreed that Ms. Simonian's behavior seemed odd.

54. At some point in late April/early May of 2020, among the many administrative tasks Plaintiff handled, she was asked to create a quip tracker to monitor financing for *Twitch* and purchase orders to help ensure that Ms. Fullen's projects stayed on budget. On May 5, 2020, Ms. Simonian, Jamie Fullen (the Level 5 employee) and Plaintiff were scheduled to have a meeting to review the quip tracker. However, after advising Ms. Simonian that Ms. Fullen could not attend the meeting, Ms. Simonian declined to review it, opting instead to provide feedback <u>after</u> receiving Ms. Fullen's buy-in.

55. This was demoralizing to Plaintiff who was the more senior employee. While Ms. Fullen oversaw *Twitch,* apart from asking Plaintiff to perform work that was below her skill set, after Plaintiff performed this rudimentary task, Ms. Simonian added insult to injury by asking Plaintiff to gain approval from her subordinate before she would review it herself.

56. At some point, Plaintiff learned that Ms. Simonian was friendly with Abigail Akzin - - the former manager Plaintiff had complained about. On one or two occasions, Ms.

Simonian announced to the team that she had plans to have drinks at her home with Ms. Postelle and Ms. Akzin. Additionally, during Plaintiff's one-on-one meetings with Ms. Simonian throughout the year, she would state, ***"I know Abs is not your fave"*** (meaning, I [Ms. Simonian] know Abigail Akzin is not your [Plaintiff's] fave [favorite person]).

57. While Ms. Simonian never disclosed more, the statement, ***"I know Abs is not your fave"***, made clear that she and Ms. Akzin had in fact discussed Plaintiff and that Ms. Simonian's understanding and awareness about the history between them derived from conversations she had with Ms. Akzin directly - - a fact she obviously wanted Plaintiff to know she was aware of. Furthermore, the fact that there appeared to be similarities in the ways that Ms. Akzin and Ms. Simonian each treated Plaintiff (*i.e.*, excluding her from meetings, ignoring her ideas/recommendations, giving confusing instructions, causing Plaintiff unnecessary embarrassment, *etc.*) reduced the likelihood that the similarities in treatment occurred by accident.

58. Upon information and belief, Ms. Akzin had informed Ms. Postelle and Ms. Simonian about the difficulties with her relationship with Plaintiff, Plaintiff's ensuing complaints, as well as how, as a result of her complaints, the leadership had transferred Plaintiff to Defendant Redington's group.

59. By this point, Plaintiff's work circumstances were causing her so much stress and anxiety that she was beginning to experience medical issues that she ultimately learned were likely aggravated by her stressful work environment.

60. On May 7, 2020, Plaintiff met with Mark Dizon and reported additional concerns about how Ms. Simonian treated her, including the fact that she was still excluding Plaintiff from meetings and routinely making her feel like an outcast. **Plaintiff also reported that**

she discovered that Ms. Simonian and Abigail Akzin were friendly and spent time together outside of work. Plaintiff then reiterated her concerns that she was being retaliated against for the complaints she had made against Ms. Akzin.

61. Plaintiff also shared with Mr. Dizon how anxious she would get when she spoke with Ms. Simonian and how the stress and anxiety was not only impacting her emotional health but that it seemed to be impacting her physically as well (*i.e.,* hair loss and other medical issues).

62. Around mid May 2020, Plaintiff started working on her Experiential Marketing document ("doc") again - - the same doc for which her previous manager (Abigail Akzin) had provided little to no support. Similar to the issues she had faced with Ms. Akzin), Ms. Simonian's instructions and guidance were similarly inconsistent and confusing.

a. Ms. Simonian initially instructed Plaintiff that while she could work with stakeholders to complete the tenets for her doc, she had to develop the strategy autonomously.

b. Thereafter, during their one-on-one meeting, Plaintiff learned that Ms. Postelle had received ***"significant assistance"*** with her <u>entire</u> doc - - not just the tenets. This obviously conflicted with the instructions Plaintiff had received from Ms. Simonian. Nonetheless, despite having little to no experience, Plaintiff followed Ms. Simonian's instructions and prepared the strategy for the doc autonomously.

c. After Ms. Postelle and Ms. Simonian had a chance to review Plaintiff's first draft, they raised a number of concerns and then asked whether Plaintiff had received any help. Plaintiff explained that she had effectively prepared the doc on

her own with very little feedback since she had never actually received any feedback from Ms. Akzin and Defendant Redington's feedback was limited.[2]

    d.   Despite Ms. Simonian's initial instructions that Plaintiff work autonomously, both Ms. Postelle and Ms. Simonian claimed that they assumed she had partnered with long-time *Amazonians* to complete her doc. They also emphasized the need to obtain as much support and assistance as possible. Once again, Plaintiff felt she had received inconsistent instructions about her doc.

63. Around early June 2020, the stress from work had started to take a serious toll on Plaintiff's health. Plaintiff felt "depleted", "drained" and had just had tests related to issues with one of her kidneys.

64. On June 2, 2020, Plaintiff met with Mark Dizon to discuss the challenges she still had with her manager. Among the things that she shared were concerns about inconsistent instructions and guidance from Ms. Simonian regarding her doc and how similar it was to the way Ms. Akzin had treated her as well as how all of the stress and anxiety she experienced was impacting her health. With respect to Ms. Simonian's behavior, Mr. Dizon said that something was ***"off"*** and that he didn't understand why it was happening.

65. During this discussion with Mr. Dizon, Plaintiff also complained again that Ms. Simonian's behavior appeared to be in retaliation for the complaints she had made about Ms. Akzin.

66. In follow-up discussions with Ms. Postelle and Ms. Simonian about Plaintiff's doc on June 10th and June 12, 2020, respectively, her managers doubled down on their advice that Plaintiff get help with her doc. They advised Plaintiff that ***"first timers"*** should get

---

[2] Defendant Redington had only pointed out a few areas that needed to be tweaked and suggested that she consider combining it with another team member's doc. Before she had the chance, however, Plaintiff had transitioned to her new managers.

as much help with their doc as possible, saying that she should **"ask Amazonians"** and that it should be a **"group effort."** This, in essence, was an acknowledgment that this was effectively Plaintiff's first meaningful effort at completing her doc. Ms. Simonian also noted, **"you don't grow unless you get feedback."**

67. After receiving their new feedback and seeking assistance from more senior *Amazonians*, Plaintiff went on to produce a second and much improved Strategy Doc that both Ms. Postelle and Ms. Simonian were very complimentary of, stating that it was **"a significant improvement"** from her first one and that she had done **"a great job!"**

68. On July 8, 2020, Ms. Simonian requested that Plaintiff provide additional administrative support to Jamie Fullen, a level 5 employee. More specifically, she asked that Plaintiff start overseeing the financing function for live streaming events that were being handled by Ms. Fullen.

69. Around the same time, the impact on Plaintiff's stressful work environment started being the focus of her therapy sessions. Additionally, as a result of the anxiety and angst that Plaintiff felt from her work circumstances, she increased her visits to seeing her therapist weekly. Plaintiff's condition was so severe that her therapist eventually referred her to a psychologist who prescribed anti-anxiety and antidepressant medication to assist in reducing Plaintiff's stress and anxiety.

<u>Ms. Simonian's Efforts to Get Plaintiff to Resign with Threats of a Revamped Position (Retaliation)</u>:

70. Upon information and belief, when Ms. Simonian's efforts to get Plaintiff to resign through her bullying, intimidation, and unfair treatment proved ineffective, she used the threat of a new revamped position to scare Plaintiff into resigning with an exit package.

