UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

KEESHA the Plaintiff,                             :

            Plaintiff,                        :     Case 1:23-cv-08347 (AS)

             - against -                    :

AMAZON.COM,    INC.,    AMAZON.COM           :
SERVICES, LLC, STEVE BOOM and RYAN           :
REDINGTON,                                   :

            Defendants.                        :

------------------------------------------------ x

## MEMORANDUM OF LAW IN OPPOSITION TO AMAZON DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(B)(6)

By:    JMD LAW GROUP
        Jessie M. Djata, Esq.
        2196 Third Avenue, #31636
        New York, New York 10035
        *Attorneys for Plaintiff, Keesha Anderson*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT……………………………………………………….….1

STATEMENT OF FACTS…………………………………………………………..…….1

LEGAL STANDARD……………………………………………………………………..2

ARGUMENT……………………………………………………………………………...3

   I.    Plaintiff Plausibly Alleges Facts that Support a Claim for Constructive Discharge……...3

        A.  The Facts Allege Evidence of the Defendants' Intent to Create an Intolerable Environment……………………………………………………..……3

        B.  The Facts Allege Evidence of Work Conditions So Intolerable Any Reasonable Person Would have Felt Compelled to Resign…………………………………6

   II.   The Facts Plausibly Allege Evidence of a Retaliatory Hostile Work Environment……….9

        A.  Section 1981……………………………………………………………….....10

        B.  NYSHRL & NYCHRL……………………………………………………14

   III.   Defendants Discriminated Against Plaintiff on the Basis of Race………………………15

        A.  Plaintiff Was Subjected to Adverse Employment Actions During Her Employment at Amazon……………………………………………………16

        B.  Plaintiff Has Plausibly Alleged More Than the Minimal Support that Amazon Defendants Were Motivated by Discriminatory Intent…………………………..18

   IV.   Defendant Retaliated Against Plaintiff……………………………………..………18

        A.  Plaintiff Has Plausibly Alleged that She Participated in a Protected Activity…..18

        B.  Plaintiff has Plausibly Alleged Defendant Redington Knew………………......19

        C.  Plaintiff Has Plausibly Alleged She Was Subjected to a 'Retaliatory Hostile Environment'……………………………………………..………....…..20

CONCLUSION…………………………………………………….…..……..20

# TABLE OF AUTHORITIES

**Cases:**

Avent v. Target Corporation et al, 19-1565, 2021 WL 3089120 (NDNY 2021)............................8

Bacchus v. New York City Dep't of Educ., 137 F. Supp. 3d 214 (E.D.N.Y. 2015)................12, 14

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)..................................................................8, 19

Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006)................................9

Cadet v. Alliance Nursing Staff of NY, Inc., 632 F. Supp. 3d 202……...………………………18

Carr v. New York City Transit Authority, No. 16-cv-9957 (VSB), 2022
WL 824367 (S.D.N.Y. 2022)...............................................................................................................9

Cajamarca v. Regal Entm't Group, 863 F.Supp.2d 237 and 252 (E.D.N.Y. 2012)......................6

CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008)..................................................................12

Cherry v. NYC Housing Authority, 564 F. Supp. 3d 140 (EDNY 2021).......................12, 13, 17

Chukwuka v. City of New York, 795 F. Supp. 2d 256 (S.D.N.Y. 2011).....................................16

Davis-Garett v. Urb. Outfitters, Inc., 921 F.3d 30 (2d Cir. 2019)..................................................9

De Figueroa v. New York, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019).....................................20

Duplan v. City of New York, 888 F.3d 612 (2d Cir. 2018)..................................................6, 7, 8

Faber v. Metro Life Ins. Co., 648 F.3d 98 (2d Cir. 2011).............................................................2, 4

Fairbrother v. Morrison, 412 F. 3d 39 (2d. Cir. 2005)..................................................................19

Faragher v City of Boca Raton, 524 U.S. 775 (1998)...................................................................8

Hicks v. Baines, 593 F.3d 159 (2d Cir. 2010)................................................................................9

Kaur v. N.Y.C. Health and Hosps. Corp., 688 F.Supp.2d 317 (S.D.N.Y. 2010).......................16

LeGrand v. Walmart Stores E., LP, 18-171 (2d Cir. 2019)..........................................................16

Littlejohn v. City of N.Y., 795 F.3d 297 (2d Cir. 2015).......................................................16, 18

*Cases cont'd.*

Massie v. Metro. Museum of Art, No. 11-CV-9549 JPO
2015 WL 3833839 (SDNY 2015).................................................................................13

Mehta vs. City of New York, 1:19-cv-03857 (EDNY 2022).....................................................14

Phelps v. Kapnolas, 308 F.3d 180 (2d Cir. 2002)........................................................3

Ryle v. Rehrig Pac. Co., No. 19-CV-1478, 2020 WL 6196144……………………………..…3

Shultz v. Congregation Shearith Israel of City of N. Y.,
867 F.3d 298 (2d Cir. 2017)...............................................................................3, 16, 20

Sosa v. N.Y.C. Dep't of Educ., 368 F. Supp. 3d 489 (EDNY 2019)........................................18

Syeed v. Bloomberg L.P. 568 F. Supp. 3d 314 (SDNY 2021)...................................................14

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)........................................................6

Velasquez v. Gates, 08 CV 2215 (CLP) (EDNY 2011)...........................................................16

*Federal Statutes*

42 U.S.C. § 1981……………………………………………………………..…1, 9, 10

New York City Human Rights Law…………………………………………………..…1, 9, 14

New York State Human Rights Law……………………………………………………..…1, 9, 14

*Rules*
Federal Rules Civil Procedure 12(b)(6).......................................................................1, 2

