UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEESHA ANDERSON,

                        Plaintiff,

  -against-

AMAZON.COM, INC. et al.,

                        Defendants.

23-cv-8347 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

## BACKGROUND

Plaintiff Keesha Anderson worked for Amazon Music from August 2019 to February 2022. Second Am. Compl. ¶ 2, Dkt. 63. She alleges that over those two and a half years, she was discriminated and retaliated against because of her race. ¶ 1. So she has sued Amazon and two Amazon Music executives, Steve Boom and Ryan Redington ("the Individual Defendants") for discrimination and retaliation in violation of 42 U.S.C. § 1981, New York State Human Rights Law § 296 (NYSHRL), and the New York City Human Rights Law (NYCHRL). ¶¶ 201–245. Defendants have moved to dismiss.

### I. August to December 2019: reporting to Akzin

During her first four months at the company, Anderson's manager was Abigail Akzin. ¶ 18. Anderson alleges that Akzin discriminated against her, including by:

- excluding her from some meetings and events, ¶ 18(b)–(c),
- rejecting her ideas, ¶ 18(d),
- being argumentative, ¶ 18(d),
- reappropriating some of her budget, ¶ 18(e),
- failing to support her in drafting a particular document, ¶ 18(f), and
- limiting her responsibility for Philicia Darns, a new hire who "was expected" to report to Anderson, ¶ 18(g).

Anderson alleges that Akzin's actions were racially motivated because:

- Akzin brought "the only other African American in her group[] to [Akzin's] welcome meeting with [Anderson]," though Anderson would not be working with the other person, ¶ 22(a),
- Akzin provided more support to a white employee's document drafting, ¶ 22(b),
- Akzin told another employee that Anderson "seems to have a passion point for Hip-Hop," though Anderson never described her music preferences to Akzin, ¶ 22(c) (emphasis omitted), and

- Anderson believed (and reported to HR) that Akzin treated another African American employee unfairly, ¶ 22(e)–(f).

Anderson complained to HR's Mark Dizon several times during these first four months, and she told him that she believed Akzin's actions were racially motivated. ¶¶ 19, 21–22.

She also complained to Defendants Boom and Redington multiple times. *See* ¶¶ 23–27, 29. Boom "expressed how impressed he was with many of [Anderson's] ideas and encouraged [her] to pursue them," approved one idea in particular, and "encouraged [Anderson] to continue ['going big']." ¶¶ 23–24. When Anderson told Redington she might resign, he "encouraged her to hang on and informed her that Defendant Boom was 'working on making changes to the organization.'" ¶ 27. In December 2019, Redington moved Anderson and Darns to his own team. ¶ 29.

## II. January to June 2020: reporting to Redington and then Postelle and Simonian

Anderson reported to Redington from January to March 2020. ¶ 30. During that time, Redington told Anderson that Darns would still not report to her. ¶ 31. Because she wasn't managing others, Anderson spent more of her time doing "administrative and tactical tasks" and couldn't demonstrate her supervisory skills, which "adversely impacted her ability to [be] promote[d]." ¶ 32. Anderson again complained to Dizon, who "expressed a sentiment like, 'we can't always have it all,' which [Anderson] took to mean that losing the ability to grow a team was the price [Anderson] had to pay for complaining about Ms. Akzin." ¶ 33.

In March 2020, Anderson's budget was cut from $3 million to $1 million, and she was reassigned. ¶¶ 34, 36. Anderson "learned that two women of color had just been hired into Defendant Redington's group: Kirdis Postelle … and Tatiana Oliviera Simonian." ¶ 35. Although Anderson would remain part of Redington's team, she would report to Simonian who, in turn, reported to Postelle. ¶ 36.

"Upon information and belief," Anderson alleges that working "under these managers of color was part of a larger plan Defendant Redington had alluded to when he informed [Anderson] in December 2020 that Defendant Boom was 'working on making changes to the organization.'" ¶ 40. The "larger plan," she says, was to push her out of the company. *Id.* This allegation comes despite other allegations that, around this time, Redington was "open to hearing her ideas, [Anderson] had the opportunity to produce several events that were viewed favorably," and she was lavished with Redington's "positive feedback." ¶ 39.

Yet the scheme was "all but confirmed," Anderson says, by the first meeting she had with Postelle. ¶ 41. During that meeting, Postelle told Anderson she'd "been dying to meet" and "heard so much about" Anderson. ¶ 42. "Postelle acknowledged that she was aware that things had 'been hard' for [Anderson] and knew that [Anderson] had been bounced around (*i.e.*[,] to different managers)." *Id.* Then, "Postelle made a comment about there being 'a lot of people' at Amazon, while facing her palm to the screen. [Anderson] took her gesture to mean that Ms. Postelle was referring to there being a lot of 'white' people employed at Amazon." *Id.* Anderson also alleges that Postelle said this out of the blue: "You don't want it to be that the Black girl has to fire the black girl. They

2

knew what they were doing when they put the black girl on the team with the other black girl." *Id.* Anderson characterizes this statement as a "Freudian slip" exposing management's plan to push her out, especially in light of Postelle's "hear[ing] so much about" Anderson. ¶¶ 43–45.

