UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

KEESHA ANDERSON,                                    :
                                                    :
                              Plaintiff,            :
                                                    :
                    - against -                     :          **Case No. 1:23-cv-08347-AS**
                                                    :
AMAZON.COM, INC., AMAZON.COM                        :
SERVICES LLC, STEVE BOOM and RYAN                   :
REDINGTON,                                          :
                                                    :
                              Defendants.           :
--------------------------------------------------------------- x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY-RELATED SANCTIONS AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR DISCOVERY-RELATED SANCTIONS

DAVIS WRIGHT TREMAINE LLP

Michael J. Goettig
Rodrigo Tranamil
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
(212) 489-8230

*Attorneys for Defendants*
*Amazon.com Services LLC and Amazon.com, Inc.*

**TABLE OF CONTENTS**

**Page**

I.    FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 1

    A.    Plaintiff's and JMD's Shifting Narrative Concerning Protected Activity ............. 1

    B.    Amazon's Human Resources Documentation Practices ........................................ 9

    C.    Anderson's Discussions with Redington ............................................................. 11

II.   ARGUMENT ...................................................................................................................... 12

    A.    The Lack of Documentation Does Not Support an Inference of Spoliation......... 12

        1.    Plaintiff Did Not Engage in Conduct Sufficient to Warrant
        Investigation.................................................................................................. 12

        2.    Plaintiff Cannot Show that the Documents She Seeks Ever Existed........ 14

    B.    Plaintiff Has Stated Under Oath that She Destroyed Documents After
    Engaging Counsel ................................................................................................. 18

III.  CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adato v. Gala Tour, Inc.*,
  No. 07 Civ. 4029 (KAM), 2011 WL 4458852 (E.D.N.Y. Sept. 23, 2011)............................15

*Alaimo v. Trans World Airlines, Inc.*,
  No. 00 Civ. 3906(GBD), 2005 WL 267558 (S.D.N.Y. Feb. 3, 2005).....................................15

*Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*,
  11-CV-1529 KMW KNF, 2015 WL 1062327 (S.D.N.Y. Mar. 3, 2015)................................20

*Farella v. City of New York*,
  No. 05 Civ. 5711(NRB), 2007 WL 193867 (S.D.N.Y. Jan. 25, 2007)....................................15

*Fujitsu, Ltd. v. Federal Exp. Corp.*,
  247 F.3d 423 (2d Cir. 2001)...................................................................................................18

*Hicks v. Baines*,
  593 F. 3d 159 (2d Cir. 2010)..................................................................................................13

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  341 F.R.D. 474 (S.D.N.Y. 2022) ...........................................................................................18

*In re Pfizer Inc. Sec. Litig.*,
  288 F.R.D. 297 (S.D.N.Y. 2013) ...........................................................................................18

*Klipsch Grp., Inc. v. ePRO E Commerce Ltd.*,
  880 F.3d 620 (2d Cir. 2018)...................................................................................................20

*Murphy v. City of Newburgh*,
  785 F. App'x 900 (2d Cir. 2019) ...........................................................................................14

*Naumovski v. Norris*,
  934 F. 3d 200 (2d. Cir. 2019).................................................................................................17

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011).....................................................................................................14

*Romano v. A360 Media, LLC*,
  1:20-CV-08988, 2023 WL 348459 (S.D.N.Y. Jan. 20, 2023) ................................................14

*Rossbach v. Montefiore Med. Ctr.*,
  81 F.4th 124 (2d Cir. 2023) ...................................................................................................20

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F. 2d 566 (2d. Cir. 1991)........................................................................................9

*Whitley* v. *Montefiore Med. Grp.*,
    No. 13 Civ. 4126 (LTS), 2016 WL 1267788 (S.D.N.Y. Mar. 30, 2016)................................14

*Zervos v. S.S. Sam Houston*,
    79 F.R.D. 593 (S.D.N.Y.1978) ............................................................................18

*Zubulake v. UBS Warburg LLC*,
    229 F.R.D. 422 (S.D.N.Y. 2004) ..........................................................................20

**Federal Statutes**

Civil Rights Act of 1964, Title VII..........................................................................14, 15

**Rules**

Fed. R. Civ. P. Rule 37 ......................................................................................1, 20

Fed. R. Civ. P. Rule 37(e)......................................................................................20

Plaintiff's[1] memorandum of law in support of her motion for spoliation sanctions (Dkt. No. 154, the "Plaintiff's Sanctions MOL") begins with a brazen falsehood. Specifically, Plaintiff's counsel ("JMD") writes, "There is no dispute that Defendants destroyed key documentary evidence, causing irreparable prejudice to Plaintiff in this litigation." Plaintiff's Sanctions MOL, at 1. Nothing could be further from the truth. Far to the contrary, there is *no* evidence in the record to suggest that Amazon destroyed *any* evidence in this matter – and in fact, Plaintiff has provided testimony under oath that it is she who has destroyed evidence relevant to this matter. Because Plaintiff's own sworn deposition testimony conclusively establishes that she destroyed evidence relevant to the claims and defenses at issue in this action – *after engaging JMD as her counsel* – Amazon is entitled to an inference that the contents of those destroyed audio recordings would have supported Amazon's defenses in this litigation. As such, Plaintiff's request that Amazon be sanctioned for spoliation of evidence is not only unsupported by the record but audacious in the extreme. The Court should deny in its entirety Plaintiff's motion for sanctions under Rule 37 and instead grant Amazon's cross-motion for that same relief.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff's and JMD's Shifting Narrative Concerning Protected Activity

The Court's familiarity with the claims and defenses in this action is assumed. Amazon incorporates by reference the summary of facts set forth in pages 5-18 of its Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. No. 148, the "SJ MOL"). However, as set forth in Plaintiff's Sanctions MOL, Plaintiff's and JMD's attempts to cobble together a cause of action sounding in retaliation began long before they filed the Complaint in this action.