71. In or about July 2020, Ms. Simonian's attitude seemed to shift and she became less abrasive towards Plaintiff.

72. On July 13, 2020, soon after Plaintiff noticed her kinder demeanor, Ms. Simonian informed Plaintiff that her position was slated to be revamped. According to Ms. Simonian, given Amazon's needs and the ongoing pandemic, the revamped position would require less in the way of experiential marketing events and more *live stream* initiatives.

73. Ms. Simonian also described the position as "more *Amazonian*" than her current role, implying that she would need to ***"substantially ramp up*** [Plaintiff's] ***Amazon knowledge"*** to succeed.

74. Upon information and belief, despite the pandemic, other Amazon lines of business, including Amazon Prime and AWS, continued to support experiential marketing initiatives. These teams continued to receive significant budgets in the realm of $20 million plus each, per year. While these lines of business also generated substantially more revenue in comparison to Amazon Music, Plaintiff's counterparts in these groups clearly had the backing they needed to conduct events even with COVID looming. Meanwhile, Plaintiff's managers used COVID as an excuse to dismiss her ideas, *etc.*

75. Even before providing Plaintiff with the job description for the new position, Ms. Simonian asked whether she wanted to stay with the company. In follow-up discussions about the new job, Ms. Simonian would state that Plaintiff was ***"welcome to stay"*** but could opt to accept a package and leave Amazon altogether. She even reminded Plaintiff on one occasion that since she had passed her one-year mark, some of her stocks had already vested.

76. On July 14, 2020, Plaintiff met with Mark Dizon again and reported that her job was being revamped. Plaintiff also informed Mr. Dizon about Ms. Simonian's efforts to dissuade her from accepting the position and urging her, instead, to accept a package and leave.

77. Plaintiff further explained that it might be difficult for her to find a new job in the middle of a pandemic and couldn't risk losing her health coverage, particularly given her new health issues. Mr. Dizon encouraged Plaintiff to explore possible openings in other Amazon departments. Plaintiff also notified Mr. Dizon that as a result of all of the stress and turmoil she experienced at work, she had started seeing a therapist.

78. On July 21, 2020, Ms. Simonian sent Plaintiff the job description for the new position and gave Plaintiff a few weeks to decide whether she would accept the new role or resign. During that time, however, Ms. Simonian continued to emphasize the substantial "ramp up" that would be required for the new position and urged that Plaintiff opt for an exit package.

79. On July 23, 2020, Plaintiff met with Mr. Dizon to discuss the progress she had made with her internal (within Amazon) job search. Plaintiff reported that she had run into issues because departments were in the midst of planning their budgets for the upcoming year and, therefore, could not confirm whether they would have openings.

80. As if the circumstances surrounding the job were not stressful enough, it was also in July 2020 that Ms. Simonian began soliciting the assistance of the entire team and other stakeholders to get Ms. Fullen promoted. Ms. Fullen was known for her abrasive attitude and complaints were made by various colleagues about the difficulties she had communicating with coworkers and how frazzled and overwhelmed she often became

during high pressure situations. Colleagues also complained that she was not a team player and was often dismissive.

81. In fact, at one point Ms. Simonian, conceded that Ms. Fullen had received "***a significant amount of support***" and that "***we all want to see her win.***" Meanwhile, Plaintiff, who was often praised for her performance, was simultaneously being ushered out the door.

82. Ironically, despite Ms. Simonian's efforts to get Plaintiff to leave, she still sought Plaintiff's assistance to secure Ms. Fullen's advancement - - by asking Plaintiff to coach Ms. Fullen to help with some of the challenges she was having since, according to her, Plaintiff had "***good leadership skills.***"

83. Additionally, for a period of 6 to 8 weeks, Ms. Simonian solicited feedback from colleagues on behalf of Ms. Fullen, to assist with her advancement in the company - - specifically stating that the feedback would help Ms. Fullen "***prepare for future promotion consideration.***"

84. During their August 3, 2020 one-on-one, Plaintiff discussed her options with the revamped position with Ms. Postelle. Unlike Ms. Simonian, Ms. Postelle appeared to be encouraging Plaintiff to accept the new role. During the discussion, Ms. Postelle complimented Plaintiff on her overall performance, stating she was **"really, really impressed"** with her. Ms. Postelle also remarked how everything they had asked Plaintiff to tackle, she had done successfully including, among other things, her doc as well as her work on *AM Live,* a virtual event Amazon Music held for music artists who wanted greater exposure. Ms. Postelle also told Plaintiff that if she decided to accept the new position, she would have Ms. Postelle's **"full support"**.

85.  Then Ms. Postelle went on to tell Plaintiff that she had even asked the leadership what kind of support Plaintiff had received (presumably prior to her joining the company) - - specifically recounting…

   *"Who was helping her? Was anybody helping her?"* [Referring to Plaintiff.]

86.  Ms. Postelle further advised Plaintiff that she had already gone through several different managers (*i.e., Josh* Fien, Abigail Akzin, Ryan Redington) and stated, *"you weren't given any guidance."* Contrary to Ms. Fullen, Plaintiff confirmed and explained that she had not received much in the way of support at all from any of her managers. Ms. Postelle further stated…

   *"You['ve] had enough opportunities to fail and I'm kind of over it. I want you to be successful."*

87.  Upon information and belief, Ms. Postelle's comments indicated that some of the challenges that Plaintiff had encountered up to that point were presented with the expectation that Plaintiff would fail and that since she had managed to succeed and survived those challenges, Ms. Postelle now claimed, at least, that she wanted to focus on helping Plaintiff to succeed.

88.  Significantly, during the same one-on-one on August 3, 2020, Ms. Postelle also shared with Plaintiff what she referred to as a *"narrative"* going around about Plaintiff amongst the leadership team…

   *"…the narrative was she's [referring to Plaintiff] just out there doing what she wants to do…"*

89.  Ms. Postelle stated that Plaintiff had *"an attitude"* and went on to explain that Plaintiff had *"earned"* that *"attitude"* because *"there was a lot of shit that went on."* Ms. Postelle's use of the term **"attitude"** or phrase, **"just out there doing what she wants to**

**do"** was in reference to the **"narrative"** being projected onto Ms. Anderson (or the manner in which Plaintiff was perceived and discussed amongst the leadership).

90. These rumors discussed amongst the leadership, which consisted of racially discriminatory "coded" language, upon information and belief, demonstrated the racial bias that members of the leadership team held against Plaintiff as a result of the complaints Plaintiff made about Ms. Akzin.

91. During a meeting with Mark Dizon on August 12, 2020, Plaintiff reported the comments that Ms. Postelle made during her August 3, 2020 one-on-one including the fact that she referenced rumors or a **"narrative"** about Plaintiff having an **"attitude"** and that she was allegedly **"just out there doing what she wants to do."**

92. Thereafter, Plaintiff had several more conversations with Ms. Simonian wherein she attempted to entice Plaintiff into taking an exit package. In a clear effort to intimidate Plaintiff into accepting an exit package, Ms. Simonian emphasized how **"hard"** the new position would be for Plaintiff, how much of a **"big ramp up"** in knowledge it would be and how it was very much **"outside of the regular scope"** of her position.

93. On August 19, 2020, Plaintiff met with Mark Dizon again to discuss her options surrounding the new position. Given the lack of opportunity in other departments, it was clear that if Plaintiff wanted to stay at Amazon, she would have to accept the new position.

94. On August 20, 2020, Plaintiff informed Ms. Simonian that she had decided to accept the offer. But, rather than discussing next steps, Ms. Simonian, who seemed frustrated with Plaintiff's decision, effectively reneged the offer - - stating that she needed to "think about it" and then reiterated that **"a super Amazonian"** was required for the position, as

if to suggest that Plaintiff was not qualified. Her reaction was, therefore, extremely upsetting to Plaintiff.