*Other Authority*
Daphna Motro, Jonathan B. Evans, Aleksander P.J. Ellis, and Lehman Benson III
"The 'Angry Black Woman' Stereotype at Work." Harvard Business Review
January 31, 2022…………………………………………………………………………..…13

## PRELIMINARY STATEMENT

Plaintiff filed a Complaint against Amazon Defendants ("Amazon" or "defendants") on September 20, 2023 alleging claims of disparate treatment, constructive discharge, retaliatory hostile work environment and retaliation in violation of 42 U.S.C. § 1981 (Section 1981); New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL), respectively. Plaintiff filed her First Amended Complaint on October 25, 2023. Thereafter, Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). In response, Plaintiff filed a Second Amended Complaint (Dkt No. 63) on January 2, 2024 along with a Memorandum of Law in Opposition to Amazon Defendants' Motion (Dkt. No. 64). Then, on January 16, 2024, Amazon defendants renewed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt No. 74). In response, Plaintiff submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

## STATEMENT OF FACTS

The Plaintiff is an African American (Black) woman who joined Amazon's music group in or about August 2019 as the Senior Event & Experiential Marketing Specialist, a Level 6 position. After making multiple complaints about her manager's racially discriminatory behavior, Amazon Music's leadership, including Defendants Boom and Redington, retaliated against Plaintiff by labeling her a "problem employee" and targeting her for termination. After stripping the Plaintiff of her supervisory responsibilities and cutting her budget (prior to the pandemic), the leadership employed an insidious "discrimination laundering" strategy where they directed their racially biased and discriminatory decisions and practices through the use of "straw managers" of the same or similar racial backgrounds to Plaintiff - - as one manager, Tatiana Simonian, was an Hispanic female and the other, Kirdis Postelle, an African American (Black) female. This

1

scheme allowed the leadership to direct and orchestrate efforts to terminate the Plaintiff from behind the scenes whilst providing themselves with a means to conceal their involvement.

Through a series of unlawful  actions where they harassed, intimidated, belittled and ridiculed the Plaintiff, these straw managers consistently made efforts to get Plaintiff to resign on her own volition. When these efforts initially failed, the leadership directed that they place the Plaintiff in "Pivot", a mechanism routinely misused by the company to get rid of "problem employees" under the pretense of poor performance. In an effort to save her job, Plaintiff accepted a PIP so onerous, it all but guaranteed her termination. Then, however, before Plaintiff had fulfilled all of the requirements of her PIP, Ms. Simonian suddenly backed out of the plan and rescinded the Plaintiff's PIP. Soon after, Ms. Simonian transferred to another group within the company. Although the Plaintiff's job was spared in that instance, Ms. Postelle, who became Plaintiff's direct manager, continued with efforts to get her to resign. Engaging in a campaign of intimidation and belittlement, Ms. Postelle worked to further diminish the Plaintiff's material responsibilities and consistently declined to assist her with efforts to grow a team or get her promoted - - making clear that Plaintiff's career would not simply stall, but regress. As a result of defendants' retaliatory conduct, Plaintiff suffered from severe emotional distress that culminated into serious health issues. Ultimately, the efforts to minimize Plaintiff's role and get her to leave combined with her growing health concerns resulting from the environment, forced her to resign.

## LEGAL STANDARD

In considering a Federal Rule 12(b)(6) motion to dismiss, a court should "draw all reasonable inferences in the plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement for relief." Faber v. Metro Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) Ultimately, a court should only grant a Rule

2

12(b)(6) motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief." Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002).

**ARGUMENT[1]**

The Court should deny Amazon Defendants' motion to dismiss. While defendants argue that Plaintiff's complaint should be dismissed for failure to state a claim, defendants' moving papers fall woefully short of presenting any sound arguments for why the Court should grant their request for a dismissal. As described in more detail below, Plaintiff has alleged facts in her Second Amended Complaint that, taken as true with all reasonable inferences drawn in her favor, plausibly support each allegation of discrimination.

**I.**  **Plaintiff Plausibly Alleges Facts that Support a Claim for Constructive Discharge**

A "[c]onstructive discharge occurs where an 'employer, rather than discharging [an employee] directly, intentionally creates a work atmosphere so intolerable that he [or she] is forced to quit involuntarily.'" Ryle v. Rehrig Pac. Co., No. 19-CV-1478, 2020 WL 6196144 at 10. A constructive discharge claim requires that the employee demonstrate, 1) evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and 2) evidence that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign. Shultz v. Congregation Shearith Israel of City of N. Y., 867 F.3d 298, 308 (2d Cir. 2017)

---

[1] Plaintiff incorporates by reference the arguments pertaining to improper venue set forth in Plaintiff's Memorandum of Law in Opposition to Individual Defendants' Motion to Dismiss the Second Amended Complaint.

A.    The Facts Allege Evidence of the Defendants' Intent to Create an Intolerable Environment

Plaintiff's complaint plausibly alleges more than sufficient evidence of intentional conduct on the part of defendants to create a work environment to pressure the Plaintiff into quitting, which ultimately culminated in her constructive discharge in February 2022. Plaintiff alleges that weeks following her complaints about Abigail Akzin's racially motivated behavior, Amazon Music's leadership, which included Defendants Boom and Redington, labeled Plaintiff a "problem employee" and targeted her for termination. (Dkt. No. 63, ¶ 6, 37, 137-139) In support of these allegations, Plaintiff alleges that after making additional complaints about Abigail Akzin to Defendant Redington on December 9, 2019, he informed her that Defendant Boom was ***"working on making changes to the organization"***. (Dkt. No. 63, ¶ 27) A week later, Plaintiff was informed that she'd be transferring to Defendant Redington's team (Dkt. No. 63, ¶ 29) where she would report directly to Defendant Redington. Plaintiff had no idea that she had been placed into a holding pattern and that the ***"changes to the organization"*** also involved reassigning her to work under two managers of color who the leadership was in the process of hiring, who would ultimately be instructed by Defendant Redington to get rid of the Plaintiff. (Dkt. No. 63, ¶ 35-37, 136-138) In further support of her claims, Plaintiff alleges that statements made by her managers also confirm defendants' scheme. (Dkt. No. 63, ¶ 42-48)