Anderson also alleges that, in May 2020, Simonian criticized the company's hypocrisy in "publicly support[ing] protests surrounding … George Floyd" while "they" were telling her to "unfairly fire a black employee." ¶ 46. Anderson says this statement was about her. *Id.*

Anderson reported these conversations to Dizon and told him that "it fe[lt] retaliatory." ¶ 50. Dizon asked whether Anderson wanted to speak to management, but she declined for fear of "further retaliation." *Id.*

She says Simonian carried out the retaliatory scheme by:

- excluding Anderson from meetings and events, ¶ 52(a),
- limiting her work and asking that she do administrative tasks, "like budgeting and tracking financial data," ¶ 52(b),
- asking her to "help out" Jamie Fullen (a white employee) on a project even though Fullen was one rank below her, ¶¶ 52(c), 68,
    - later, waiting to review Anderson's work on the project until Fullen reviewed it, ¶¶ 54–55,
- failing to provide "much support" for Anderson's virtual-event ideas, ¶ 52(f),
- once saying, "I don't need ideas from you," ¶ 52(g),
- emailing "the entire team" (without first telling Anderson) to say that Anderson "would no longer be representing the experiential team on the 'Genre Lead or Pod Calls,'" ¶ 52(h),
- "deliberately trying to confuse [Anderson] with inconsistent instructions," and reprimanding her for following some of those instructions, ¶¶ 52(i), 62, 66–67,
- once making Anderson apologize to Fullen during a meeting, ¶ 52(iii), and
- openly discussing Simonian's friendliness with Akzin and telling Anderson, "I know Abs is not your fave," ¶ 56.

Anderson again spoke with Dizon during April and May 2020. ¶¶ 53, 60.

### III.   July to August 2020: the "revamped" position

Anderson alleges that in July 2020, "Simonian's attitude seemed to shift[,] and she became less abrasive towards [Anderson]." ¶ 71. Now, instead of "bullying," Simonian "used the threat of a new[,] revamped position to scare [Anderson] into resigning." ¶ 70. "[G]iven Amazon's needs and the ongoing pandemic, the revamped position" would shift its focus from "experiential marketing" to "live stream initiatives." ¶ 72. The position would require Anderson to "substantially ramp up [her] Amazon knowledge." ¶ 73. Simonian told Anderson that she was "welcome to stay" but "could opt to accept a[n exit] package," and Simonian reminded Anderson that "some of [An-

3

derson's] stocks had already vested" because she'd been at Amazon more than a year. ¶ 75. Anderson spoke with Dizon about this discussion, and he suggested that Anderson should consider both options as well as explore openings in other Amazon divisions. ¶¶ 76–77.

Later in July, Simonian sent the job description for the new position and "gave [Anderson] a few weeks to decide." ¶ 78. Simonian "continued to emphasize the substantial 'ramp up' … and urged that [Anderson] opt for an exit package." *Id.* Around this same time, Simonian solicited the team's support for Fullen's promotion. ¶ 80. According to Anderson, this effort came despite "complaints … made by various colleagues" about Fullen's shortcomings. ¶ 80. Simonian even solicited Anderson's help with Fullen's promotion, praising Anderson's "good leadership skills." ¶ 82.

In August, Anderson talked to Postelle about the "revamped" job. Postelle "encourag[ed] [Anderson] to accept the new role." ¶ 84. She also "complimented [Anderson] on her overall performance, stating she was 'really, really impressed,'" and praising specific work. *Id.* Postelle told Anderson that her early time at the company was unfair because "you weren't given any guidance." ¶ 86; *see also* ¶ 85. Postelle said that the "narrative was [Anderson is] just out there doing what she wants to do" and that Anderson had "an attitude." ¶¶ 88–89. But Postelle said that attitude was "earned" because "there was a lot of shit that went on." ¶ 89. Postelle said, "You've had enough opportunities to fail and I'm kind of over it. I want you to be successful." ¶ 86 (alteration adopted). Anderson would have Postelle's "full support" in the new job. ¶ 84. Anderson interprets these statements to reveal that her bosses had been deliberately discriminating against her because of her race and her complaints about Akzin. ¶¶ 89–90. She reported these comments to Dizon. ¶ 91.

Later in August, Anderson told Simonian that she would take the new job. ¶ 94. Simonian "seemed frustrated," said that she needed to "think about it," and said that the position would need "a super Amazonian." *Id.* Anderson tried to contact Dizon to discuss this conversation, but neither he nor Simonian responded to her emails about the new job for a month. ¶¶ 96–99.