---

[1] Capitalized terms not defined herein are assigned the meanings attributed to them in the Memorandum of Law in Support of Amazon's Motion for Sanctions already before the Court (Dkt. No. 141).

Specifically, and as summarized in the SJ MOL, Anderson's campaign of surreptitiously making audio recordings of her discussions with colleagues and supervisors began shortly after Amazon hired her. Dkt. 149-1 at 48, Pl. Tr., 226-29.[2] At her deposition on September 16, 2024, Plaintiff testified under oath that she was making those audio recordings as early as 2019, while she was reporting to Akzin. *Id.* at 49, Pl. Tr., 130-31. Anderson further testified that she engaged JMD in September 2020 in anticipation of commencing this lawsuit against Amazon. *Id.* at 48-49, Pl. Tr., 229-233; Goettig 12/4 Sanctions Decl. Ex. A, Pl. Tr., 21-22[3]. Anderson also testified under oath that she provided to her attorney only those audio recordings which she felt bolstered her case against Amazon – and she destroyed the rest. Dkt. No. 149-1 at 4-5, 49, Pl. Tr., 27-30, 233. She testified:

> Q: You mentioned that you destroyed recordings, correct?
> A: Yes.
> Q: So, how did you decide which recordings to destroy and which recordings to retain?
> A: I sent [JMD] ones that were relevant my case.
> Q: Who established relevance?
> A: I did.

*Id.* at 5, Pl. Tr., 29:15-24. She also testified:

> A: I am not familiar with the process. I gave to [JMD] what I felt she should hear and should know.
> Q: And you deleted the rest?
> A: Yes.

*Id.* at 67, Pl. Tr., 233:2-6. Concerning the scope of what she felt was relevant to her case and what she thought that her attorney should hear, Plaintiff testified as follows:

> Q: How did you decide which recordings to turn over to your attorney when you were making them over the course of your employment with Amazon?
> A: When something egregious, racist, harassing happened.

---

[2] Where noted, relevant passages of Plaintiff's deposition transcript are found at Exhibit A to the November 11, 2024, Declaration of Michael Goettig (Dkt. No. 149-1).

[3] Where noted, relevant passages of the deposition of Keesha Anderson ("Pl. Tr.") are attached as Exhibit A to the December 4, 2024, Declaration of Michael Goettig in Support of Defendant's Opposition to Plaintiffs Motion for Sanctions ("Goettig 12/4 Sanctions Decl.").

*Id.*, at 5, Pl. Tr., 30:19-25.  The contents of the recordings are, in fact, not "egregious, racist, [or] harassing."  Instead, most of them capture run-of-the-mill workplace meetings and Anderson's supervisors' performance management efforts.

Plaintiff further testified that she was aware of her duty to preserve all documents relevant to the present case.  Goettig 12/4 Sanctions Decl., Pl. Tr. 25:6-16. JMD also acknowledged her professional duty to advise Anderson of the importance of preserving relevant evidence – and her awareness of the fact that her client had intentionally deleted recorded conversations. Dkt. No. 149-1 at 50, Pl. Tr., 234:2-10 ("The only [recordings] that I was aware of in that respect were the ones that she had done in 2019. Those are the only ones that I was aware where she was recording for note-taking purposes and she had just deleted them. It was kind of like she would use them, and then the next day she would just get rid of it").

Anderson's claim that she recorded these discussions for work-related purposes (*Id.* at 5, Pl. Tr., 28:3-10) cannot be reconciled with the evidence in the record.  For instance, JMD stated in writing to this Court on August 21, 2024, that an audio recording of a January 20, 2022, discussion between Anderson and Simonian was "a part of [JMD's] investigation into this matter and structured to assist [JMD] in determining the merits of Plaintiff's case.  Th[e] call was initiated by the Plaintiff, at [JMD's] direction, and recorded for the sole purpose of investigating and eliciting additional information about" Simonian's prior representations."  Dkt. No. 108, at 2.  What's more, Anderson recorded her February 27, 2022, discussion with Josh Fein *after* her last day of employment with Amazon.  Dkt. No. 149-1 at 31, Pl. Tr., 155:18-158:14.  During that discussion, she did not disclose that she was no longer employed by Amazon and scheduled to begin working with a new employer – and on the contrary, represented to him that she was still an Amazon employee.  Goettig 12/4 Sanctions Decl., Ex. B (2/27/22 Audio Transcript, 26 - KA

– 000705 (R) (redacted)[4], at 3:16 ("I'm trying to understand like how do you get promoted in this place?"), 8:20 ("I've been back for two days and the only thing that I've been feverishly doing is getting signage for an event and getting promo cards printed"), 15:13 ("I go into the Brooklyn office on occasion. It's a very really pretty space. It's just not functional for all of the events and it's super far to get to"), 19:59 ("I'm sure there will be other things that will come down the pipeline. I'm, I'm feverishly checking and looking so something will pan out"). This compels the conclusion that Plaintiff was recording her discussions with Amazon employees in anticipation of this litigation – and that she deleted those recordings which she did not consider helpful to her claims.