95. Additionally, during the same discussion, Ms. Simonian stated again… ***"I know Abs is not your fave"***, referring to Plaintiff's issues with Abigail Akzin, which seemed completely out of place.

96. On the same day, Plaintiff reached out to Mr. Dizon via email to let him know that Ms. Simonian appeared to be reneging her job offer and, again, expressed how she felt like an outcast. Plaintiff also reported Ms. Simonian's out-of-place mention of Abigail Akzin and how it reinforced her belief that she was being retaliated against for the complaints she had made.

97. Despite Plaintiff's repeated efforts to reach out to Mr. Dizon and Ms. Simonian after August 19, 2020, neither responded. Mr. Dizon never replied to Plaintiff's emails and, while Ms. Simonian continued to meet with the rest of her team, she declined Plaintiff's efforts to schedule her regular weekly one-on-one meetings. Of course, not knowing her fate at Amazon, all of this caused Plaintiff a great deal of distress and anxiety.

<u>Ms. Simonian's Efforts to Get Plaintiff to Resign Through the Pivot Process (Retaliation)</u>:

98. Upon information and belief, after Plaintiff refused to follow Ms. Simonian's cues and resign from Amazon with an exit package, Ms. Simonian was forced to employ Amazon's disciplinary process to exit Plaintiff from the company.

99. As a result, following several weeks with no response from either Ms. Simonian or Mr. Dizon about the state of Plaintiff's position, during a one-on-one meeting with Ms. Simonian on September 21, 2020, Ms. Simonian notified Plaintiff that they had entered

her into Pivot - - a mechanism used by Amazon to assist employees who are falling short of performance expectations.

100.    Notably, Mark Dizon, the HR Partner whom Plaintiff had been confiding in for the better part of a year and who had stopped returning her calls, was also present for this meeting.

101.    Plaintiff felt completely blindsided. Ms. Simonian entered Plaintiff into Pivot despite never having received any negative performance evaluations or being informed of any serious issues with her performance. If anything, the feedback Plaintiff received about her performance was overwhelmingly positive.

102.    They issued the Pivot based on the following three (3) trumped up allegations:

    a.    Plaintiff's alleged failure to meet the Level 6 bar due to inconsistency of ownership in strategy and execution;

    b.    An allegation that Plaintiff's strategy Doc was "not created or shipped independently and required deadlines as well as "significant coaching" and;

    c.    Plaintiff's alleged failure to complete a 1-hour training course.

103.    The allegations included in the Pivot were completely baseless and simply a pretext to justify an unwarranted Pivot.

104.    With respect to the first allegation, none of Plaintiff's managers ever advised that she was performing below the Level 6 bar. To the contrary, Plaintiff received consistent praise for her work and the events she produced (or assisted with). Plaintiff's March 2020 performance review, prepared by Defendant Redington, noted in pertinent part:

    *"Your superpower is the ability to just get things done."*

    *"I've been impressed by her* (Plaintiff's) *proactive approach and desire to jump in and take on numerous different events…"*

This feedback combined with the positive feedback Plaintiff received from Ms. Simonian and Ms. Postelle regarding her doc and overall performance, were in strong contradiction with any claim that Plaintiff had challenges with strategy and execution.

105.    Second, upon information and belief, new employees were strongly encouraged to seek assistance from *Amazonians* when preparing a doc. Indeed, Ms. Postelle and Ms. Simonian had specifically instructed Plaintiff that ***"first timers"*** should get as much help as possible with their doc, ***"ask Amazonians"*** and advised that it should be a ***"group effort."*** Even Ms. Postelle, who was a first timer, admitted that she herself had received ***"significant coaching"*** and assistance on her own doc. Upon information and belief, however, Ms. Simonian turned this standard (and strongly encouraged) practice into a performance issue to justify an unwarranted Pivot.

106.    Even if the claims regarding Plaintiff's performance were true, rather than offer her the kind support and coaching being offered to Ms. Fullen, they opted instead to place her in Pivot, forcing her to fight for her job.

107.    Lastly, their claim that Plaintiff failed to complete certain assigned training courses was a misrepresentation of the facts. By the time they entered Plaintiff into Pivot, of the 13 training courses scheduled for completion, Plaintiff had completed 12 of them. Plaintiff had not yet concluded the last course, however, only because she had encountered a technical glitch with the system. Plaintiff ultimately completed the 1-hour course when she received access on September 25th. Not to mention, there were other team members, including Jamie Fullen, who had not completed the training and were neither reprimanded nor disciplined.

108. The Pivot officially revoked the offer for the revamped position that Ms. Simonian had extended to Plaintiff. As part of the PIVOT, Plaintiff was given the option to voluntarily leave Amazon with an exit package or submit to the Improve at Amazon option which included entering a performance improvement plan (PIP).

109. Significantly, entering Plaintiff into Pivot contradicted the very recommendations outlined in Amazon's *Performance Improvement Process* and *Performance Review* policies. According to the policy, this extreme step would not be recommended unless Plaintiff had received a "below expectations" rating on a performance appraisal or, at a minimum, received negative feedback (formal or otherwise) that Plaintiff was performing below the Level 6 bar. Neither was the case for Plaintiff. And, while these policies provided for circumstances where a PIP may be imposed without having received a below expectations rating, that exception seemed only appropriate where the performance issue became urgent, which was not the case for Plaintiff as she had neither received any negative feedback or complaints about her performance before being placed on Pivot.

110. In addition to the fact that the allegations in the Pivot seemed contrived in an attempt to legitimize a groundless Pivot, a review of the proposed measurements for Plaintiff's PIP revealed no realistic way for Plaintiff to achieve the goals within the time frame allotted.

111. Much of the underlying data and information required to complete at least two of the goals, for example, needed to be obtained from other individuals within the organization and would not even be available in time to meet Plaintiff's deadlines. What's more, Plaintiff was being asked to complete tasks by herself in a matter of weeks that normally would be completed by a team of individuals over a longer period of time.

112.    Despite these challenges, in order to save her position, Plaintiff opted to enter into the PIP. The entire ordeal, however, caused Plaintiff extraordinary stress and apprehension. Once again, Plaintiff felt she was put in limbo and unsure of her fate at Amazon. What's more, even if Plaintiff managed to complete the PIP successfully, having entered Pivot and accepting a PIP could negatively impact her career at Amazon since the Pivot would be part of her permanent record. In fact, Amazon required that Plaintiff sign an acknowledgement and authorization confirming that Plaintiff was aware that a copy of her PIP would be placed in her "Pivot file".

113.    Additionally, according to Amazon's *Performance Review* policy, while employees were on a PIP, they were not permitted to apply for transfers or get promoted. Thus, Plaintiff had to withdraw from further consideration from the Amazon positions for which she had applied to prior to the Pivot. Furthermore, Amazon's *Performance Review* policy warned that, whether successful or not, being on a PIP could have a "significant impact" on future salary increases and promotional opportunities. This proved to be true since during Plaintiff's employment, she never received a salary increase or any real consideration for a promotion.

114.    As a result of the stress and anxiety caused by these circumstances, Plaintiff increased her weekly sessions with her therapist to twice per week. Additionally, her ongoing stress had already manifested into physical pain, causing other medical issues including severe back pain, abdominal pain and continued hair loss. Plaintiff also experienced a loss of appetite, sleeplessness and a great deal of anxiety and distress.