Plaintiff alleges that the Whistleblower reported that Plaintiff had been wrongfully targeted by the leadership that directed that actions be taken to terminate her because of the complaints she had made about Abigail Akzin. (Dkt. No. 63, ¶¶ 136-149, 190). While defendants make every effort in their motion to downplay the witness accounts of the "unnamed Whistleblower", the Court, nonetheless, has an obligation to "assume all well-pleaded factual allegations to be true." Faber, *supra*, at 104. Thus, the fact that the Whistleblower's account of

4

the events surrounding Plaintiff's treatment are so glaringly consistent with Plaintiff's own experiences, necessarily render defendants' arguments moot.

Consistent with the Whistleblower's account of events, at her very first meeting with Plaintiff, Kirdis Postelle (Plaintiff's skip-level manager at the time) made the following statement: ***"You don't want it to be that the Black girl [Ms. Postelle] has to <u>fire</u> the black girl [Plaintiff]. They knew what they were doing when they put the black girl [Plaintiff] on the team with the other black girl [Ms. Postelle]"***. (Dkt. No. 63, ¶ 42) Ms. Postelle's out-of-context remark about having to **"fire"** the plaintiff, which alludes to her having been told to do so, cannot be ignored, particularly given Ms. Postelle' status as an upper level manager in the organization. (Dkt. No. 63, ¶ 35) Then, remarkably, less than two months after Ms. Postelle's *Freudian slip*, Ms. Simonian (Plaintiff's direct manager) complained about the hypocrisy of Amazon to release a statement in support of George Floyd after his racially motivated murder while ***"they"*** simultaneously directed that she ***"unfairly exit a black girl from the company."*** (Dkt. No. 63, ¶ 46) When considered in context, these comments simply cannot be denounced as stray remarks that carry no weight. The fact that Ms. Postelle and Ms. Simonian each, on separate occasions, made remarks about having to fire a "black girl" at the direction of the leadership is no coincidence and completely consistent with the Whistleblower's account of the events. (Dkt. No. 63, ¶ 138) Even more, the internal memorandum inadvertently leaked by Amazon's human resources department, confirms defendants' misuse of the company's performance management process (namely, the practice of selecting employees for 'focus' and 'Pivot' without the requisite support) (Dkt. No. 63, ¶ 183) another fact reported by the Whistleblower as well. (Dkt. No. 63, ¶ 139-140) These alleged facts show that defendants' actions were "deliberate" in nature.

Moreover, the fact that Plaintiff received positive performance evaluations and defendants offered Plaintiff well-deserved praise for her stellar performance is of no consequence. To the contrary, the fact that Defendant Redington praised Plaintiff's performance is consistent with their Discrimination Laundering strategy. Indeed, the entire point of their scheme was to ensure that there would be no reason to suspect any connection between the leadership and the discriminatory decisions being taken against the Plaintiff. (Dkt. No. 63, ¶ 8, 35-38) Certainly, offering undeserved criticism would have laid bare their true motives. As for Ms. Postelle, the Plaintiff's allegations make clear that praising the Plaintiff about her performance while still relegating her to lower level work and refusing to support her advancement was part and parcel of the charade to force Plaintiff to leave the company voluntarily. (Dkt. No. 63, ¶ 128-130, 153) Finally, Plaintiff alleges that she made at least nine (9) different complaints to Mark Dizon, the HR partner, about retaliation that went ignored. (Dkt. No. 63, ¶¶ 33, 50, 53, 60-61, 64-65, 76-77, 79, 91, 93) Defendants' failure to take her complaints seriously or to take prompt corrective action is further evidence of their complicity in the unlawful conduct and intent to do harm. Cajamarca v. Regal Entm't Group, 863 F.Supp.2d 237 at 249 and 252 (E.D.N.Y. 2012)

B.   The Facts Allege Evidence of Work Conditions So Intolerable Any Reasonable Person Would Have Felt Compelled to Resign

Defendants argue that Plaintiff's constructive discharge claim fails because her "dissatisfaction with her budget" would not compel a reasonable person to resign. Plaintiff, however, alleges significantly more than a budget cut in support of her claim. Plaintiff's complaint plausibly alleges a litany of events and circumstances that created a work environment so intolerable Plaintiff felt she had no choice but to resign. Thus, when evaluating a constructive discharge claim, "the working conditions should be viewed as a whole." Terry v. Ashcroft, 336

6

F.3d 128, 152 (2d Cir. 2003) For example, in <u>Duplan v. City of New York</u>, 888 F.3d 612 (2d Cir. 2018), the court held that evidence that plaintiff's supervisors "collectively and persistently discouraged him from remaining at the Department by ostracizing him, giving him insufficient work, and making clear to him that his career would not advance further by denying him every promotion and raise… establish[ed] a drumbeat of retaliatory animus…" that was sufficient to survive the defendant's motion for summary judgment. <u>Duplan</u>, *supra,* at 626. Similarly, Plaintiff was subjected to a series of events and circumstances that ultimately resulted in her resignation.