### IV. September 2020 to March 2021: the PIP

In September, Anderson met with Simonian, and Dizon also attended (to Anderson's surprise). ¶¶ 99–100. Simonian said Anderson was being assigned a performance-improvement plan (PIP). ¶¶ 99, 101. The justification for the PIP was based on "trumped up allegations" of minor infractions. ¶ 102. The PIP "officially revoked the offer for the revamped position," and it would be part of her "permanent record," hindering her advancement. ¶¶ 108, 112. Plus, the deadlines for the PIP's tasks were unrealistic. ¶ 110. Anderson was offered the choice between an exit package and the PIP, and, despite these downsides, she took the PIP. ¶ 112. Shortly after she accepted the PIP, a potential transfer to another Amazon division (a job to which she'd applied on Dizon's advice) came up, but she couldn't transfer or be promoted while under the PIP. ¶ 113.

Two weeks later, Simonian updated the PIP to extend the deadlines and permit Anderson to work with others on the tasks, "rendering the tasks more achievable." ¶ 115. "Simonian vowed her full support and repeatedly stated that [Anderson] should seek as much assistance from others as she needed." *Id.* Around this time, Postelle excluded Anderson from a meeting, which Anderson

alleges was because Postelle "obviously believed that [Anderson's] termination was a for[e]gone conclusion since she likely would not successfully complete her PIP." ¶ 117.

In late October, while still working on the PIP, Simonian "complained" to Anderson about Fullen. ¶ 120. Simonian asked Anderson to "take on more" because Simonian was concerned that "Fullen was not properly managing the budget." *Id.* Simonian said Fullen could use Anderson's "leadership skills," "ability to work with people," and ability to "get things done." ¶ 119.

In November, about six weeks after starting the PIP, Simonian "suddenly rescinded" it and told Anderson to "resume her normal work responsibilities." ¶ 122. "No one ever made any mention of the 'revamped position' ever again." *Id.* And Postelle was "back to being encouraging and complimentary," saying Anderson was "doing so great" and "let's get you promoted." ¶ 123. A few weeks later, Simonian was reassigned, and Postelle became Anderson's direct manager. ¶ 124.

To Anderson, "everything else stayed more or less the same" while working directly under Postelle. ¶ 125. It "proved challenging" because Postelle "often had positive feedback" but could also be "dismissive." ¶¶ 128–129. She told Anderson that "leadership considered events 'a low priority'" and "continued to assign her … lower level tasks." ¶ 130. In March 2021, Anderson received "overwhelmingly positive" performance reviews. ¶ 133. Yet she never got a raise or promotion. ¶ 134. The complaint speculates that the PIP "seemed to be impacting her ability to get a salary increase and advance within the company." ¶ 135.

V. **April 2021 to February 2022: the whistleblower and resignation**

Then, in April 2021, a "Whistleblower" approached Anderson to reveal the "scheme" against her. ¶¶ 136–153. This anonymous person told Anderson (1) about Simonian's earlier statement about "fir[ing] a black employee," ¶ 148, (2) that the PIP was "not about her performance," ¶ 143, and (3) that Boom, Redington, Dizon, Akzin, Simonian, Postelle, and others conspired to push Anderson out. The whistleblower told Anderson that she was "labeled a 'problem employee'" after complaining about Akzin (about eighteen months before), and Redington told Anderson's managers "that the company wanted [Anderson] 'exited' from the company." ¶¶ 137–138.

After these revelations, Anderson "wasn't sure who, if anyone, she could trust." ¶ 149. Over the next ten months, she was still asked to support Fullen's projects, and in-person events (Anderson's specialty) were not making much of a comeback despite the pandemic's dying down. ¶¶ 155, 161–162. Anderson was not being given the opportunity to "consistently demonstrate" the skills needed for promotion, "[o]ther than … the few events-related projects" that she had put together "on her own." ¶¶ 157–158, 163. She also continued to be excluded from some meetings and events, and her budget remained at the post-cut level. ¶¶ 164–170.

In November 2021, Anderson met with Postelle. Postelle congratulated her on a recent festival she'd organized, saying that "now I can show people how great you are." ¶ 177. But when it came to Anderson's getting direct reports, Postelle said it would be "no time soon," and Postelle asked what Anderson "need[ed] the head count for." ¶ 178. Postelle said they should first focus on getting Anderson to the "top tier" in her current role. *Id.*

In December 2021, Postelle told Anderson she'd be getting another new manager. ¶ 184. (From the complaint, it doesn't seem that this reassignment actually happened before Anderson quit in February 2022.) Anderson alleges that having all these different managers slowed her potential for advancement because her manager needed to be familiar with her to recommend her for a promotion. ¶¶ 184–185. Separately, even though Postelle would soon no longer be her manager, Postelle sent Anderson a gift in early 2022 with the message, "Hi Keesha! Just a little something to celebrate an amazing 2021 and to toast to an even better 2022. Thank you for everything you did last year! You're an amazing part of this team!" ¶ 187. Postelle also said she was "hyping" Anderson to try to get her a larger budget (though that larger budget wouldn't come to fruition). ¶ 188.