At her deposition, Anderson had "no idea" of the total number of audio recordings that she had created and destroyed – including during the time period after which she had engaged JMD in connection with her anticipated lawsuit against Amazon. Dkt. No. 149-1 at 48, Pl. Tr., at 227:3-229:20.

In addition to surreptitiously recorded conversations, Anderson has produced confidential Amazon documents that she collected in anticipation of this lawsuit. This includes, for example, instant message exchanges that she had with Simonian in March 2020 (Goettig 12/4 Sanctions Decl., Ex. C) (Direct Messages produced by Plaintiff as Bates KA - 000527-29)) and electronic mail correspondence with colleagues from as far back as October 2019 – one month after her date of hire (Goettig 12/4 Sanctions Decl., Ex. D) (redacted email thread produced by Plaintiff as Bates KA – 000073-75)).

On February 1, 2022, Plaintiff's and JMD's efforts came to fruition in the form of a twenty-six (26)-page letter sent to Amazon's General Counsel David Zapolsky, supported by a

---

[4] See, also, Dkt. No. 149-27 (Affidavit of Authenticity with Schedule).

twenty-four (24)-page sworn and notarized affidavit from Anderson.  Dkt. No. 154-2.  In that letter, JMD acknowledged the fact that Anderson experienced *nothing* as an Amazon employee to suggest that she was being treated differently on the basis of her race.  Rather, her theory of the case at that time was predicated upon Anderson being the victim of "unconscious racism, implicit bias, [and] subjective decision-making[.]" *Id.*, at 2.  In that same letter, she claimed – without citation to any supporting case law whatsoever (because there is none) – that Plaintiff "need not present evidence of any overt racism, bigotry or hatred" to adequately state a claim of race-based discrimination under applicable law.  *Id.* at 12.  In fact, in an implicit acknowledgment that Anderson could point to *no* word or deed on the part of her supervisors that gave any suggestion that race was a factor in their treatment of her, JMD argued instead, "Racial bias is typically expressed through subtle, nonverbal behavior and can be pervasive even among well-meaning people.  In many cases, individuals can be completely unaware of the unconscious negative feelings and beliefs that they harbor." *Id.*

In that correspondence, JMD characterized Akzin's selection of Terika Palmer to accompany her to her first meeting with Plaintiff as "a perfect example of how unconscious bias can creep into our everyday social interactions without individuals necessarily realizing it." *Id.*, at 13.  JMD acknowledged at that time that Palmer's presence at Akzin's first meeting with Plaintiff "may not appear to be overtly discriminatory" (*id.* at 14), and conceded that it was likely that "Ms. Akzin believed that Ms. Anderson would feel more comfortable having another African American employee present." *Id.*

With the passage of time, Anderson now claims not only that Palmer's presence at that meeting was, "like, bias, that's racism, because why would you think that you needed to bring another Black person down here to meet me?" (Dkt. No. 149-1 at 35, Pl. Tr., 174:13-16), but also

that she told Mark Dizon how "horrible" it was "that Abigail brought Terika downstairs because I was Black and she was Black to meet me." *Id.* at 32, Pl. Tr., 165:3-4.

 This is only one of many instances in which Plaintiff and JMD have exaggerated, distorted and fabricated details of Anderson's discussions with Dizon in an effort to salvage their claim that Anderson engaged in protected activity. Between January 24, 2022 and November 11, 2024, Anderson's sworn representations about what she said to Dizon have changed in material ways – all in an effort to salvage a claim of retaliation where one will not lie. For example:

| Jan. 24, 2022 Affidavit (Dkt. No. 154-2) | Nov. 11, 2024 Affidavit (Dkt. No. 154-1) |
|---|---|
| During my December 9th meeting, I also complained about my frustration with a complaint that Ms. Akzin had made to the human resources department regarding an "inappropriate" comment made by Terika Palmer (the only other African American team member) during a team gathering that presumably made team members uncomfortable. Following Ms. Akzin's complaint, Ms. Palmer was instructed by HR to apologize to the entire team, including individuals like me who were not even present when she made the comment. Significantly, most (if not all) of the members of the team either didn't recall the comment or didn't find it offensive. <u>I recall asking Mr. Dizon whether this was how HR operated at Amazon. To require that she apologize before conducting a complete investigation to determine whether anyone was offended in the first place seemed designed to debase and humiliate her. I remember feeling like Ms. Akzin was needlessly singling Ms. Palmer out and I honestly believed that she would not have been asked to issue a broad-based apology if she was Caucasian. I also reiterated how sick I felt every time I needed to speak to or interact with Ms. Akzin and how unfair she always treated me.</u> I also explained how I always did | I further reported how I felt that ordering Ms. Palmer to apologize under those circumstances seemed designed to debase and humiliate her. I also expressed concern over how the HR department had dealt with the issue, <u>even asking Mr. Dizon, "is this how people of color are treated here"</u> and <u>expressing my belief that if Ms. Palmer was Caucasian, she would not have been asked to issue a broad-based apology</u>.<br><br>Paragraph 9 (underline added).<br><br>I also reported that <u>as a result of her hostile and racially biased behavior,</u> each time I needed to speak to or interact with Ms. Akzin, I would feel sick and anxious.<br><br>Paragraph 10 (underline added). |