115.    Two weeks after being entered into Pivot, however, Ms. Simonian did an about face and issued an updated PIP, which Plaintiff entered on October 5, 2020. Ms. Simonian had

extended the deadlines and given Plaintiff the ability to collaborate with stakeholders, rendering the tasks more achievable. Additionally, contrary to the initial PIP, Ms. Simonian vowed her full support and repeatedly stated that Plaintiff should seek as much assistance from others as she needed. Ms. Simonian even suggested at one point that the Plaintiff allow Jamie Fullen to complete one of the tasks under Plaintiff's direction - - promising Plaintiff would still get credit for the work since she'd be supervising.

116.    While the updates brought Plaintiff some relief, she was still under a great deal of stress and not certain whether she could even trust Ms. Simonian's turnaround. What's more, while the updated PIP seemed more achievable, Plaintiff knew it would still take a herculean effort to meet all of the requirements within the allotted time frame.

117.    On or about October 27 or 28 of 2020, Ms. Postelle excluded Plaintiff from a major experiential meeting to brainstorm about the *Coming 2 America* movie, scheduled to be released in 2021. Plaintiff was noticeably absent from this meeting as other team members questioned why she was not present. Upon information and belief, Ms. Postelle obviously believed that Plaintiff's termination was a forgone conclusion since she likely would not successfully complete her PIP.

118.    On Oct 28, 2020, after experiencing severe back pain, Plaintiff saw her gynecologist who ultimately advised her that a fibroid she had for several years, without issue, had grown significantly and was likely the culprit of her pain. According to her doctor, the sudden growth was likely due to stress as stress can spike hormone levels and encourage fibroid growth. After undergoing a series of tests, Plaintiff learned that she had also developed a painful condition known as Adenomyosis, which can also be aggravated by high levels of stress.

119.   On October 30, 2020, while still completing her PIP, Ms. Simonian advised Plaintiff that Ms. Fullen could benefit from Plaintiff's ***"leadership skills,"*** her ***"ability to work with people"*** and ***"get things done"***. Yet, Ms. Fullen, a caucasian female with glaring performance issues and a number of complaints was never issued a Pivot or placed on a PIP.

120.   A few weeks later, while Plaintiff was still in the process of completing her PIP, Ms. Simonian again complained to Plaintiff about Ms. Fullen. According to Ms. Simonian, she wanted Plaintiff to take on more of the financial obligations for Livestreaming because she had concerns that Ms. Fullen was not properly managing the budget.

121.   By early November, Plaintiff was still having difficulty managing her stress, which was still impacting her ability to sleep and eat. As a result, on November 7, 2020, Plaintiff visited a neurologist who prescribed an anti-anxiety/anti-depressant to aid with her sleeplessness and loss of appetite.

122.   On or about November 18, 2021, approximately two weeks before her deadline, Ms. Simonion suddenly rescinded Plaintiff's PIP and directed that Plaintiff resume her normal work responsibilities as the Senior Events & Experiential Marketing Specialist (and not the new "revamped" position that they had discussed prior to the Pivot). Significantly, Ms. Simonian ended the PIP despite the fact that Plaintiff had not yet met all of the requirements. No one ever made any mention of the "revamped position" ever again.

123.   During a one-on-one with Ms. Postelle in November 2020, after Ms. Simonian had abruptly ended Plaintiff's PIP, Ms. Postelle was back to being encouraging and complimentary of Plaintiff's performance - - saying that Plaintiff was ***"doing so great"***

and stating… *"let's get you promoted"*. Plaintiff found this behavior odd given that Plaintiff would not have been placed in Pivot without Ms. Postelle's approval.

124.    Then, a few weeks later, in December 2020, Plaintiff learned that Ms. Simonian would be transferring to another group within Amazon and would no longer be Plaintiff's supervisor. As a result, Ms. Postelle transitioned from being Plaintiff's skip-level to being her direct manager - - Plaintiff's fifth manager in just over a year.

<u>Ms. Postelle's Efforts to Get Plaintiff to Resign By Significantly Diminishing Plaintiff's Role and Advancement Opportunities (Retaliation)</u>:

125.    While it was a relief for Plaintiff to have the Pivot behind her, everything else stayed more or less the same.

126.    Plaintiff had joined Amazon with the understanding that she would have the opportunity to build an experiential team and lead events that would help raise brand awareness for Amazon Music. Despite all of the excitement and engrossment about doing more in the way of experiential as well as Steve Boom's promise (in November 2019) that he still had an interest in seeing Amazon "go big" in experiential, the leadership's interest in expanding in this area seemed to wane after Plaintiff's complaints.

127.    Even before the pandemic, Plaintiff was told that she would no longer be able to grow a team and they reduced her budget. Despite Ms. Postelle's promises about resuming their focus on experiential and Plaintiff's advancement within the company, her career at Amazon stalled.

128.    Working directly with Ms. Postelle proved challenging. On the one hand, Ms. Postelle often had positive feedback about Plaintiff's performance - - often commenting that Plaintiff was a *"great producer"* who *"gets things done"* and was *"able to work well*

*with people."* Ms. Postelle would also share positive feedback that she received from other colleagues and contacts within Amazon as well as external to the organization.

129.    However, anytime Plaintiff approached Ms. Postelle about increasing the events and experiential work that she handled or inquired about getting promoted to Level 7 - - as Ms. Postelle had mentioned shortly after Ms. Simonian ended her PIP - - Ms. Postelle was dismissive.

130.    Ms. Postelle routinely rejected Plaintiff's ideas about experiential and often communicated that the leadership considered events *"a low priority"*. And, while Plaintiff had started to perform more Level 6 work by then (early 2021), Ms. Postelle continued to assign her a considerable amount of lower level tasks (*i.e.*, administrative and tactical) that were more in line with Level 5 and, in some cases, even Level 4 work.

131.    Meanwhile, someone at Plaintiff's level should have been leading events and performing work involving significantly more strategy. What's more, Plaintiff was still saddled with 1/3 of the original budget she received when she was first hired (prior to making any complaints), with little to no chance of getting reports to grow a team.

132.    Plaintiff continued to experience a great deal of stress and anxiety caused by her work circumstances. In March 2021, Plaintiff complained to her healthcare providers about experiencing back and abdominal pain which flared up whenever she was stressed and anxious about work.

Plaintiff's Performance and Work Ethic

133.    In or about March 2021, Plaintiff received her performance review which was overwhelmingly positive. Even more, feedback on Plaintiff's performance from peers was similarly positive.

134.    In the face of glowing performance reviews, Plaintiff's advancement at Amazon remained stunted. What's more, Plaintiff never received a raise. In fact, though employed since August 2019 and eligible, she never received a salary increase in 2020 or 2021.

135.    Upon information and belief, while Plaintiff ultimately made it past the PIP ordeal, the fact that she had been placed in Pivot in the first place and accepted a PIP, seemed to be impacting her ability to get a salary increase or advance within the company.

A Whistleblower Confirms the Leadership's Efforts to Get Plaintiff Terminated:

136.    In April 2021, an individual (hereinafter, "the Whistleblower") approached Plaintiff with knowledge of the circumstances surrounding her Pivot and other decisions made by the leadership regarding her employment at Amazon.

137.    According to the Whistleblower, after complaining about Ms. Akzin's racially biased and hostile behavior, Plaintiff was effectively labeled a *"problem employee"* by the leadership.

138.    The Whistleblower further reported that within days of Ms. Postelle and Ms. Simonian starting at Amazon, Defendant Redington informed them that Plaintiff was a *"problem employee"* who needed to be *"focused"*, making it clear that the company wanted Plaintiff *"exited"* from the company.

139.    Once in "Focus", if an employee's performance did not improve, they were placed into "Pivot". Upon information and belief, however, Amazon's leadership - - in conjunction with human resources - - had since corrupted the Pivot process by converting it into a tool to exit "problem employees" from the company under the pretense of poor performance in order to insulate Amazon from liability.