Soon after making her last complaint to Mark Dizon about Ms. Akzin's racially motivated behavior, Plaintiff's supervisory responsibilities were removed. (Dkt. No. 63, ¶¶ 31, 127) Shortly after that, Plaintiff's budget was cut. (Dkt. No. 63, ¶¶ 34) Then, upon being transferred to her fourth manager in seven months, Ms. Simonian - - who was explicitly instructed to get rid of the Plaintiff (Dkt. No. 63, ¶ 138) - - began excluding Plaintiff from meetings, rejecting her ideas, belittling her in front of co-workers; making false claims of misconduct, assigning her lower level tasks, directing that she "support" and "backup" a lower level employee, giving inconsistent instructions, and taunting her about the complaints she had made about Abigail Akzin's racially motivated behavior.  (Dkt. No. 63, ¶¶ 52a-h, 54-55, 56-58, 70-73, 82) Then, when those efforts proved unsuccessful, Ms. Simonian unjustly placed the Plaintiff in Pivot (Dkt. No. 63, ¶¶ 98-111), forcing Plaintiff to enter a performance improvement plan (PIP) that was purposefully designed for her to fail. (Dkt. No. 63, ¶ 112) The fact that the PIP was ultimately revoked prior to its completion does not diminish the negative impact it had on Plaintiff in the work context and personally. (Dkt. No. 63, ¶ 112, 113) Likewise, under Ms. Postelle's management (her fifth manager), the defendants' efforts to exit the Plaintiff from the company continued with the same tactics to both marginalize her role and make clear that she

had no real opportunities for advancement. (Dkt. No. 63, ¶¶ 127-132, 154-158) Ms. Postelle, too, excluded the Plaintiff from important meetings, minimized and/or precluded her involvement in major event/experiential projects, relegated the Plaintiff's responsibilities to lower level tasks under the pretext of COVID, and continued to marginalize her role, belittle and humiliate her in front of colleagues - - even diverting her responsibilities to other less experienced individuals while still maintaining that, **"experiential is a low priority"** and leadership's view was that **"events are a nice to have."** (Dkt. No. 63, ¶¶ 160-174, 179-180) Then, Ms. Postelle informed Plaintiff that she would be reassigned to a new manager, which would further limit Plaintiff's career progression. (Dkt. No. 63, ¶¶ 184-186) Then, in early 2022, Ms. Postelle made clear that it would be more of the same. (Dkt. No. 63, ¶¶ 188-189) Like in <u>Duplan</u>, *supra,* defendants, through their behavior, established a drumbeat of retaliatory animus that led to Plaintiff's constructive discharge.

In addition, further complicating her circumstances were Plaintiff's growing feelings of helplessness and hopelessness because she didn't have anyone at Amazon she could turn to for help. (Dkt. No. 63, ¶¶ 149-153)[2] As a result, Plaintiff believed that her circumstances were only going to get worse. <u>Id</u>. After all, following plaintiff's complaints and transition to Defendant Redington's team, Plaintiff engaged in numerous discussions with Mark Dizon, the HR Partner, to whom Plaintiff made nine (9) different complaints about retaliation and unfair treatment that went ignored. (Dkt. No. 63, ¶¶ 33, 50, 53, 60-61, 64-65, 76-77, 79, 91, 93) Not only did Mr. Dizon fail to conduct an investigation, in late August he stopped responding to Plaintiff's efforts to reach him altogether and, despite having first hand knowledge of Plaintiff's complaints, ultimately conspired with defendants to "unfairly" enter Plaintiff into Pivot in September 2020.

---

[2] *See* <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v City of Boca Raton</u>, 524 U.S. 775 at 807 (1998) (plaintiff's failure to complain was not unreasonable where defendant's complaint mechanism was ineffective.)

(Dkt. No. 63, ¶¶ 96-97, 99-101). *See* <u>Avent v. Target Corporation et al</u>, 19-1565, 2021 WL 3089120 (NDNY 2021) (where the court took into account the employer's failure to take action to prevent wrongful acts against the Plaintiff.) Finally, as a direct result of Plaintiff's increasingly intolerable work environment and her dwindling hope for any improvement, Plaintiff alleges that under these circumstances, her emotional and physical health worsened (Dkt. No. 63, ¶¶ 53, 59, 61, 63-64, 69, 77, 97, 112, 114, 116, 118, 121, 132, 153, 159, 160, 175, 191-193, 196, 200). When Plaintiff's working conditions are viewed as a whole, it is not difficult to see that Plaintiff has plausibly alleged discriminatory conduct that was part of a series of events and circumstances that culminated in her constructive discharge.

II.     <u>**The Facts Plausibly Allege Evidence of a Retaliatory Hostile Work Environment**</u>

        Plaintiff plausibly alleges that she was subjected to a retaliatory hostile work environment in violation of Section 1981, NYSHRL and NYCHRL. Plaintiff's claim is based on the premise that defendants created a hostile work environment in retaliation for her complaints of discrimination opposing Abigail Akzin's racially motivated behavior. (Dkt. No. 63, ¶ 21, 22a-g) Contrary to  defendants' assertions, whether the adverse action "altered the conditions of the plaintiff's employment" is no longer the appropriate legal standard for analyzing a hostile work environment in the context of a retaliation case. <u>Carr v. New York City Transit Authority</u>, No. 16-cv-9957 (VSB), 2022 WL 824367 at 12 (S.D.N.Y. 2022). Following <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53 (2006), the Second Circuit has held that "the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination," <u>Carr</u>, *supra,* at 12 *quoting*, <u>Davis-Garett v. Urb. Outfitters, Inc.</u>, 921 F.3d 30 at 43 (2d Cir. 2019), and that "[p]rior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment, no longer represent the state of the law," <u>Id</u>., see also <u>Hicks v. Baines</u>, 593 F.3d 159 at 165 (2d Cir. 2010)

(internal citations omitted). Thus, "to make out a prima facie case of a retaliatory hostile work environment, a plaintiff must allege that the materially adverse retaliatory actions would "dissuade a reasonable worker from making or supporting a charge of discrimination. <u>Carr</u>, *supra*, at 12 (*quoting* <u>Burlington Northern</u>, *supra,* at 68).