In late January 2022, Anderson again spoke with the "Whistleblower," who told her that, had Anderson "not complained about Ms. Akzin's behavior, [Anderson] would not have been targeted for termination." ¶ 190. This comment seems to repeat what the whistleblower said in April 2021, but, this time, it "caused [Anderson] extreme stress" and prompted her to quit. ¶¶ 191–194. Postelle tried to persuade her to stay, encouraging her to take a leave of medical absence if she needed to. ¶¶ 194, 197. But Anderson remained steadfast and resigned.

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (Sotomayor, J.). Before discovery, as here, the plaintiff "may defeat the [12(b)(2)] motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (cleaned up).

## DISCUSSION

### I. Personal jurisdiction

Anderson claims only specific jurisdiction over the Individual Defendants. *See* Dkt. 81 at 2–10. To establish specific jurisdiction, New York's long-arm statute must confer jurisdiction, and exercising that jurisdiction must comport with due process. *See Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 456 (2d Cir. 2024). Anderson points to two subparts of New York's long-arm statute, but neither applies.

#### A. Section 302(a)(1)

Anderson first points to N.Y. C.P.L.R. § 302(a)(1). That section applies if the Individual Defendants (1) "transact[ed] any business within the state," and (2) Anderson's claims "aris[e] from"

6

those transactions. § 302(a)(1). Anderson doesn't argue that her cause of action arises from the Individual Defendants' transactions in the state. Instead, she says *Amazon* transacted in New York by recruiting her and setting up its Brooklyn offices. And those transactions should be imputed to the Individual Defendants, she says, because Amazon was acting as their agent. Dkt. 81 at 2–4.

To impute one party's acts to another, the Court looks to whether the supposed principal knew of, benefited from, and controlled the activity giving rise to personal jurisdiction. *See Okla. Firefighters*, 92 F.4th at 457. The complaint alleges none of these. For recruiting, the complaint says Anderson spoke with "an Amazon recruiter" and then spoke with several others at Amazon Music before being hired. *See* Second Am. Compl. ¶¶ 15–17. The Individual Defendants are not mentioned until much later in the story. Although they were high-ranking executives at Amazon Music, it is doubtful that they knew of, benefited from, and controlled every hire. And in any event, it is Anderson's burden to plead personal jurisdiction.

For the Brooklyn offices, the complaint alleges that the Individual Defendants "secured" the lease and had at least some control over the renovation. ¶ 176. Even assuming that could be enough for the other prongs, the offices still weren't for the Individual Defendants' benefit. The complaint pleads that the site "included office space for Amazon Music employees as well as artists," "a recording studio … so that artists could record their music on site," and "a content capture space where artists could be interviewed." *Id.* Unsurprisingly, Amazon's offices were for Amazon's benefit rather than for the benefit of the Individual Defendants. *See New York v. Mountain Tobacco Co.*, 2015 WL 3455080, at *6 (E.D.N.Y. May 29, 2015) (describing the "benefit" prong as focusing on the officer's financial stake in the transaction, and collecting cases for same); *see also* ¶ 176 ("Given that New York is the 'hub of music,' Amazon Music was interested in expanding its footprint in the New York market."). So § 302(a)(1) doesn't confer jurisdiction over the Individual Defendants.

### B. Section 302(a)(3)

Nor does § 302(a)(3). That subsection establishes personal jurisdiction over out-of-state defendants whose torts cause in-state injury. But the defendants must also meet certain conditions. As relevant here, the Individual Defendants must regularly do business in New York, engage in a persistent course of conduct in the state, derive substantial revenue from the state, or derive substantial revenue from interstate commerce. § 302(a)(3)(i)–(ii). Anderson again points to her recruiting and the Brooklyn lease. She also says she should get jurisdictional discovery to determine whether the Individual Defendants derive substantial revenue from New York or interstate commerce.

Anderson has not alleged any "regular" business or "persistent course of conduct" by the Individual Defendants in New York. They played no role in her recruiting, and "secur[ing]" a lease for Amazon Music and then overseeing a single, completed renovation in New York aren't enough. *Ingraham v. Carroll*, 687 N.E.2d 1293, 1295 (N.Y. 1997) (holding that § 302(a)(3)(i) "necessitates some ongoing activity within New York State" (emphasis omitted)); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez* (*Bank Brussels II*), 305 F.3d 120, 126–27 (2d Cir. 2002) ("Of

course, it is not the 'mere rental' that satisfies § 302(a)(3)(i), it is the long-term (i.e., 'persistent') rental and use … which confers long-arm jurisdiction.").