| Jan. 24, 2022 Affidavit (Dkt. No. 154-2) | Nov. 11, 2024 Affidavit (Dkt. No. 154-1) |
|---|---|
| whatever she asked and tried to be a team player yet, it never made a difference.<br><br>Paragraph 33(d) (underlines added). | |
| February-March 2020 – My discussions with Mr. Dizon during February and March of 2020 … primarily revolved around my move back to New York from Seattle, WA.<br><br>Paragraph 75(d). | On February 20, 2020, I met with Mark Dizon to, among other things, discuss concerns that I had about my transfer to Defendant Redington's group. During this conversation, I explained that while I greatly appreciated that Ms. Akzin was no longer my manager, it still seemed unfair that I lost the ability to grow an experiential team with the change. Mr. Dizon appeared to acknowledge my dilemma but then expressed a sentiment like, "we can't always have it all," which I took to mean that losing the ability to grow a team was the price I had to pay for complaining about Ms. Akzin.<br><br>Paragraph 15. |
| April 8, 2020 – I reported issues concerning how Ms. Simonian and how my relationship seemed strained because of how she was treating me.<br><br>Paragraph 75(e). | On April 8, 2020, I contacted Mark Dizon to discuss concerns about my new managers and how my relationship with Ms. Simonian seemed strained from the start. I also conveyed how in some ways, Ms. Simonian's actions towards me were reminiscent of Ms. Akzin's behavior and explained ***"it feels retaliatory".*** I also informed Mr. Dizon about the comment that Ms. Postelle made about ***"firing the black girl".*** Though Mr. Dizon asked whether I wanted to report my complaints to leadership, I told him that I didn't want to speak to management for fear that I would be regarded as the ***"problem black girl"*** and subjected to further retaliation.<br><br>Paragraph 16 (emphasis in original). |
| April 24, 2020 – I reported issues concerning how Ms. Simonian was treating me, including the fact that she was giving me inconsistent instructions, sending mixed messages and unjustifiably reprimanding me. | I spoke to Mark Dizon again on April 24, 2020. During their conversation [*sic*], I reported issues I had concerning how Ms. Simonian continued to treat me, including the fact that Ms. Simonian was giving me |

| Jan. 24, 2022 Affidavit (Dkt. No. 154-2) | Nov. 11, 2024 Affidavit (Dkt. No. 154-1) |
|---|---|
| Paragraph 75(f). | inconsistent instructions, sending mixed messages and reprimanding me without cause. I also expressed the frustration and anxiety I felt over the situation since Ms. Simonian seemed to have an issue with me despite having only just met me barely a month earlier. Mr. Dizon agreed that Ms. Simonian's behavior seemed odd.<br><br>Paragraph 17. |
| May 7, 2020 – I reported additional concerns about how Ms. Simonian was treating me, including the fact that she was excluding me from meetings and routinely making me feel like an outcast.<br><br>Paragraph 75(g). | On May 7, 2020, I met with Mark Dizon and reported additional concerns about how Ms. Simonian treated me, including the fact that I was still being excluded from meetings and routinely making me feel like an outcast. I also reported that I discovered that Ms. Simonian and Abigail Akzin were friendly and spent time together outside of work. I then reiterated my concerns that I was being retaliated against for the complaints I had made against Ms. Akzin.<br><br>Paragraph 18. |
| June 2, 2020 – I reported additional concerns about inconsistent instructions and guidance from Ms. Simonian regarding my marketing strategy doc.<br><br>Paragraph 75(h). | On June 2, 2020, I met with Mark Dizon to discuss the challenges I still had with my manager. Among the things that I shared were concerns about inconsistent instructions and guidance from Ms. Simonian regarding my doc and how similar it was to the way Ms. Akzin had treated me as well as how all of the stress and anxiety I experienced was impacting my health. With respect to Ms. Simonian's behavior, Mr. Dizon said that something was ***"off"*** and that he didn't understand why it was happening.<br><br>Paragraph 20.<br><br>During this discussion with Mr. Dizon, I also complained again that Ms. Simonian's behavior appeared to be in retaliation for the complaints I had made about Ms. Akzin.<br><br>Paragraph 21. |

| Jan. 24, 2022 Affidavit (Dkt. No. 154-2) | Nov. 11, 2024 Affidavit (Dkt. No. 154-1) |
|---|---|
| August 20, 2020 – I reported to Mr. Dizon via email that Ms. Simonian appeared to be reneging her job offer and how I felt that Ms. Simonian was not interested in having me as part of her group.<br><br>Paragraph 75(m). | On August 20, 2020, I reached out to Mr. Dizon via email to let him know that Ms. Simonian appeared to be reneging her job offer and, again, expressed how I felt like an outcast. I also reported Ms. Simonian's out-of-place mention of Abigail Akzin and how it reinforced my belief that I was being retaliated against for the complaints I had made.<br><br>Paragraph 27. |

This is not an instance of a hastily drafted affidavit being expanded upon with factual details upon a subsequent, more fully developed record. Far to the contrary, Anderson and JMD had almost *a year and a half*, from Anderson's engagement of JMD in September 2020 to JMD's service of the February 1, 2022 letter, to set forth the details of Anderson's discussions with Dizon in support of her claim of retaliation – *all* of which were already known to them. Plaintiff's and JMD's subsequent efforts to shore up Anderson's claim that she engaged in protected activity not only are unavailing as a matter of law ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony," *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F. 2d 566, 572 (2d. Cir. 1991)), but should be seen for what they are: part of an ongoing campaign of distortion and fabrication about which this Court has already expressed "serious concerns." Dkt. No. 142-8, at 22-24.