140.   According to the Whistleblower, who had intimate knowledge of the broader scheme at play, the leadership routinely used the Pivot process to get rid of employees based on certain internal population goals, even if it was not warranted. The leadership would, nonetheless, direct managers to issue the Pivot and fabricate performance issues as needed to justify their actions.

141.   Even more, the Pivot offered the option to leave Amazon with an exit package or agree to a PIP. In those cases where the employee opted to complete the PIP, failure was all but guaranteed because managers would intentionally make the requirements so challenging the employee would have virtually no chance of succeeding, which was also true in Plaintiff's case.

142.   The requirements for Plaintiff's PIP were so burdensome that within two weeks of issuing the Pivot, Ms. Simonian updated the terms to make it more achievable and ultimately rescinded the balance of the requirements before the deadline.

143.   According to the Whistleblower, the leadership in conjunction with members of the human resources department, used the same process against Plaintiff by directing that Ms. Simonian fabricate a basis upon which to place Plaintiff in Pivot. The Whistleblower further confirmed that placing Plaintiff in Pivot was ***"not about her performance"***.

144.   According to the Whistleblower, Plaintiff's previous managers including, Defendant Redington, Tami Hurwitz (skip-level manager) and Abigail Akzin - - had all falsely claimed that Plaintiff received negative performance feedback from them so that they could justify the Pivot. Additionally, members of the human resources department were also involved in the scheme. Mark Dizon, for one, to whom Plaintiff had made numerous complaints, among other things, about potential retaliation and who knew that Plaintiff

had not received any negative feedback from any of her managers, still supported the leadership's efforts to terminate her - - even taking part in the meeting where Ms. Simonian officially entered Plaintiff into Pivot.

145.    Finally, the Whistleblower explained that it was their belief that upper management had specifically placed Plaintiff under Ms. Postelle and Ms. Simonian, two managers of color, because they believed that Amazon would have less exposure for a discrimination claim if the decision to terminate Plaintiff came from them - - the same sentiment alluded to by Ms. Postelle when she made the comment to Plaintiff about having to *"fire"* the *"black girl"*.

146.    The Whistleblower not only confirmed that Plaintiff's Pivot was a complete farce, they seemed to allude that all of the events that had occurred were directly tied to the complaints Plaintiff had made about Ms. Akzin.

147.    This also brought clarity to Ms. Postelle's comments that *"there was a lot of shit that went on"* and *"You had enough opportunities to fail…"* as well as Ms. Simonian's behavior and repeated comments about *"Abs"* [Ms. Akzin] not being *"my fave"* [Plaintiff's favorite].

148.    The Whistleblower also informed Plaintiff of a complaint made by Ms. Simonian, which also confirmed the existence of the scheme. The murder of George Floyd on May 25, 2020, ultimately spawned months of protests nationwide. On May 31, 2020, Amazon tweeted a statement in support of George Floyd protesters about the "inequitable and brutal treatment of black people." According to the Whistleblower, Ms. Simonian complained about the hypocrisy of Amazon to release that statement while, at the same

time, directing that she unfairly ***"fire a black employee from the company"***, in reference to Plaintiff.

149.    With regards to making a complaint about what the Whistleblower had shared, Plaintiff wasn't sure who, if anyone, she could trust. Amazon's Workplace Discrimination, Harassment and Bullying policy encouraged employees to report inappropriate conduct to a supervisor, department manager or human resources representative. If what the Whistleblower had shared was true, however, Plaintiff believed that making complaints to anyone in leadership or human resources would be futile.

150.    First, the leadership was complicit in the discrimination and retaliation Plaintiff was subjected to. Thus, Plaintiff believed that any complaints about her circumstances to Defendant Boom, Defendant Redington, or any other members of leadership would fall on deaf ears and probably result in more retaliation, if not outright termination.

151.    Similarly, after the negative experience Plaintiff had with Mark Dizon, Amazon Music's HR Partner, who up to that point had still not made any effort to contact her despite emails and calls, she no longer felt comfortable reporting any of her concerns to him or anyone else in human resources.

152.    Finally, while Ms. Postelle's involvement might have been obligatory, based on her comment about having to "fire" the "black girl" in reference to Plaintiff believed that she understood the scheme and agreed to go along with it.

153.    Additionally, Ms. Postelle's duplicitous ways made it difficult for Plaintiff to trust her, causing Plaintiff to be in a continuous state of stress and anxiousness. During the time that Ms. Postelle served as Plaintiff's direct manager, Plaintiff came to realize that Ms.

Postelle's positive feedback and good nature only served to provide her with a false sense of security since, upon information and belief, Ms. Postelle never actually intended to follow through. Ms. Postelle would feign her support for Plaintiff's growth and advancement within the organization only to pull the rug out from under her when Plaintiff tried to make any strides.

Ms. Postelle's Efforts to Significantly Diminish Plaintiff's Role and Advancement Opportunities at Amazon & Beyond (Retaliation):

154.    Despite all of the praise that Plaintiff routinely received about her performance from Ms. Postelle and other colleagues, each time Plaintiff mentioned doing more in the way of experiential, growing a team or efforts to make any kind of advancement in the company, Ms. Postelle gave her the brush off. And, while Ms. Postelle encouraged and supported growth opportunities for other, non-protected group members of her team (*i.e.*, Jamie Fullen), she continued to insist that Plaintiff was a long way from getting promoted.

155.    For example, as previously noted, Ms. Postelle continued to ask Plaintiff to provide assistance to Jamie Fullen, a Level 5 employee, with her live streaming objectives. Plaintiff had already been asked to take over the financing function for her live streaming altogether. As a Level 6 employee, it seemed illogical that Plaintiff would effectively be "reporting to" Ms. Fullen rather than the other way around. Not to mention, more often than not, Plaintiff was directed to handle tactical and administrative tasks like managing the budgets and promotional printing, which were Level 5 functions rather than high Level 6 or level 7 strategic functions that could, at least, help with her advancement in the organization.

156.    At Amazon, promotions are typically from one grade to another (*i.e.*, Level 6 to Level 7), rather than to a new position. Therefore, as a Level 6 employee, in order for Plaintiff to apply and be considered for any Level 7 positions, she would first need to be promoted to Level 7, apply and then transfer into the position.

157.    In order to be given any consideration for a promotion to the next grade level, however, Plaintiff needed to "consistently demonstrate" the ability to both perform tasks at the higher end of her current grade (L6) as well as perform tasks at the next grade level (L7). According to the *Leveling Grid for General Marketing Manager* positions, that meant consistently demonstrating her ability to "manage significantly complex marketing initiatives", demonstrate her "deep knowledge of core business objectives", "influencing organizational priorities", "proactively driving business and senior leader reviews", etc.

158.    Other than *A.M. Live* and the few events-related projects that Plaintiff had corralled together on her own by partnering with other groups, Plaintiff was not being given the opportunities she needed to demonstrate these abilities so that she could advance. Even when such opportunities became available, Plaintiff was passed over and relegated to performing lower level work that would not assist with her advancement.

159.    On May 17, 2021, Plaintiff was still experiencing flare ups of pain in her back and abdomen. She ultimately made an appointment with another gynecologist for a second opinion to find out if there was a way to treat her pain without a surgical procedure.

160.    Ms. Postelle had informed Plaintiff on more than one occasion that the pandemic significantly impacted her ability to get support for experiential events. Thus, while the actions of Ms. Postelle and members of the leadership routinely caused Plaintiff a great deal of stress and anxiety to the point where she would still get knots in her stomach and

become physically ill, Plaintiff hoped that as COVID restrictions lifted, there would be more support for experiential and she could get back on track with the role she was hired to perform or at least find her way to advancing within the organization. Plaintiff's efforts, however, were to no avail.