A.    <u>Section 1981</u>

Plaintiff has plausibly alleged facts to support a claim of retaliatory hostile work environment under Section 1981. The series of actions ultimately taken against Plaintiff beginning mere weeks after her December 2019 complaints, in the aggregate, would undoubtedly dissuade a reasonable worker from making or supporting a charge of discrimination:

- <u>Jan 2020</u>: Removal of supervisory responsibilities (Dkt No. 63, ¶ 31-32);

- <u>Feb/Mar 2020</u>: Budget cut by ⅔ (Dkt No. 63, ¶ 34);

- <u>Feb/Mar 2020</u>: Denied salary increase (Dkt No. 63, ¶ 35);

- <u>Mar/Apr 2020</u>: Ms. Postelle's **"fire the black girl"** statement (Dkt. No. 63, ¶ 113, 134);

- <u>Mar - Jun 2020</u>: Harassed, intimidated and bullied by Ms. Simonian:

  - excluded from meetings involving experiential (Dkt. No. 63, ¶ 52a);

  - dismissed her ideas wholesale (Dkt. No. 63, ¶ 52g);

  - inconsistent instructions and misdirection (Dkt. No. 63, ¶ 52i);

  - false claims about Plaintiff's performance (Dkt. No. 63, ¶ 52i(i) - (iii));

  - diminished Plaintiff's role (Dkt. No. 63, ¶ 52h);

  - increased Plaintiff's administrative/tactical responsibilities, (Dkt. No. 63, ¶ 52b-f);

  - forced to "support" and "backup" Jamie Fullen (Dkt. No. 63, ¶ 52b-f); and

  - taunted about Abigail Akzin (Dkt. No. 63, ¶ 56-57)

- <u>Jul - Aug 2020</u>: Threatened with revamped position (Dkt. No. 63, ¶ 70-73);

- <u>Aug 3, 2020</u>: Learns of racially biased rumors amongst leadership (Dkt. No. 63, ¶ 88-90);

- <u>Aug 20, 2020</u>: Simonian reneges job offer (Dkt. No. 63, ¶ 94-95);

- <u>Aug - Sept 2020</u>: Simonian cancels one-on-ones (Dkt. No. 63, ¶ 97);

- <u>Aug - Sep 2020</u>: Mark Dizon stops responding (Dkt. No. 63, ¶ 97);

- <u>Sep 21 - Nov 2020</u>: Unjustifiably entered into Pivot (Dkt. No. 63, ¶ 99-100);

- <u>Oct - Nov 2020</u>: Forced to accept unrealistic PIP (Dkt. No. 63, ¶ 110-112);

- <u>Oct. 27/28, 2020</u>:  Excluded from major experiential meeting (Dkt. No. 63, ¶ 117);

- <u>Oct. 30, 2020</u>: Asked to support Jamie Fullen while on PIP (Dkt. No. 63, ¶ 119-120);

- <u>Jan 2021 - End</u>: Postelle created difficult, intimidating environment (Dkt. No. 63, ¶ 153);

- <u>Feb 2021</u>: Denied salary increase for second time (Dkt. No. 63, ¶ 9, 113);

- <u>Feb 2021</u>: Budget still cut by ⅔ of original budget (Dkt. No. 63, ¶ 131);

- <u>Feb/Mar 2021</u>: Told events were "a low priority" (Dkt. No. 63, ¶ 130, 162);

- <u>Apr 2021</u>: Whistleblower surfaces (Dkt. No. 63, ¶ 136-148);

- <u>Jun 3, 2021</u>: "Back outside" and still efforts to limit opportunities (Dkt. No. 63, ¶ 161-162);

- <u>Jun 2021</u>: Postelle holds back support for Plaintiff's advancement (Dkt. No. 63, ¶ 163);

- <u>Jun 2021</u>: Pandemic used as an excuse to limit opportunities (Dkt. No. 63, ¶ 161);

- <u>Jul-Sep 2021</u>: Bypassed as lead on 3 major experiential events (Dkt. No. 63, ¶ 165-171);

- <u>Sep - End</u>: Still relegated to level 4 and Level 5 tasks (Dkt. No. 63, ¶ 172-173);

- <u>Nov 17, 2021</u>: No support for advancement  (Dkt. No. 63, ¶ 177-180);

- <u>Dec 6, 2021</u>: HR inadvertently leaks email re misuse of "Pivot" (Dkt. No. 63, ¶ 183);

- <u>Dec 7, 2021</u>: Informed of new (sixth) manager (Dkt. No. 63, ¶ 184-186);

- <u>Jan/Feb 2022</u>: Events budget maintained at ⅓ (Dkt. No. 63, ¶ 188);

- <u>Jan 2022</u>: Whistleblower confirms intentional discrimination" (Dkt. No. 63, ¶ 190); and

- Feb 15, 2022: Plaintiff forced to resign (Dkt. No. 63, ¶ 194-200)

For over two years the Plaintiff was the target of a campaign deliberately orchestrated by the leadership (defendants Boom and Redington) to get her to leave which resulted in an environment permeated with antagonism, intimidation, belittlement, and ridicule. Working under those conditions caused Plaintiff to experience undue stress, humiliation and anxiety which manifested into physical ailments that grew progressively worse over time. (Dkt. No. 63, ¶¶ 53, 59, 61, 63-64, 69, 77, 97, 112, 114, 116, 118, 121, 132, 153, 159, 160, 175, 191-193, 196, 200) When considering these multiple acts together along with the toll it took on the Plaintiff's health, her allegations of a retaliatory hostile environment are overwhelming.