Instead, Anderson seems to again rely on Amazon's activities. But the recruiting and offices can't be imputed to the Individual Defendants for the reasons above. And the "revenue of the company is not imputed to its employees for jurisdictional purposes." *Gordon v. Credno*, 960 N.Y.S.2d 360, 362 (1st Dep't 2013). At best, it would follow the same agency analysis, and there is nothing to suggest that the Individual Defendants controlled Amazon's revenues or that Amazon made money for the benefit of the Individual Defendants. *Ahava Food Corp. v. Donnelly*, 2002 WL 31757449, at *4 (S.D.N.Y. Dec. 9, 2002); *cf. Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 360 (S.D.N.Y. 2007) ("The revenue of a corporation is imputed to individuals for jurisdictional purposes only if they are major shareholders.").

Finally, Anderson asks for jurisdictional discovery as to the Individual Defendants' "revenues." In so many words, Anderson says this information is "peculiarly within the knowledge of the opposing party." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004). Maybe so, but it doesn't get her where she needs to go. Not only must she show that the Individual Defendants derived substantial revenue from New York or interstate commerce, but she must also show their "volitional" and "ongoing" or "extensive" engagement with the state or with interstate commerce. *Williams v. Beemiller, Inc.*, 130 N.E.3d 833, 842 (N.Y. 2019) (Feinman, J., concurring); *Ingraham*, 687 N.E.2d at 599 (citation omitted). Alleging these facts is usually doable without discovery. Indeed, the complaint here alleges that the Individual Defendants vetted the New York site, oversaw the renovation, and attended an event at the new offices. Those episodic interactions aren't enough for § 302(a)(3) jurisdiction on their own, but they show Anderson's access to information. If there were more New York or interstate engagements to allege, Anderson likely would have done so after two sets of amendments to the complaint.

Plus, it's unclear what Anderson wants from discovery or whether it would get her any closer. Section 302(a)(3) requires that a defendant "derives substantial revenue" from New York or interstate commerce. Whether or how this provision applies to employees is unclear. Section 302(a)(3)(ii)'s substantial-revenue requirement has been described as a "'bigness requirement' designed to assure that the defendant is economically big enough to defend suit in New York." *Ingraham*, 687 N.E.2d at 599 (citation omitted). And "revenue" itself has a corporate connotation. *See, e.g.*, *Revenue*, Cambridge Advanced Learner's Dictionary (4th ed. 2013) ("[T]he income that a government or company receives regularly."). Even construing "revenue" as simply "income," the Court struggles to see how a plaintiff could prove how an employee's income was "derive[d]" when it was not tied to specific transactions, and especially when he is employed by a large company. *See Derive*, *id.* ("[T]o get something from something else.").

Perhaps attribution would be possible if the employee's job was overwhelmingly focused on serving New York or dealing in interstate commerce. But if that were true, a plaintiff would likely be able to plead it without discovery, as explained above. So Anderson has neither pleaded the requirements for § 302(a)(3) nor has she made a "sufficient start" justifying discovery. *Wilson & Wilson Holdings LLC v. DTH, LLC*, 673 F. Supp. 3d 409, 413 (S.D.N.Y. 2023) (citation omitted).

### C. Venue

Related to the arguments about personal jurisdiction, both Amazon and the Individual Defendants contest venue. But because the Individual Defendants have been dismissed, venue is proper in this district under 28 U.S.C. § 1391(b)(1), (d). *See Marshall v. Annucci*, 2018 WL 1449522, at *10 (S.D.N.Y. Mar. 22, 2018).

## II. Discrimination

To state an employment-discrimination claim under § 1981, Anderson must plausibly plead "(1) that she is a member of a protected class, (2) that she was qualified for the position …, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Only elements three and four are disputed here, and most of the action is on element three. For that element, Anderson points to three kinds of adverse actions: a hostile work environment, constructive discharge, and some other conduct, like the PIP. Second Am. Compl. ¶¶ 202, 217, 232; Dkt. 84 at 3, 9, 17.

### A. Hostile work environment

"To establish a hostile work environment under … § 1981, … a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). This is a "high bar." *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe but are not intended to promote or enforce civility, gentility or even decency. Put differently, excessive criticism and rudeness do not constitute a hostile work environment." *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022) (cleaned up). The test has objective and subjective parts: "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (citation omitted).

Defendants say the conduct described in the complaint objectively falls short of the "abuse and trauma" necessary to create a hostile work environment. They are right. And two recent Second Circuit cases are especially instructive.

First, in *Littlejohn*, the plaintiff alleged that her boss (1) "made negative statements" about the plaintiff to another employee, (2) "was impatient and used harsh tones with" the plaintiff, (3) "distanced herself" from the plaintiff when she was nearby, (4) declined to meet with the plaintiff, (5) required the plaintiff to redo certain work, (6) "replaced" the plaintiff at meetings, (7) "wrongfully reprimanded" the plaintiff, (8) increased the plaintiff's "reporting schedule," and (9) "sarcastically told [the plaintiff] 'you feel like you are being left out,' and that [the plaintiff] did not 'understand the culture' at [the company]." 795 F.3d at 321.