## B.    Amazon's Human Resources Documentation Practices

Plaintiff's Sanctions MOL proceeds from the inaccurate premise that Anderson's discussions with Dizon and Redington warranted investigation and documentation. This is not the case.

In his role as Senior Human Resources Business Partner, Dizon was "involved in everything from organization design, change management, reviews of org health metrics, coaching, providing guidance on talent strategy and talent management, [and] leading talent management initiatives. And then obviously, any sort of coaching or concerns that would be raised that come up from an employee would also be part of that as well." Deposition Transcript of Kim Costello ("Costello Tr."), 53:19-54:4.[5]

At Amazon, "employees engage with HR in multiple different ways." Costello Tr., 74:22-75:16. Particularly in the first quarter of 2020, when the COVID-19 pandemic was spreading around the world, "there was definitely a lot more engagement from [Amazon's] HR business partners with employees." Costello Tr., 75:11-14. For instance, in February and March 2020, Anderson's discussions with Dizon "primarily revolved around [her] move back to New York from Seattle, WA." Dkt. No. 154-2, ¶ 75(d). Before that, in 2019, Anderson was discussing with Dizon "how Ms. Akzin was excluding [her] from meetings, constantly rejecting [her] ideas and shutting projects down that she had previously authorized." *Id.*, ¶ 33(a). She also "complained about all the back and forth and inconsistent instructions that [she] received from Ms. Akzin[.]" *Id.*, ¶ 33(b).

While Amazon has a robust system for documenting internal investigations into complaints of "race discrimination, harassment or hostile work environment, racial bias" or retaliation (Costello Tr., 27:20-28:20), it does not maintain a "complaint file" to document generalized employee grievances (*id.*, 125:23-126:14). If an employee complains to Human Resources of discrimination, harassment or retaliation, confidentiality is a "cornerstone" of Amazon's subsequent investigation process. *Id.*, 139:15-140:14. However, Amazon does not

---

[5] The passages of Kim Costello's deposition transcript that were not previously filed are attached as Exhibit E to the Goettig 12/4 Sanctions Decl.(marked Confidential and filed under seal).

forego the investigation process simply because an employee requests confidentiality, discloses information "off the record," or asks that an investigation not be conducted. *Id.*, 140:22-141:6.

In this matter, Amazon has produced documents reflecting Anderson's interactions with Dizon, including, for example, meeting requests that Anderson sent to Dizon (Dkt. No. 154-10), correspondence concerning Anderson's relocation from Washington to New York (Dkt. No. 150-24), and documentation memorializing Dizon's participation in Anderson's placement into Pivot (Dkt. No. 150-10). It has *not* produced documentation reflecting the substance of Anderson's discussions with Dizon or any subsequent investigation prompted by those discussions – because none exist.

## C.     Anderson's Discussions with Redington

In at least one respect, Anderson's January 24, 2022 affidavit and her November 11, 2024 affidavit are consistent: both of them establish that her discussions with Redington do not constitute protected activity. In each affidavit, Anderson states that she discussed with Redington her struggles with Akzin's management style (compare Dkt. No. 154-2, ¶ 35(b) and Dkt. No. 154-1, ¶ 11), her frustrations in generating a strategy document (compare Dkt. No. 154-2, ¶ 35(a) and Dkt. No. 154-1, ¶ 11), her anxiety in anticipation of her interactions with Akzin (compare Dkt. No. 154-2, ¶ 35(b) and Dkt. No. 154-1, ¶ 12), and the fact that she was considering leaving Amazon altogether (compare Dkt. No. 154-2, ¶ 35(b) and Dkt. No. 154-1, ¶ 12). In both affidavits, Redington encouraged Anderson to continue her employment with Amazon and shared with her that Steve Boom was "working on making changes to the organization" (compare Dkt. No. 154-2, ¶ 35(b) and Dkt. No. 154-1, ¶ 12). Notably absent from either affidavit is any suggestion that she made *any* representation to Redington to suggest that her race played any part in her interactions with Akzin.

## II.    ARGUMENT

Amazon has met its discovery obligations throughout this litigation.  Plaintiff's claims of spoliation are predicated upon nothing more than rank speculation and revisionist history. What's more, the fact that Anderson was building this case with JMD for almost a year and a half prior to her voluntary resignation from Amazon in February 2022 compels the conclusion that the audio recordings she deleted were unhelpful to her claims of discrimination and retaliation.  As such, the Court should deny Plaintiff's motion for discovery-related sanctions in its entirety – and grant to Amazon the relief it seeks on its cross-motion.

### A.    The Lack of Documentation Does Not Support an Inference of Spoliation

Anderson and JMD provide nothing other than the absence of documents to support the contention that Amazon has spoliated evidence.  Because they have nothing more than conjectural assumption and hope that documents supporting her claims existed, the Court should deny Plaintiff's Sanctions Motion in its entirety.