161.    On June 3, 2021, Ms. Postelle sent an email to the team announcing that Amazon Music was officially "back outside" and getting involved with in-person events. Even after that, however, Ms. Postelle continued to reject Plaintiff's efforts to do more in the way of higher level work and/or experiential. Thus, after months of saying that the pandemic hampered the company's ability to properly support experiential events, it proved to be just an excuse.

162.    Even after Amazon went "back outside" Ms. Postelle continued to sideline Plaintiff's efforts to focus on experiential. Anytime that Plaintiff inquired about having more opportunities to focus on experiential, Ms. Postelle continued to advise, *"experiential is a low priority"* or  she'd say *"events are a nice-to-have."*

163.    While Plaintiff began to perform more in the way of Level 6 tasks, much of the work she performed was still lower level tactical or administrative in nature. This was problematic for Plaintiff since performing lower level work would not provide any growth opportunity for her advancement in the company.

164.    Like her predecessors, Ms. Postelle routinely excluded Plaintiff from different team meetings that someone with her expertise should have been part of and others, including Philicia Darns and Katie Klein (another Level 6 employee) noticed, which was always humiliating for Plaintiff.

165.    For example, Plaintiff was not included in the planning for "*The Weekend*," a project
that Ms. Postelle assigned to other members of the team in July 2021. Despite the fact
that the event had a significant experiential piece, Ms. Postelle didn't seek to get Plaintiff
involved until they had budgetary concerns and might need to rely on Plaintiff's limited
budget to complete the event. Once again, the limited funds Plaintiff had at her disposal
were being used to support other initiatives that she was not even involved with.

166.    Additionally, there were occasions where Ms. Postelle excluded Plaintiff's
involvement and/or allowed inexperienced members of the team to handle experiential
functions that, as the head of experiential, Plaintiff should have led or, at the very least,
been involved with.

167.    For example, Ms. Postelle assigned Josh Peas, a Marketing Manager with expertise in
labels and artists marketing (and <u>not</u> experiential) to handle experiential events for major
projects like the one held for *Doja Cat* - - a high profile artist.

168.    When Plaintiff asked Ms. Postelle why she had assigned the event to Mr. Peas, who
didn't even have any expertise in experiential, Ms. Postelle's only response was that ***"it
wasn't intentional"*** and then she implied that Plaintiff was busy working on other
projects (namely, L4 and L5 level projects) anyway and wouldn't have time.

169.    While Ms. Postelle made it seem like the decision was random, she went on to assign
Mr. Peas other major/high-profile experiential events to handle as well like the
*Tyler-the-Creator* concert, for example.

170.    Additionally, Ms. Postelle initially excluded Plaintiff's involvement in the planning of
another major experiential event. The multi-city tour - - *Amazon Music X Coldplay:
Music of the Spheres, NYC* - - was advertised as an "immersive experience" that would

"transport you into the Music of the Spheres universe" and also involved a listening booth. Ms. Postelle didn't invite Plaintiff to get involved until Plaintiff asked about the event and by then, the planning was well underway and most of the major decisions had already been made.

171.    These were not only major, high profile events involving experiential, they were repeating engagements that, if successful could have served as the basis to get leadership support for a team and a larger experiential budget. Rather than assigning Plaintiff to lead these efforts or, at least, play a major part, Ms. Postelle left Plaintiff occupied doing the menial work she assigned that would not propel Plaintiff's advancement in any way.

172.    First, Ms. Postelle used the pandemic as an excuse to minimize Plaintiff's role. Then, even after Amazon was effectively "back outside" Ms. Postelle insisted that she couldn't support experiential events because they were a ***"low priority"*** to the leadership. Now, they were finally "back outside" and actually putting on experiential events, yet despite being the head of experiential, Ms. Postelle continued to exclude Plaintiff from the few major events the leadership was willing to support.

173.    What's more, Plaintiff approached Ms. Postelle a number of times about her interest in promoting to the next level. While Ms. Postelle maintained that Plaintiff was not ready to be promoted, she continued to solicit her support to assist Ms. Fullen with her efforts to be promoted from a Level 5 to Level 6.[3]

174.    Furthermore, Ms. Postelle offered little to no support to help Plaintiff meet this objective. With minor exceptions which included a writing class recommended by Ms.

---

[3] Even after Plaintiff's constructive discharge in February 2022, Ms. Postelle continued to groom Jamie Fullen (Caucasian female) for a promotion from Level 5 to Level 6 and the leadership continued to provide her with the support she needed to advance. Upon information and belief, even before being promoted to Level 6, Ms. Fullen was slated to receive a significant budget for 2022. And, since Plaintiff's discharge, Ms. Fullen's promotion to Level 6 became official and she now has at least two direct reports.

Postelle (which Plaintiff attended) and the opportunity to assist another colleague with a doc (where Ms. Postelle praised Plaintiff for her work), Ms. Postelle had offered little support or training towards helping Plaintiff to improve her doc writing skills.

175.    By September 2021, as a result of her building stress and anxiety, plaintiff was still experiencing a great deal of pain in her back and abdomen. Around that time, Plaintiff made an appointment with her gynecologist to whom she also complained that the pain occasionally radiated to her legs.

176.    In a September 24, 2021 email to Ms. Postelle related to her 2022 Talent Review, Plaintiff specifically addressed her concerns about her limited budget, losing her headcount and the fact that others were permitted to produce major experiential events without her involvement. Ms. Postelle never bothered to respond to these concerns in a reply email or otherwise.

177.    During a one-on-one with Ms. Postelle on November 17, 2021,  Plaintiff inquired again about her concerns with her advancement and performing more experiential work. During their session, Ms. Postelle congratulated Plaintiff for her efforts on the *Day N Vegas Festival* claiming, ***"now I can show people how  great you are."*** Ms. Postelle went on to explain how she had received a number of **"hits"** from people within and outside of Amazon commending Plaintiff for her work. Ms. Postelle also discussed how, unlike Jamie Fullen, people liked working with Plaintiff because she knew how to talk with people, *etc*.

178.    Despite her glowing review, as soon as Plaintiff asked about getting direct reports, Ms. Postelle laughed, replying ***"no time soon"*** then she questioned, ***"Girl, whatchu[4] need head count for?"*** Plaintiff explained again that she was interested in advancing and

---

[4] "Whatchu" meaning, what do you…"

would need reports to scale. Ms. Postelle responded by saying that she first needed to get Plaintiff to the ***"top tier"*** (*i.e.,* performing high Level 6 work). This was, in effect, an acknowledgment by Ms. Postelle that she was well aware that she routinely assigned Plaintiff low level work. Before ending their discussion, however, Ms. Postelle reminded Plaintiff that building cross-category, content marketing and *Twitch* were leadership's priorities, <u>not</u> events.

179.    By the end of 2021, while Plaintiff was performing more in the way of Level 6 work, much of her workload still consisted of lower level work. In addition to managing the finances for different projects - - an Level 5 function - -  Plaintiff developed processes (*i.e.,* ways for different teams to interact with each other, review entries, make decisions about which shows to livestream for different teams, *etc*.) and performed necessary but menial tasks for various events including handling the printing of promotion cards, *etc*., which amounted to Level 4 or Level 5 functions. Meanwhile, in order for her to be considered for a promotion to Level 7, Plaintiff needed to be performing <u>high</u> level Level 6 and Level 7 work.

180.    While Plaintiff did not have a problem with assisting colleagues in general and always tried to be helpful, the fact that this lower level work took so much of her time directly undermined her ability to advance within the organization and, based on Ms. Postelle's previous comment, she clearly understood that.

181.    In early December 2021, Plaintiff attended Amazon Music's *All Hands* meeting where Plaintiff had produced the event portion of the meeting and received wide praise for the work she did to put it together.