In support of their argument, defendants claim, once again, that Plaintiff's pleadings are "internally inconsistent," questioning, in effect, how Plaintiff can legitimately allege that she was subjected to a retaliatory hostile work environment while still acknowledging that defendants "lavished" her with praise. But, in reality, one has nothing to do with the other. The idea that Defendant should have license to unleash their discriminatory policies and practices upon Plaintiff and get away with it simply for some well-deserved praise is outrageous and runs afoul of the intentions behind antidiscrimination laws. Defendants also argue that Plaintiff has not plausibly alleged facts to support that defendants' conduct was because of race. Plaintiff's claims, however, stem entirely from the retaliation she was subjected to following her complaints about Abigail Akzin's racially motivated behavior. Thus, any retaliatory behavior or conduct alleged by Plaintiff was inherently "because of her race." CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008) Notwithstanding this fact, Plaintiff has nevertheless made additional allegations that further support that defendants' actions were because of race.

12

The Second Circuit has long held that verbal comments may give rise to an inference of discrimination. <u>Cherry v. NYC Housing Authority</u>, 564 F. Supp. 3d 140 at 172 (EDNY 2021) "Even a single comment may be actionable in the proper context…" <u>Bacchus v. New York City Dep't of Educ.</u>, 137 F. Supp. 3d 214 at 245 (E.D.N.Y. 2015). Plaintiff alleges that she was subjected to a variety of discriminatory comments that appear to have been made in relation to decisions regarding her employment. For example, these comments that specifically refer to Plaintiff's race/color more than suggest that it was because of race:

- Ms. Postelle's comment about the ***"black girl"*** being used to **"fire" the "black girl"** (Dkt. No. 63, ¶ 42)

- Ms. Simonian's comment that ***"they"*** were simultaneously directing that she ***"unfairly fire a black employee"*** (Dkt. No. 63, ¶ 46)

Additionally, the rumors going around about Plaintiff amongst the leadership that she had an **"attitude,"** which Ms. Postelle claimed Plaintiff had **"earned."** (Dkt. No. 63, ¶¶ 88-90) This remark was a veiled reference to the racially charged trope of the "angry black woman" stereotype where a black woman's strengths and confidence are viewed instead as "hostile", "aggressive" or "illogical".[3] The fact that these statements were not made in Plaintiff's presence, is of no consequence. *See* <u>Massie v. Metro. Museum of Art</u>, No. 11-CV-9549 JPO, 2015 WL 3833839 (S.D.N.Y. 2015) (finding "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment.") Furthermore, on several occasions Ms. Simonian taunted Plaintiff by reminding her… ***"I know Abs is not your fave"*** - - comments that were inherently based on race since they were meant to remind Plaintiff about the complaints of race discrimination she had lodged against Abigail Akzin. (Dkt. No. 63, ¶¶ 56-58)

---

[3] *See* Daphna Motro, Jonathan B. Evans, Aleksander P.J. Ellis and Lehman Benson III, "The 'Angry Black Woman' Stereotype at Work." Harvard Business Review, January 31, 2022.

There is no doubt these comments were probative of an intent to discriminate (Cherry, *supra,* at 172-173). They were made by Plaintiff's direct managers as well as members of the leadership, related to important aspects of her employment (*i.e.* potential termination, support in her role, and her previous complaints, respectively), and were offensive in nature. Id. In addition to discriminatory acts of harassment, however, the Second Circuit has also held that "facially neutral acts must also be considered" particularly when "the same individual engaged in multiple acts of harassment, some overtly based on [race] and some not." Mehta vs. City of New York, 1:19-cv-03857 at 19 (EDNY 2022) In this case, both Ms. Postelle and Ms. Simonian also engaged in facially neutral conduct (outlined above) that must also be considered. The totality of the circumstances make clear the discrimination she endured for over two years caused Plaintiff severe stress, anxiety and humiliation that unreasonably interfered with her ability to perform her job. (Dkt. No. 63, ¶¶ 52a, 52h, 53, 55, 57, 61, 64, 69, 114, 132, 160, 164, 182, 191-193)

   B.   NYSHRL & NYCHRL

In evaluating a hostile work environment claim under the NYSHRL and the NYCHRL at the pleading stage, the seminal question is "whether [the] plaintiff was treated less well than similarly situated others because of their membership in a protected group." Syeed v. Bloomberg L.P. 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021). The Court, however, must consider "the totality of the circumstances…" Bacchus, *supra,* at 245. Here, Plaintiff has plausibly alleged that she was treated less favorably than Jamie Fullen, a similarly situated Caucasian female. Though Ms. Fullen was a Level 5 employee, she was on the same team as Plaintiff (Dkt. No. 63, ¶ 52c), subject to the same training requirements (Dkt. No. 63, ¶ 107), performance evaluation process (Dkt. No. 63, ¶ 157) and discipline standards (Dkt. No. 63, ¶ 80) and reported to the same managers (Dkt. No. 63, ¶ 52c). In comparison to Ms. Fullen, however, Plaintiff was treated less

well in two ways: 1) Defendants entered Plaintiff into Pivot despite her having a substantially better performance record than Ms. Fullen, and 2) Plaintiff received significantly less support to assist with her advancement in comparison to Ms. Fullen.