9

The court held that, even on a motion to dismiss, "[t]hese allegations could not support a finding of [a] hostile work environment." *Id.* And it cited two other cases for this holding, further illustrating facts that fall short:

> *See, e.g.*, *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (concluding that no hostile work environment existed even though "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *see also Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08-CV-7586 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd*, 488 F. App'x 530 (2d Cir. 2012).

*Id.* (alterations in original).

Second, in *Duplan*, the plaintiff alleged that he was (1) denied a raise, (2) not hired for a new position in the organization that matched a job he had previously held, (3) denied a promotion, (4) "assigned additional duties that were 'well below' his civil service and functional titles," and (5) deprived of the sole task that was at his level. 888 F.3d at 618. The court held that these allegations were "not sufficient" to constitute a hostile work environment on a motion to dismiss. *Id.* at 619.

Anderson alleges no more than the plaintiffs in *Littlejohn*, the cases it cites, and *Duplan*. Her allegations similarly focus on diminished responsibilities and occasionally rude, unsupportive, and demanding bosses. In fact, if anything, her allegations establish that her workplace was *less* hostile: interspersed with any rudeness, she got praise, support, and encouragement. To a reasonable employee, that positivity would counterbalance the hostility. *See Tongalson v. Dreyfus Serv. Corp.*, 2005 WL 356805, at *5 (S.D.N.Y. Feb. 14, 2005).

The only added negatives here that weren't present in the cases above are Anderson's reduced budget and PIP. But at the outset, these issues don't seem to be meaningfully different. They likely fall into the episodic, diminished-responsibilities, reprimand, or additional-tasks buckets. In any event, having one's budget reduced from $3 million to $1 million simply isn't the kind of "abuse" that makes a job "intolerable." Nor does the PIP do so. Courts have routinely held that PIPs don't make a work environment hostile, even when combined with other allegations similar to those here. *See, e.g.*, *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, 2022 WL 973861, at *10–11 (S.D.N.Y. Mar. 30, 2022); *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 527 (S.D.N.Y. 2015). That principle applies with force here because the PIP was quickly watered down and then rescinded.

Finally, Anderson doesn't seem to rely on any isolated statements to support this claim. But to the extent that she does, none of the statements in the complaint is the kind of "extraordinarily severe" "single incident" that "work[s] a transformation of the plaintiff's workplace." *Alfano v.*

*Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation omitted); *cf. Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) ("A single incident of rape, for example, sufficiently alters the conditions of the victim's employment." (cleaned up)).

### B. Constructive discharge

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). Constructive discharge is essentially a "'worse case' harassment scenario," *id.* at 147, so the "standard is higher than the standard for establishing a hostile work environment," *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010). "Because [Anderson] failed to establish a hostile work environment, her claim of constructive discharge also fails." *Id.*; *see also Maron*, 605 F. Supp. 3d at 571 ("[B]ecause plaintiff has not stated a hostile work environment claim[,] *a fortiori* she has not stated a claim for constructive discharge." (cleaned up)).

### C. Other adverse action

Finally, Anderson points to the PIP and her diminished responsibilities as adverse employment actions. When this motion was filed, the law in this circuit was that "[a] plaintiff sustains an adverse employment action if he or she endures a *materially* adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (emphasis added) (citation omitted). But the landscape has changed with the Supreme Court's decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024).[1]

*Muldrow* was a Title VII case. "Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Id.* at 974 (quoting 42 U.S.C. § 2000e-2(a)(1)). In *Muldrow*, the Court interpreted the phrase "discriminate against." *Id.* It held that the phrase "refer[s] to differences in treatment that injure employees." *Id.* (internal quotation marks omitted). But it rejected "that the harm incurred [must be] significant. Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* (internal quotation marks omitted); *see also id.* at 973 n.1 (collecting rejected standards, including a Second Circuit case using the phrase "materially significant disadvantage").

The Second Circuit has applied the same "materially adverse" standard to both Title VII and § 1981 employment-discrimination claims. *See Robinson v. Concentra Health Servs., Inc.*, 781

---

[1] By its terms, *Muldrow* did not address the hostile-work-environment and constructive-discharge theories discussed above, so the Court applies existing Second Circuit law with respect to those arguments. *See Augenbaum v. Anson Invs. Master Fund LP*, 2024 WL 263208, at *4 (S.D.N.Y. Jan. 24, 2024).

11

F.3d 42, 45 (2d Cir. 2015) ("[T]he same core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." (cleaned up)); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("In analyzing § 1981 claims, we apply the same standards as in Title VII cases." (citation omitted)); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (articulating one standard for adverse employment action when the plaintiff's Title VII and § 1981 claims both "turn[ed] on whether he [could] prove an adverse employment action").