### 1.    Plaintiff Did Not Engage in Conduct Sufficient to Warrant Investigation

Amazon did not investigate or document Plaintiff's discussions with Dizon or Redington because they did not warrant investigation or documentation.  The Court should reject the arguments to the contrary in Plaintiff's Sanctions MOL.

JMD's attempts to rely on Costello's deposition testimony in support of the contention that Anderson's discussions with Dizon would certainly have prompted an investigation and generated documentation are misplaced.[6]  On the contrary, JMD made clear during Costello's

---

[6] The representation at page 9 of Plaintiff's Sanctions MOL that, "[o]ther than testifying that the [litigation hold] process exists, [Costello] was directed by counsel not to answer, asserting privilege," is false.  Rather, Amazon's "position is that [JMD was] precluded from inquiring about attorney-client communications."  Costello Tr., 142:13-20.  JMD elicited information about the litigation hold process in general, but when she attempted to inquire as to the litigation hold process in Anderson's case, the witness was instructed not to answer the question.  *Id.*, 144:6-9. Counsel then went off the record and discussed the scope of questioning that would not seek attorney-client

deposition that her questions about Amazon's investigation and documentation policies and processes were "always going to be … about a race discrimination complaint."  Goettig Sanctions Decl., Ex. E, Costello Tr., 38:21-23 (marked confidential and filed under seal).  In fact, JMD repeatedly emphasized that her questions about Amazon's investigation and documentation policies were limited to complaints of "discrimination … racial bias, harassment, hostile work environment" and retaliation.  *Id.*, 31:21-33:9.  The only time that JMD asked about documentation of generalized "complaints about anything" outside of the context of discrimination, harassment or retaliation, Costello testified that she was "not aware of a complaint file."  *Id.*, 125:23-126:14.

There is no admissible evidence in the record – including in Plaintiff's January 24, 2022 sworn affidavit – to suggest that Plaintiff engaged in protected activity.  While Plaintiff and JMD subsequently inserted references to Akzin's "hostile and racially biased behavior" into their recounting of Anderson's discussions with Dizon (see Dkt. No. 154-1, ¶ 10; *see also, id.*, ¶¶ 16, 18, 21), those are precisely the sort of conclusory assertions that a court need not consider at this stage of litigation.  *Hicks v. Baines*, 593 F. 3d 159, 167 (2d Cir. 2010) ("Plaintiffs' affidavits on this point lack specifics and are conclusory; a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove").  At the close of discovery, it is incumbent upon Plaintiff to show facts in support of her claim that she engaged in protected activity under applicable law.  The evidence shows that Plaintiff did not make complaints of unlawful discrimination, but instead made generalized workplace complaints.  *See, e.g.*, Dkt. No.

---

communications.  Counsel went back on the record, and JMD elicited testimony indicating that, when Costello receives *any* litigation hold notice, she complies with the instructions set forth in that document.  *Id.*, 144:10-145:14.  JMD then stated, "Okay.  All right.  I have no further questions…. We can go off the record, or, you know, we could end the deposition."  *Id.*, 145:15-19.

154-10, at 2 ("Hi Mark…. I'd appreciate the opportunity to connect as soon as possible, I've been experiencing some surprising/alarming moments").

Courts in the Second Circuit have consistently held that, when an employee makes a complaint with human resources, the activity is not protected when the communication *makes no mention of discrimination*.  The Court should follow that precedent in this case.  *Romano v. A360 Media, LLC*, 1:20-CV-08988 (LTS) (OTW), 2023 WL 348459, at *11 (S.D.N.Y. Jan. 20, 2023) (emphasis in original).  *See also Murphy v. City of Newburgh*, 785 F. App'x 900, 902 (2d Cir. 2019) (finding no protected activity when an employee made a written complaint to management, stating that she felt "bullied" and "harassed" by her supervisor; but this did not qualify as a protected activity under Title VII because it did not allege that she was treated poorly based on a protected trait); *Whitley* v. *Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016) ("A generalized complaint about perceived mistreatment without a specific connection to discrimination based on membership in a protected class is insufficient to establish a protected activity"); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (affirming summary judgment on retaliation claim because "[t]he competent evidence in the record showed that any complaints [the plaintiff] made were generalized and therefore [the defendant] could not reasonably have understood that she was complaining of conduct prohibited by Title VII").

### 2.    The Documents that Plaintiff Seeks Do Not Exist

JMD's allegation that Amazon destroyed documents is based on her own subjective belief and mere guesswork.  However, a party seeking sanctions for spoliation must prove as an initial step that the evidence in question existed and was lost or destroyed.  *See, e.g.*, *Farella v. City of New York*, No. 05 Civ. 5711(NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) ("[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-

after evidence *actually existed and was destroyed.*" (emphasis in original)).  Courts in this

Circuit have routinely denied motions for sanctions where the movant failed to establish that the

evidence in question actually existed.  *See, e.g.*, *Alaimo v. Trans World Airlines, Inc.*, No. 00

Civ. 3906(GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) (stating that there could be no

finding of spoliation because the plaintiff did not establish that the records and documents she

sought ever existed); *Adato v. Gala Tour, Inc.*, No. 07 Civ. 4029 (KAM), 2011 WL 4458852, at

*9 (E.D.N.Y. Sept. 23, 2011) (denying motion for sanctions because plaintiffs failed to show that

a logbook entry pertaining to an injury ever existed, let alone that it had been destroyed).

Because JMD has not made this threshold showing in this case, the Court should follow that

precedent and deny Plaintiff's motion.