182.    Jamie Fullen approached Plaintiff at the *All Hands* to congratulate and compliment her for the success of the event. She then went on to suggest that Plaintiff join **her** (Ms. Fullen's) team and serve as **her** (Ms. Fullen's) Producer. This encounter obviously caused Plaintiff great humiliation. Ms. Fullen, a lower level employee, did not only propose that Plaintiff be part of her team but, based on her comment it also appeared that Ms. Fullen, who was still a Level 5, had been promised a team (See Footnote #3 above).

Evidence of Amazon Music Leadership's Misuse of the Pivot Process

183.    On December 6, 2021, Emmy Gladney Vallejos, Global Head of HR for Amazon Music, inadvertently leaked a memorandum, entitled *'Q1 2022 Talent Review: Performance Management Recommendation'*, which referenced Amazon Music's practice of targeting employees for "Focus" or "Pivot" in order to meet certain internal goals. Among other things, the memorandum acknowledged that the company had a practice of placing employees in pivot without the requisite support to justify those actions. The document also served to confirm some of what the Whistleblower had shared with Plaintiff. Upon information and belief, Plaintiff believed that, in her case, her managers in concert with the leadership had used the process as a weapon for discrimination by retaliating against her for the complaints she made.

Plaintiff Slated for New Manager (Retaliation)

184.    The following day (December 7, 2021), in their one-on-one meeting, Ms. Postelle informed Plaintiff that she would be getting another new manager. This would have been Plaintiff's sixth transition to a new manager since being employed by Amazon barely two and a half years earlier. Upon information and belief, this transition would further hinder her ability to advance.

185.    It was well understood at Amazon that getting a new manager essentially meant starting from scratch. With each new manager, Plaintiff's responsibilities, their expectations of her, and the terms of her employment had changed. In fact, Amazon's Leveling Grid notes that when determining whether a candidate is ready to be promoted…

> *"A manager should be able to justify readiness for promotion as well as <u>have enough experience with the employee</u>* [emphasis added] *to assess areas where they are still growing. This means <u>you need enough data</u>* [emphasis added] *(time to assess and track record) to support the recommendation."*

186.    Thus, upon information and belief, assigning Plaintiff to another manager would adversely impact her ability to advance since it would take time for that new manager to collect "enough data" to determine her readiness to promote.

<u>Evidence of Ms. Postelle's Continued Efforts to Limit Plaintiff's Opportunities</u>

187.    On January 10, 2022, Plaintiff received a package from Ms. Postelle that included the following message:

> *"Hi Keesha! Just a little something to celebrate an amazing 2021 and to toast to an even better 2022. Thank you for everything you did last year! You're an amazing part of this team! Kirdis"*

188.    Yet, in mid-January 2022 during discussions with Ms. Postelle about Plaintiff's role, she indicated that despite her **"hyping"** Plaintiff **"up"** to believe that she could secure a budget around $6 million for 2022, the final proposed budget for experiential was about $3,500,000. In late January/early February 2022, however, Ms. Postelle informed Plaintiff that she would receive the same budget that she had received the previous two years - - which was ⅓ of the original budget she had received prior to making her

complaints. Meanwhile, upon information and belief, Ms. Fullen, an L5 employee, was expected to receive a budget significantly higher than Plaintiffs.

189.    Additionally, in or about January and February 2023, Ms. Postelle continued to be dismissive about Plaintiff's opportunities to advance within the organization or grow a team.

Whistleblower Confirms Intentional Discrimination by Amazon

190.    On January 20, 2022, Plaintiff spoke with the Whistleblower again. During that conversation, among other things, the Whistleblower acknowledged that **had Plaintiff not complained about Ms. Akzin's behavior, Plaintiff would not have been targeted for termination** in the first place. The Whistleblower also confirmed that, with respect to Plaintiff, there was "no truth" to her Pivot process and discussed how she was aware of other individuals who had been targeted for termination and unjustifiably subjected to the pivot process as a means to get rid of them.

Plaintiff's Health Took a Turn for the Worse

191.    Learning the truth regarding how Plaintiff's complaints about Ms. Akzin's ultimately impacted her role and career with Amazon was devastating and caused Plaintiff extreme stress and anxiety that continued to exacerbate her physical ailments.

192.    By the end of January/beginning of February, Plaintiff's inability to manage her stress seemed to be having a negative impact on her health and she was experiencing more and more flare ups of pain and making appointments with various doctors to try to get it under control. This included multiple visits with her treating physicians between January and February 2022. In fact, by early February Plaintiff was experiencing such severe back and abdominal pain, that her doctor recommended that she have a surgical procedure that

he believed would help resolve the pain. Plaintiff underwent the procedure in March 2022.

193.    Ultimately, the negative impact of her work environment and on her health caused Plaintiff extreme pain and discomfort to such a degree that she and her psychologist discussed that it might be beneficial to her health if she removed herself from her tumultuous work circumstances and environment.

Plaintiff's Constructive Discharge

194.    On February 15, 2022, Plaintiff was forced to resign from her position. On February 16, 2022, the day following her resignation, Ms. Postelle reached out to confirm that she wanted to resign. She suggested that Plaintiff might want to consider taking a leave of absence instead to deal with her medical issues. She also stated…

> *"I know Amazon ain't for everybody, but you're doing so well and we're back outside. Now is your time."*

195.    Ms. Postelle had made similar claims in the past and rather than providing the support Plaintiff needed to focus on events and experiential and secure more support from leadership to take part in more events, Ms. Postelle always seemed to be doing everything she could to marginalize Plaintiff's role, even going as far as assigning less experienced employees the few experiential projects that received approval.

196.    Between Plaintiff's impending transfer to a new manager, her growing health concerns and the suppressed budget she had received for the third year in a row, it was clear to Plaintiff that Ms. Postelle was just giving her more lip service.

197.    Indeed, the day Plaintiff resigned, Ms. Postelle claimed that 2021 had been her ***"best year yet"*** and that she had even secured ***"more money"*** for Plaintiff. A few days later,

when Plaintiff inquired about how much money she had secured, Ms. Postelle danced around the issue only to finally admit that no number had been finalized yet.

198.   After making legitimate complaints about her manager's racially motivated behavior, Plaintiff was subjected to retaliation for over two years with the ultimate goal of terminating her. In response, Plaintiff made complaints to human resources on 9 separate occasions wherein, among other things, she specifically alleged that she was being retaliated against for the complaints she had made. Rather than investigate those claims, Human Resources joined in the retaliation against Plaintiff when Ms. Simonian placed her in Pivot under the guise of poor performance.

199.   While Ms. Simonian ultimately pulled the plug on the unjustified Pivot and prematurely ended Plaintiff's PIP, Plaintiff continued to be the target of a retaliatory campaign by the leadership by substantially limiting her advancement opportunities within the organization, while simultaneously making significant efforts to ensure that other less qualified non-protected group members advanced.

200.   The behavior and conduct that Plaintiff was subjected to over the two year period was offensive, hostile, and belittling and intentionally perpetrated by defendants with the sole purpose of exiting Plaintiff from the company. This retaliatory hostile environment not only caused great disruption in Plaintiff's work and career progress, it caused Plaintiff extreme stress, anxiety, pain and discomfort, ultimately giving her no choice but to resign from her position.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of the 42 U.S.C. § 1981
### Against All Defendants

201.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

202.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by treating her differently than similarly situated employees on the basis of her race and/or status as a complainant of discrimination, creating and maintaining a retaliatory hostile work environment and significantly diminishing her role to the point that she no longer had any real opportunities for advancement, in violation of 42 U.S.C. § 1981, thereby leading to her constructive discharge on February 25, 2022.