While Plaintiff had stellar performance and was well regarded by co-workers and clients alike, Ms. Fullen's performance was regularly criticized by clients and co-workers for her abrasive nature, inability to communicate well, dismissive attitude and her incapacity to function well during high pressure situations. (Dkt. No. 63, ¶¶ 80) What's more, Plaintiff further alleges that Ms. Simonian and Ms. Postelle complained to Plaintiff about Ms. Fullen's performance issues, including the challenges she had managing her budgets, working with others, getting her work done as well as her lack of leadership skills. (Dkt. No. 63, ¶¶ 119-120, 177) Yet, while Plaintiff alleges that defendants fabricated performance concerns to justify entering her into Pivot (Dkt. No. 63, ¶¶ 102-107), despite her glaring performance issues, Ms. Fullen was never entered into Pivot or forced to accept a PIP to save her position. Additionally, unlike Plaintiff, defendants threw their full support behind Ms. Fullen to ensure she had every opportunity to succeed - - even soliciting the support of other members of the team, including Plaintiff, to maximize her chances of success. (Dkt. No. 63, ¶¶ 52c-e, 54, 68, 80-83, 106, 154-55, 173). Meanwhile, even though Ms. Postelle acknowledged that Plaintiff had not received much support prior to her joining Amazon (Dkt. No. 63, ¶ 85-87) anytime Plaintiff inquired about promoting and/or growing her team, Ms. Postelle gave her the brush off, insisting that *"experiential is a low priority"* and  leadership's view was that *"events are a nice to have."* (Dkt. No. 63, ¶¶ 11, 130-131, 153-155, 160-174). In the end, with the support she had received, Ms. Fullen, who is still at Amazon today, flourished - - she was promoted to Level 6 in early 2022, received a team

of 1 to 2 reports and has a respectable budget. (Dkt. No. 63, ¶ 173, FN #4) Meanwhile, the Plaintiff was constructively discharged and forced to find another job. (Dkt. No. 63, ¶ 194-200)

III.    **Defendants Discriminated Against Plaintiff on the Basis of Race**

In their motion, defendants dispute two of the elements of Plaintiff's evidentiary standard for disparate treatment: 1) whether plaintiff suffered an adverse employment action; and 2) whether Plaintiff has pled sufficient factual content giving rise to a "minimal inference of discriminatory motivation" <u>Littlejohn v. City of N.Y.</u>, 795 F.3d 297, 311 (2d Cir. 2015). As described in more detail below, Plaintiff has alleged facts that "plausibly give rise to an entitlement to relief" on each of these elements.

A.    <u>Plaintiff Was Subjected to Adverse Employment Actions During Her Employment at Amazon</u>

In order for an adverse action to be considered a "materially adverse change" in the conditions of employment, it requires a change in conduct that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." See <u>Velasquez v. Gates</u>, 08 CV 2215 (CLP), 18 (E.D.N.Y. 2011). First, as outlined in <u>Section I</u> above, Plaintiff has plausibly alleged that she was constructively discharged. The Second Circuit has held that, in the context of discrimination, a constructive discharge constitutes an adverse employment action. <u>LeGrand v. Walmart Stores</u> E., LP, 18-171 at 4 (2d Cir. 2019). Thus, Plaintiff's constructive discharge constitutes a materially adverse action. Similarly, Plaintiff has also plausibly alleged that she was subjected to a retaliatory hostile work environment (<u>Section II</u> above), which also constitutes an adverse employment action for purposes of a retaliation claim. See <u>Shultz</u>, *supra*, at 309.

In addition, Plaintiff alleges that defendants' decision to enter plaintiff into Pivot was a materially adverse action. While the use of performance management tools like evaluations and improvement plans do not typically constitute an adverse employment action (<u>Chukwuka v. City</u>

16

of New York, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011)), where there are "accompanying adverse consequences affecting the terms of employment, they can." *Id. citing* Kaur v. N.Y.C. Health and Hosps. Corp., 688 F.Supp.2d 317, 332 (S.D.N.Y. 2010). Plaintiff plausibly alleges several adverse consequences that accompanied the Pivot from making it part of Plaintiff's permanent file (Dkt. No. 63, ¶ 112), to forcing her to accept a PIP (Dkt. No. 63, ¶¶ 108, 112), to precluding consideration for transfers/promotions (Dkt. No. 63, ¶ 113), and negatively impacting her salary increases and advancement opportunities. (Dkt. No. 63, ¶¶ 113, 127, 134-135, 154, 158, 177-178, 180, 189) Entering Plaintiff into Pivot no doubt affected the terms and conditions of her employment because it materially altered her ability to advance her career.

Finally, defendants' consistent efforts to diminish and marginalize Plaintiff's role constitutes a materially adverse action. Second Circuit courts have long recognized that requiring employees to perform tasks outside of their job responsibilities or job description could constitute an adverse employment action "if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." Cherry, *supra,* at 166 (E.D.N.Y. 2021). Plaintiff plausibly alleges the following in support of her claim that her role was significantly diminished, impacting her ability to advance: Plaintiff's supervisory responsibilities removed, (Dkt. No. 63, ¶¶ 31-32), her budget was cut (Dkt. No. 63, ¶¶ 34), they assigned her lower level tasks (Dkt. No. 63, ¶¶ 52b-f), directed she "support" a lower level employee (Id.), marginalized her role (Id.), relegated to lower level tasks under the pretext of COVID (Dkt. No. 63, ¶¶ 129-132, 154-158), denied involvement with major experiential projects (Dkt. No. 63, ¶¶ 167-172),  and continued to marginalize her role, claiming "low priority" and  leadership's view is "events are a nice to have." (Dkt. No. 63, ¶¶ 160-174, 179-180) In fact, Plaintiff's 2021 Performance Review specifically referenced Plaintiff's lower level workload:

*"...during COVID, Keesha has been a great team player leaning into live streaming, managing budget, and developing processes for other AMK teams"* <u>and</u> *"Keesha also had to take on responsibilities far outside her job description…"* (Dkt. No. 63, ¶ 133)

When these actions are considered as a whole, they reveal a concerted effort on the part of Defendants to ensure that Plaintiff's status would not simply stall but regress.