So the only question after *Muldrow* (at least for this motion) is whether § 1981 differs from Title VII in some way that justifies a continued materiality rule. It does not. If anything, § 1981 is even more clearly categorical: it declares that "[a]ll persons … shall have *the same right* … to make and enforce contracts," and it defines "make and enforce contracts" to include "the enjoyment of *all* benefits, privileges, terms, and conditions of the contractual relationship." § 1981(a)–(b) (emphasis added). As in the Title VII context, "[t]here is nothing in [§ 1981] to distinguish … between [adverse actions] causing significant disadvantages and [adverse actions] causing not-so-significant ones. And there is nothing to otherwise establish an elevated threshold of harm. To demand 'significance' is to add words—and significant words, as it were—to the statute Congress enacted. It is to impose a new requirement on a [§ 1981] claimant, so that the law as applied demands something more of her than the law as written." *Muldrow*, 144 S. Ct. at 974. So the action need not be *materially* adverse.[2]

Under this standard, Anderson has plausibly alleged that the PIP and her diminished role were adverse actions. These actions adversely affected Anderson's benefits, privileges, terms, or conditions of employment by saddling her with more and worse tasks, tarnishing her permanent record, dampening her prospects of a promotion or raise, temporarily preventing her from transferring, excluding her from certain meetings and projects, and so on. Although some of these actions might once have been considered immaterial, *see Littlejohn*, 795 F.3d at 312 n.10, they are now enough to state a claim (so long as they alter Anderson's "enjoyment of" any "benefits, privileges, terms, [or] conditions" of her employment contract, which was not a focus of the briefing on this motion).

Anderson has also met her "*minimal* burden of showing facts suggesting an inference of discriminatory motive." *Id.* at 311. She says the same bosses who made comments and took actions that were racially inflected also took the allegedly adverse actions. And while her other allegations

---

[2] Because it was not the subject of this motion, the Court does not reach whether a plaintiff must show that the discrimination was "disadvantageous" under § 1981, as *Muldrow* held it must be under Title VII. *Compare Muldrow*, 144 S. Ct. at 974 (holding that Title VII "requires [the plaintiff] to show that the transfer brought about some 'disadvantageous' change in an employment term or condition" (citation omitted)), *with id.* at 980 (Kavanaugh, J., concurring in the judgment) ("[T]he text of Title VII does not require a separate showing of some harm. The discrimination is harm."). *Muldrow*'s analysis of this point hinged on the negative connotation of "discriminate against." *Id.* at 974 ("The words 'discriminate against,' … refer to differences in treatment that injure employees." (cleaned up)). For § 1981, a similar analysis might apply to the positive connotation of the phrase "enjoyment of all benefits, privileges, terms, and conditions." But § 1981's requirement that "[a]ll persons … have the same right" in "the making, performance, modification, and termination of contracts" might suggest that no disadvantageousness showing is necessary.

12

(like the exit package or being treated rudely) might "not independently constitute adverse employment actions," "purpose may often be inferred from the totality of the relevant facts," and those facts "provide relevant background evidence." *Vega*, 801 F.3d at 88 (internal quotation marks omitted). Given the "minimal" showing required, Anderson has done enough at this stage.

### D. City and state law

"The NYCHRL does not distinguish between claims of 'discrimination' and 'harassment' or hostile work environment[.]" *Mitura v. Finco Servs., Inc.*, 2024 WL 232323, at *3 n.3 (S.D.N.Y. Jan. 22, 2024). To state a discrimination claim under city law, a "plaintiff need only show differential treatment—that she is treated less well—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks omitted); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 36–41 (1st Dep't 2009). The NYSHRL standard is "close[] to the standard of the NYCHRL." *Mitura*, 2024 WL 232323, at *4 n.4 (citation omitted). Under state law, a plaintiff must show that she was subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more of the protected categories." *Id.* at *4 (cleaned up).

These standards are similar to that articulated in *Muldrow*, so the same conclusion follows: Anderson has adequately pleaded discrimination claims under the NYCHRL and NYSHRL. Defendants' only argument against these claims is that Anderson "does not allege facts that rise above the level of … petty slights and trivial inconveniences." Dkt. 74 at 18 (internal quotation marks omitted). Under the NYCHRL, "courts may … dismiss truly insubstantial cases," but only when "the defense is clear as a matter of law." *Mihalik*, 715 F.3d at 111 (internal quotation marks omitted). "In evaluating … the defendant's affirmative defense, courts must consider the totality of the circumstances," and "a jury is often best suited to make this determination." *Id.* (internal quotation marks omitted).

Here, the defense is not clear as a matter of law. The Court can't say the alleged conduct was "truly insubstantial" when accepting all the allegations as true and drawing inferences in Anderson's favor. She says she was denied opportunities for advancement, passed around to different managers, given menial job assignments, unfairly criticized, and put on a PIP. A jury might find that this conduct qualifies as being "treated less well" or being subjected to "inferior conditions of employment."