   Here, Plaintiff has not demonstrated that the documents she seeks ever existed.  For

instance, on this motion, Plaintiff claims that Amazon has failed to produce documents reflecting

her colleague Jenny Levine's ("Levine's") purported complaint to Human Resources.  *See* Dkt.

No. 154, at 2, 6, 7, 10.  However, Anderson's own conflicting testimony on this point fails to

support the contention that Levine ever made such a complaint.  Specifically, in her January 24,

2022 affidavit, Anderson states, "On December 17, 2019, I learned that Jenny Levine, a

Caucasian employee on Ms. Akzin's team who observed the way that Ms. Akzin treated me, had

also reported her concerns to Human Resources.  I **believe** she made her complaint to Mr. Dizon

**as well**, but I am unsure of the exact date."  Dkt. No. 154-2, ¶ 34 (emphasis added).  However, at

her September 16, 2024 deposition, Anderson testified as follows:

> Q: Please tell me everything you remember about learning that Jenny Levine
> discussed Abigail Akzin's interactions with you with a member of Human Resources.
> A: … Jenny said to me, "I just want you to know that I spoke to Mark.  I see how
> Abigail treats you." And she was like, "And it is wrong and it makes me mad, and I told
> Mark about that."

Dkt. No. 149-1 at pp. 46-47, Pl. Tr., 221:15-222:7.

When asked about the discrepancy between her deposition testimony and her January 24, 2022 affidavit, in which she said that she "believed" Levine also spoke with Dizon *in addition to* going to Human Resources, Anderson responded, "Oh, then perhaps I stand corrected." *Id.* at 47, Pl. Tr., 224:11. Plaintiff further stated that she "must have been remiss, or I didn't mean to do that. I am not perfect." *Id.*, 225:4-5. She further testified that she had nothing beyond Levine's hearsay statement to support her belief that Levine had spoken with anyone in Human Resources about Akzin's treatment of her. *Id.*, 225:15-25. And of course, even assuming Levine *did* speak with a Human Resources representative, nothing in Anderson's recitation of Levine's disclosure of that fact to her – either in January 2022 or in September 2024 – suggests that Levine gave any indication that Akzin's treatment of Anderson was in any way related to Anderson's race. In sum, there is nothing remarkable about Amazon's failure to produce documents reflecting a discussion that Levine purportedly had, either with Dizon or some other Human Resources representative, in which she discussed her perception that Akzin's interactions with Anderson were "wrong" and "made [her] mad." *Id.*, 221:15-222:7.

Similarly baseless are Anderson's attempts to argue that Akzin's purported comment that Plaintiff had a "passion for hip hop," which she characterizes as "based on her color and offensive" (Dkt. No. 154, at 4), was sufficient to warrant an internal investigation. In the first instance, the Court may take judicial notice that hip hop as a musical genre transcends race-based demographics – the fact that Anderson is claiming that this purported comment is "offensive" only serves to underscore the lengths to which Plaintiff and JMD feel the need to go in order to support *any* suggestion of race-based disparate treatment. What's more, here too, Anderson's deposition testimony establishes that she heard about this purportedly "offensive" comment only

16

through an after-the-fact conversation with colleague Philicia Darns. Dkt. No. 149-1 at pp. 21, 23, Pl. Tr., 121:5-20, 126:8-25. Moreover, whereas in her January 22, 2022, letter, JMD attributes this comment to Akzin's "unconscious bias" (Dkt. No. 154-2, at 13), by the time of Plaintiff's September 16, 2024, deposition, Plaintiff reported that Darns was "disgusted" (Dkt. No. 149-1 at p 23, Pl. Tr., 127:15) and "really taken aback" (*id.*, 128:9-10) by the comment. Here too, it is entirely unremarkable that Dizon elected not to launch an investigation into a stray comment that Akzin may or may not have made about Plaintiff's music genre preferences. *See, e.g.*, *Naumovski v. Norris*, 934 F. 3d 200, 215-16 (2d. Cir. 2019).

Plaintiff also claims that Amazon has failed to produce an email that she allegedly sent to Dizon on August 20, 2020. This representation strains credulity. It is undisputed that Plaintiff engaged JMD in September 2020, at which time it may be presumed that Plaintiff was instructed to gather all documents in support of her claims. As summarized above, Plaintiff gathered, retained and subsequently produced in litigation documents reflecting correspondence that she had with colleagues and others – including Dizon – going as far back as October 2019. In fact, among the documents that she produced was a meeting confirmation dated August 12, 2020 – barely more than a week before the email that she claims to have sent to Dizon. Goettig 12/4 Sanctions Decl., Ex. F (Meeting Confirmation produced by Plaintiff as Bates KA - 000234.) Had she actually sent an email to Dizon on August 20, 2020, it is fair to presume that she would have misappropriated it for her own use in the same way that she misappropriated other Amazon documents during that time frame. The fact that Amazon did not produce this alleged email does not support Plaintiff's contention that it was destroyed – or even that it existed in the first place.

Courts cannot levy spoliation penalties based solely on a plaintiff's aspiration to uncover case-bolstering materials. There is no basis to sanction a party for non-production when those

documents never existed in the first instance. *See Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y.1978) ("Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production"); *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 328 (S.D.N.Y. 2013) (sanctions not warranted when party did not have any relevant documents to preserve or produce); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 538 (S.D.N.Y. 2022) (finding party failed to establish that purported ESI existed, let alone that the party suffered prejudice as would justify sanctions). Accordingly, the Court should deny Plaintiff's motion in its entirety.

**B.    Plaintiff Has Stated Under Oath that She Destroyed Documents After Engaging Counsel**

As Plaintiff correctly notes in her Motion, "Sanctions for spoliation are warranted when a party with control over evidence has a duty to preserve it, fails to do so with a culpable state of mind, and where the destroyed evidence bears sufficient relevance to the opposing party's claim or defense." Dkt. No. 154, at 12 (citing *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu, Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Plaintiff knew or should have known as early as September 2020 – when she engaged counsel – of her duty to preserve evidence. *See* Goettig 12/4 Sanctions Decl. Ex. A, Pl. Tr., at 25:6-16. Instead, by Plaintiff's own admission, she has failed to do so – and on the contrary, has destroyed an unknown number of recordings that were unhelpful to the case against Amazon that she was trying to build. Dkt. No. 149-1 at 49,  Pl. Tr., 233:2-6.

For example, featuring prominently in the Complaint is a discussion that Anderson had with Kirdis Postelle in which Postelle stated, "You don't want it to be that the Black girl has to fire the Black girl. They knew what they were doing when they put the Black girl on the team with the other Black girl." Dkt. No. 63, ¶ 42. Not only does Postelle dispute Anderson's interpretation of their discussion (*see* Goettig 12/4 Sanctions Decl., Ex. G (Postelle Tr., at 73:23-77:12[7])), but this discussion took place in March or April 2020 – *after* Anderson had begun recording her workplace conversations. Dkt. No. 154-2, ¶ 42. At her deposition, Postelle testified that Plaintiff's and JMD's characterization of her statements "is conflating two different things" (Postelle Tr., at 74:18) in a way that "presents a narrative that [Postelle] never intended" (*Id.*, at 76:17-18). Postelle Tr., at 73:23-77:12. When asked at her deposition whether she had a recording of that conversation, Plaintiff testified, "I don't believe so." When asked to elaborate, she responded, "I can't recollect why I don't have it." When asked if she destroyed the recording, she stated, "I don't remember." Dkt. No. 149-1, at 21, Pl. Tr., 118:1-9. Together with Plaintiff's acknowledged spoliation of workplace recordings she made, history of misrepresenting key passages of recorded discussions in the pleadings (*see* Dkt. No. 142-8, at 22-24), and evasive and noncommittal responses to Amazon's questions about whether she recorded the conversation with Postelle that was quoted in boldface and italics in the Complaint (Dkt. No. 63, ¶ 42), Amazon is entitled not only to an inference that the contents of that recording would have undermined Plaintiff's claims of discrimination and retaliation, but to dismissal of the Complaint with prejudice. *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 135 (2d Cir. 2023) (affirming dismissal with prejudice of complaint, sanctions order and fee award

---

[7] [7] The passages of the transcript of Kirdis Postelle's deposition taken 10/4/2024 that were not previously filed are submitted under seal as Exhibit G to the Goettig 12/4 Sanctions Declaration.

upon a determination that plaintiff had misrepresented material facts at issue and destroyed relevant evidence).

In this matter, it is in fact Plaintiff who had a culpable state of mind when she intentionally destroyed evidence relevant to this Complaint.  As Plaintiff correctly points out, this misconduct is sanctionable behavior.  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 433, 437 (S.D.N.Y. 2004) (sanctioning a party's conduct when it was under a duty to preserve emails and deleted such emails willfully); *Klipsch Grp., Inc. v. ePRO E Commerce Ltd.*, 880 F.3d 620, 632–633 (2d Cir. 2018) (spoliation of electronically stored information can be punished under court's inherent powers, and Fed. R. Civ. P. 37(e) is not exclusive authorization for such sanctions); *Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, 11-CV-1529 KMW KNF, 2015 WL 1062327, at *1 (S.D.N.Y. Mar. 3, 2015) (granting defendant's motion for sanctions, and finding that, as a result of the plaintiff's spoliation of evidence, the plaintiff and its attorney were jointly and severally liable to the defendant for reasonable attorney's fees and costs incurred in connection with the sanctions motion).  As such, the Court should grant Amazon's cross-motion under Rule 37 seeking an inference that the audio recordings that Plaintiff failed to preserve were harmful to her claims of discrimination and retaliation, and dismiss the Complaint with prejudice in its entirety.

## III.    CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Sanctions in its entirety.  Defendants further request that the Court grant their cross-motion and enter an Order sanctioning Plaintiff and her counsel JMD for willfully destroying documentation relevant to the claims and defenses in this action.  Defendants further request that this Court dismiss Keesha Anderson's Second Amended Complaint with prejudice, that they be awarded their attorneys' fees and costs, that the Court take such additional steps as are necessary and appropriate to

address JMD's misconduct, and that it grant to Amazon such other and further relief that it may

deem proper.

Dated: December 4, 2024          DAVIS WRIGHT TREMAINE LLP
New York, New York

By: s/ Michael J. Goettig
       Michael J. Goettig
       Rodrigo Tranamil
       1251 Avenue of the Americas, 21st Floor
       New York, New York 10020
       (212) 489-8230
       *Attorneys for Defendants*
       *Amazon.com, Inc. and Amazon.com Services LLC*