203.    Defendants Boom and Redington are personally, directly and individually liable in that they aided and abetted Amazon in its unlawful discriminatory acts against Plaintiff, in violation of 42 U.S.C. § 1981.

204.    In the alternative, defendants Boom and Redington are personally, directly and individually liable as employers for the unlawful discrimination against Plaintiff, in violation of 42 U.S.C. § 1981.

205.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, stock options as well as emotional and physical distress, pain and discomfort.

206.    Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

207.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front

pay, emotional distress and other compensatory damages, punitive damages, prejudgment

interest, post judgment interest, attorney's fees, costs and disbursements.

### SECOND CAUSE OF ACTION
### Retaliation in Violation of the 42 U.S.C. § 1981
### Against All Defendants

208.    Plaintiff repeats and realleges each and every allegation set forth above with the same

force and effect as if fully set forth herein.

209.    Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her

employment on the basis of her protected activities, in violation of 42 U.S.C. § 1981.

210.    In retaliation for Plaintiff's complaints regarding Ms. Akzin hostile treatment and

racial bias, Defendants made specific efforts to get the Plaintiff to leave the workforce

voluntarily. When those efforts failed, the Plaintiff was unjustifiably issued a Pivot and

placed on a performance improvement plan which negatively impacted her career at

Amazon. After one of Plaintiff's managers confirmed that the Pivot and PIP were not

warranted and ended the Plaintiff's PIP, her new manager maintained a retaliatory hostile

work environment by resuming efforts to get the Plaintiff to leave her position voluntarily

(via a constructive discharge), which Plaintiff ultimately did in February 2022.

211.    Defendants Boom and Redington are personally, directly and individually liable in

that they aided and abetted Amazon in its unlawful retaliatory acts against Plaintiff, in

violation of 42 U.S.C. § 1981.

212.    In the alternative, defendants Boom and Redington are personally, directly and

individually liable as employers for the unlawful retaliatory acts against Plaintiff, in

violation of 42 U.S.C. § 1981.

213.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, stock options as well as emotional and physical distress, pain and discomfort.

214.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

215.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post judgment interest, attorney's fees, costs and disbursements.

**THIRD CAUSE OF ACTION**
**Discrimination in Violation of the NYSHRL**
**Against All Defendants**

216.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

217.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by treating her differently than similarly situated employees on the basis of her race and/or status as a complainant of discrimination, creating and maintaining a retaliatory hostile work environment and significantly diminishing her role to the point that she no longer had any real opportunities for advancement, in violation of New York State Human Rights Law (NYSHRL), thereby leading to her constructive discharge on February 25, 2022.

218.    Defendants Boom and Redington are personally, directly, and individually liable in that they aided and abetted Amazon in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296(6).

219.    In the alternative, defendants Boom and Redington are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296(1).

220.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, stock options as well as emotional and physical distress, pain and discomfort.

221.    Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

222.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post judgment interest, attorney's fees, costs and disbursements.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of the NYSHRL
### Against All Defendants

223.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

224.    Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment on the basis of her protected activities, in violation of the New York State Human Rights Law (NYSHRL).

225.    In retaliation for Plaintiff's complaints regarding Ms. Akzin hostile treatment and racial bias, Defendants made specific efforts to get the Plaintiff to leave the workforce voluntarily. When those efforts failed, the Plaintiff was unjustifiably issued a Pivot and placed on a performance improvement plan which negatively impacted her career at Amazon. After one of Plaintiff's managers confirmed that the Pivot and PIP were not

warranted and ended the Plaintiff's PIP, her new manager maintained a retaliatory hostile

work environment by resuming efforts to get the Plaintiff to leave her position voluntarily

(via a constructive discharge), which Plaintiff ultimately did in February 2022.

226.    Defendants Boom and Redington are personally, directly and individually liable in

that they aided and abetted Amazon in its unlawful retaliatory acts against Plaintiff, in

violation of NYSHRL § 296(6).

227.    In the alternative, defendants Boom and Redington are personally, directly and

individually liable as employers for the unlawful retaliatory acts against Plaintiff, in

violation of NYSHRL § 296(1).

228.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages,

including lost wages, benefits, stock options as well as emotional and physical distress,

pain and discomfort.

229.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's

rights, entitling her to an award of punitive damages.

230.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front

pay, emotional distress and other compensatory damages, punitive damages, prejudgment

interest, post judgment interest, attorney's fees, costs and disbursements.

### FIFTH CAUSE OF ACTION
#### Discrimination in Violation of the NYCHRL
#### Against All Defendants

231.    Plaintiff repeats and realleges each and every allegation set forth above with the same

force and effect as if fully set forth herein.

232.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of

her employment by treating her differently than similarly situated employees on the basis

of her race and/or status as a complainant of discrimination, creating and maintaining a retaliatory hostile work environment and significantly diminishing her role to the point that she no longer had any real opportunities for advancement, in violation of New York City Human Rights Law (NYCHRL), thereby leading to her constructive discharge on February 25, 2022.

233.    Defendants Boom and Redington are personally, directly, and individually liable in that they aided and abetted Amazon in its unlawful discriminatory acts against Plaintiff, in violation of NYCHRL.

234.    In the alternative, defendants Boom and Redington are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiff in violation of NYCHRL.

235.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, stock options as well as emotional and physical distress, pain and discomfort.

236.    Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

237.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post judgment interest, attorney's fees, costs and disbursements.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of the NYCHRL**
**Against All Defendants**

238.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

239.    Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment on the basis of her protected activities, in violation of the New York City Human Rights Law (NYCHRL).

240.    In retaliation for Plaintiff's complaints regarding Ms. Akzin hostile treatment and racial bias, Defendants made specific efforts to get the Plaintiff to leave the workforce voluntarily. When those efforts failed, the Plaintiff was unjustifiably issued a Pivot and placed on a performance improvement plan which negatively impacted her career at Amazon. After one of Plaintiff's managers confirmed that the Pivot and PIP were not warranted and ended the Plaintiff's PIP, her new manager maintained a retaliatory hostile work environment by resuming efforts to get the Plaintiff to leave her position voluntarily (via a constructive discharge), which Plaintiff ultimately did in February 2022.

241.    Defendants Boom and Redington are personally, directly and individually liable in that they aided and abetted Amazon in its unlawful retaliatory acts against Plaintiff, in violation of NYCHRL.

242.    In the alternative, defendants Boom and Redington are personally, directly and individually liable as employers for the unlawful retaliatory acts against Plaintiff, in violation of NYCHRL.

243.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages, benefits, stock options as well as emotional and physical distress, pain and discomfort.

244.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

245.    Therefore, defendants are jointly and severally liable to Plaintiff for back pay, front

pay, emotional distress and other compensatory damages, punitive damages, prejudgment

interest, post judgment interest, attorney's fees, costs and disbursements.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment that:

a.  Declares that the discriminatory and retaliatory actions, practices, and policies of
    defendants as set forth above violated § 1981, the NYSHRL, and the NYCHRL;

b.  awards monetary damages to Plaintiff to compensate her for the discrimination
    and retaliation she experienced, including economic damages and damages for
    emotional distress, physical distress, pain and discomfort;

c.  awards Plaintiff punitive damages pursuant to 42 U.S.C. § 1981, and the
    NYCHRL;

d.  awards Plaintiff reasonable attorney's fees costs in this action; and

e.  grants such other relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York

     September 21, 2023

                              Respectfully submitted,
                              JMD Law Group (d/b/a)

                              By:

                              Jessie M. Djata, Esq.
                              2196 Third Avenue
                              Suite
                              New York, New York 10035
                              (917) 501-7958
                              jmdlawyer@gmail.com
                              *Attorneys for Plaintiff*