> B.    <u>Plaintiff Has Plausibly Alleged More than the Required Minimal Support that Amazon Defendants Were Motivated By Discriminatory Intent</u>

At the motion to dismiss stage, "the plaintiff does not need substantial evidence of discriminatory intent." <u>Littlejohn</u>, *supra,* at 311. In the instant case, an inference of discrimination can be drawn through a variety of factors including direct evidence of Amazon's unlawful motives (see <u>Section I.A</u> above), discriminatory comments made by Plaintiff's managers (see <u>Section II.A</u> above), and evidence that Plaintiff's managers treated her less favorably than non-protected group members (see <u>Section II.B</u> above). When these factors are considered in the aggregate along with the Whistleblower's statements (Dkt. No. 63, ¶ 146, 190), it's clear Plaintiff has plausibly alleged that defendant's motives were based on race.

## IV.    <u>Defendant Retaliated Against Plaintiff</u>

To survive a motion to dismiss, the plaintiff must plausibly allege: (1) participation in a protected activity; (2) defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Sosa v. N.Y.C. Dep't of Educ.</u>, 368 F. Supp. 3d 489, 516–17 (E.D.N.Y. 2019)

> A.    <u>Plaintiff Has Plausibly Alleged that She Participated in a Protected Activity</u>

Protected activity is "complaining about or otherwise opposing discrimination." <u>Cadet v. Alliance Nursing Staff of NY, Inc</u>., 632 F. Supp. 3d 202 at 223. Defendants argue that the Plaintiff cannot satisfy this element because Plaintiff has not alleged she informed Defendants Boom or Redington of her belief that Abigail Akzin's behavior was racially motivated.

Amazon's *Workplace Discrimination, Harassment and Bullying policy* directed employees to report inappropriate conduct to a supervisor, department manager *or* (emphasis added) human resources representative (Dkt. No. 63, ¶ 149). Thus, Plaintiff's complaints to Mark Dizon about Abigail Akzin's racially motivated behavior (Dkt. No. 63, ¶¶ 21, 22a-g), alone, were sufficient to put Amazon defendants on notice about the harassment and trigger Amazon's obligations to respond reasonably to her complaints. <u>Fairbrother v. Morrison</u>, 412 F. 3d 39 at 44 (2d. Cir. 2005) Thus, Plaintiff has plausibly alleged facts sufficient to satisfy the first element.

  B. <u>Plaintiff has Plausibly Alleged Defendant Redington Knew</u>

   With respect to the second element, Plaintiff has sufficiently alleged facts to support that Defendant Redington knew, or should have known about Plaintiff's race discrimination complaints to Mark Dizon. *See* <u>Burlington Indus.</u>, *supra*, at 753 (finding that if the employer knows (or should know about) the harassment but fails to take appropriate remedial action to stop it, they are accountable.) While Plaintiff did not specifically complain to Defendant Redington about her belief that Abigail Akzin's hostile behavior was racially motivated (Dkt. No. 63, ¶¶ 26-29), the alleged facts support that Defendant Redington knew.

   Mark Dizon had an obligation to notify the leadership about Plaintiff's complaints and, therefore, would have done so as part of his usual protocol. He confirmed his protocol with Plaintiff after she complained about potential retaliation and Mr. Dizon asked if she wanted him to report her concerns to the leadership. (Dkt. No. 63, ¶ 50) Conversely, Defendant Redington also had an obligation to report Plaintiff's complaints to human resources. Plaintiff also alleges that Amazon's leadership worked "in conjunction" with HR to unfairly exit "problem employees" and further alleges that HR representatives, including Mark Dizon, were involved with the scheme (Dkt. No. 63, ¶ 139, 143-144, 198). These facts further suggest that defendants

would have had conversations with Mark Dizon regarding the details of Plaintiff's complaints. Even if the Court finds the facts as alleged unpersuasive, however, Plaintiff has nevertheless alleged facts that show Defendant Redington's decisions were still because of Plaintiff's race.

For example, defendants' decision to place Plaintiff with two managers of color to handle her termination supports an inference that their decision was based on race. Indeed, if defendants had a legitimate basis to terminate Plaintiff in the first place, Defendant Redington would have done so himself. Instead, defendants placed Plaintiff into a holding pattern while they waited two months for Ms. Postelle and Ms. Simonian to join so that they could thrust the responsibility onto them, making clear that these decisions were because of race. And, given the proximity in timing, were clearly in retaliation for the complaints Plaintiff had made.

    C.    <u>Plaintiff Has Plausibly Alleged She Was Subjected to a 'Retaliatory Hostile Environment'</u>

Alleging a retaliatory hostile environment is another way to satisfy the "adverse employment action" element of a retaliation claim. <u>Shultz</u>, *supra*, at 309. Accordingly, Plaintiff has plausibly alleged that through a series of acts aimed at getting her to either leave Amazon voluntarily or terminate her outright under the pretense of poor performance, Defendants created a 'retaliatory hostile environment' (Section II above) which constitutes an adverse action. <u>Id</u>. Finally, that the retaliation (i.e. removal of supervisory responsibilities) began within weeks of Plaintiff's last complaint, creates a causal inference. <u>De Figueroa v. New York</u>, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019).

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Plaintiff respectfully requests an Order denying Amazon Defendants' motion to dismiss, and grant her such additional relief as the Court may find proper.

Dated: New York, New York
       February 12, 2024

Respectfully submitted,

JMD LAW GROUP

By: _____
    Jessie M. Djata, Esq.
    2196 Third Avenue, #31636
    New York, New York 10035
    (917) 765-7475
    *Attorneys for Plaintiff*