## III. Retaliation

### A. The standard

To state a retaliation claim under § 1981, the complaint must plausibly plead "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (citation omitted); *see also Duplan*, 888 F.3d at 625.

For the third element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in [the retaliation] context means it well might have

13

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *see also Muldrow*, 144 S. Ct. at 976 (reaffirming and distinguishing *White*). This standard is "not limited to discriminatory actions that affect the terms and conditions of employment." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (citation omitted). But "[t]rivial harms," "slights," and "annoyances" don't count. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

As for the fourth element, "[t]o adequately plead causation, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action. 'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive. Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan*, 888 F.3d at 625 (cleaned up).

### B. The claim here

Anderson points to the same adverse actions as before: a hostile work environment, constructive discharge, Defendants' "consistent efforts to diminish and marginalize [her] role," and the PIP. Dkt. 84 at 10–11, 16–17, 20. The first two grounds fail because, as explained above, the complaint fails to plausibly allege them, and Anderson doesn't argue that they should be evaluated differently under the retaliation standard. Many parts of the third ground might also fail, but the Court need not address it in full because the PIP is enough for the retaliation claim to survive.

Defendants say the PIP fails on elements two, three, and four. On element two, they point out that the complaint doesn't allege that Dizon told Redington that Anderson's complaint was about racial discrimination rather than mistreatment in general. But only "general corporate knowledge" is required. *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *see also Moore v. Hadestown Broadway Ltd. Liab. Co.*, 2024 WL 989843, at *14 (S.D.N.Y. Mar. 7, 2024). And in any event, the complaint alleges that Dizon was part of the conspiracy to oust Anderson. So his knowledge would still be included even if the relevant unit was smaller than the corporation.

On element three, Defendants repeat their arguments that Anderson didn't suffer any adverse action. But it's plausible that being put on a PIP "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotation marks omitted). That conclusion is confirmed by the PIP's effects on transfer and advancement. *See Marshall v. Westchester Med. Ctr. Health Network*, 2024 WL 665200, at *5 (S.D.N.Y. Feb. 16, 2024).

On element four, Anderson has sufficiently alleged causation. Normally, causation is shown through indirect evidence, namely, "temporal proximity." *See, e.g.*, *Duplan*, 888 F.3d at 625. Anderson hasn't based her argument on temporal proximity here, and that argument would likely fail because the PIP came more than a year and multiple managers after her complaint about Akzin. Instead, Anderson's is the rare complaint alleging direct evidence. Although courts have repeatedly recognized that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental

14

processes," that is exactly what Anderson has alleged. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). She says the "Whistleblower" had "knowledge of the circumstances surrounding her [PIP] and other decisions made by the leadership." Second Am. Compl. ¶ 136. And that whistleblower allegedly confirmed all of Anderson's suspicions. In particular, the whistleblower said that "had [Anderson] not complained about Ms. Akzin's behavior, [Anderson] would not have been targeted for termination" and "subjected to the [PIP] process." ¶ 190. That's enough to survive a motion to dismiss. *See LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 783 (2d Cir. 2019). (And because the federal claim survives, the state and city claims do too. *See Shkoza v. NYC Health & Hosps. Corp.*, 2024 WL 1116145, at *6 (S.D.N.Y. Mar. 13, 2024).)

### C. The whistleblower

Defendants argue that the Court should discount the whistleblower's account because it is hearsay. But their authority for that idea addresses a completely different issue. Dkt. 74 at 20 (citing *Sletten v. LiquidHub, Inc.*, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014) ("[W]e also find that secondhand comments are not as impactful on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim.")). Just like any other plausible allegation, and particularly those of historical fact, the Court must accept as true that a whistleblower approached Anderson and told her what is recounted in the complaint. *Cf. Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

Nevertheless, the Court is skeptical. The idea that an anonymous insider came out of the shadows to confirm Anderson's position in this litigation—and then did it again nine months later just to shore up the specific causal link—strains credulity. And the whistleblower's account is in tension with other parts of the complaint. The complaint paints a picture of a run-of-the-mill workplace, maybe even one with more positivity than usual. And each time she tried to quit, her bosses tried to convince her to stay. If there was a conspiracy to oust her, they weren't doing a very good job.

However, the identity of and statements made by the alleged whistleblower will be subjects of discovery. And as this case continues, the Court expects counsel for both sides to strictly adhere to their obligations to ensure that the parties' factual contentions have (or will have) evidentiary support. Fed. R. Civ. P. 11(b)(3)–(4).

## CONCLUSION

For these reasons, the Individual Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED. Defendant Amazon's motion to dismiss is DENIED.

The Clerk of Court is directed to close Dkts. 68 and 73 and to terminate Defendants Boom and Redington from the docket.

SO ORDERED.

Dated: May 31, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge
