UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEESHA ANDERSON,<br><br>                              Plaintiff,<br><br>          -against-<br><br>AMAZON.COM, INC. and AMAZON.COM SERVICES, INC.,<br><br>                              Defendants. | 23-cv-8347 (AS)<br><br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Keesha Anderson sues Amazon.com and Amazon.com Services for discrimination and retaliation in violation of 42 U.S.C. § 1981, New York State Human Rights Law § 296 (NYSHRL), and the New York City Human Rights Law (NYCHRL).

Anderson used to work as part of the Amazon Music team, where she held the "Senior Event & Experiential Marketing Specialist" role. Dkt. 63 ¶ 2. Anderson says that during her time at the company, she was subjected to racial discrimination and that, but for her race, she would have received opportunities to advance through Amazon's ranks. She also claims that when she complained about this discrimination to Amazon's higher ups, the company retaliated against her. In her complaint, Anderson alleged that a "whistleblower" came forward to warn her about the conspiracy inside Amazon to sideline her. *See id.* ¶¶ 136–53. Her complaint highlighted several of the whistleblower's most damning statements in bold.

Defendants deny Anderson's allegations and say that she was never treated less favorably because of her race. They say that any setbacks she experienced were due to her poor job performance, not anything else.

After Anderson filed suit, defendants moved to dismiss the complaint. The Court denied defendants' motion. *See Anderson v. Amazon.com, Inc.*, 2024 WL 2801986, at *13 (S.D.N.Y. May 31, 2024). During discovery, two revelations emerged. First, Anderson disclosed that she had secretly recorded conversations with her coworkers and managers while at Amazon, and that she had deleted some of these recordings. Second, it turns out that Anderson's anonymous "whistleblower" was none other than Anderson's one-time manager, whom Anderson names in other parts of the complaint. And a recording of Anderson's conversation with this manager showed that she never made several of the statements Anderson bolded in her complaint.

With discovery now closed, defendants move for summary judgment. The parties also seek an assortment of sanctions against each other. For the reasons given below, defendants' motion for summary judgment is GRANTED, defendants' motion for sanctions under Rules 11 and 37 is

DENIED, and Anderson's motion for sanctions under Rule 37 is DENIED. Anderson's motion to strike defendants' amended responses to her requests for admission and to exclude defendants' expert report (neither of which the Court considered on the other motions) is DENIED as moot.

## BACKGROUND

Anderson joined the Amazon Music team on August 19, 2019. *See* Dkt. 197-1 ¶ 15. When she first joined the team, her manager was Abigail Akzin. *See id.* ¶¶ 23, 26.[1] Tami Hurwitz was Anderson's "skip-level manager," or her manager's manager. *Id.* ¶ 26. During the four months when Akzin was her manager, Anderson claims Akzin "regularly precluded [Anderson] from participating in planning meetings and/or the preparation for various strategies and initiatives"; "limited [Anderson's] access to … marketing events"; "'question[ed] and challeng[ed] the reasons for having' experiential events"; and "reject[ed] [Anderson's] recommendations and put[] up roadblocks to almost every idea that [Anderson] proposed." *Id.* ¶ 30. She also says that Akzin "on occasion 'would initially approve one of [Anderson's] ideas only to pull her support after [they] had already spent significant amounts of time and effort trying to get it completed'"; that "[o]n other occasions, [Akzin] 'rejected an idea up front and then gave approval late in the timeline'"; and that "[Akzin] provided little to no support to assist [Anderson] with the development of [her] new [projects]." *Id.*

Both sides agree that Anderson complained to Steve Boom, then-Vice President of Amazon Music, on November 13, 2019. *See id.* ¶ 32. Defendants say that Anderson's complaints were about her general dissatisfaction with the job, not about Akzin specifically. *See id.* Anderson says that she told Boom that Akzin's "combative behavior was stifling [her] progress" to the point that she was "consider[ing] leaving Amazon." Dkt. 180 ¶ 38.

About two weeks later, on November 26, 2019, Anderson met with Amazon Human Resources Business Partner Mark Dizon. Dkt. 197-1 ¶ 33. (Anderson also asserts that she met with Dizon several other times to discuss Akzin's behavior.) *See* Dkt. 180 ¶ 35. An email Anderson forwarded to Dizon that day suggests that Anderson and Dizon discussed Akzin's response to a holiday party Anderson had proposed. *See id.* ¶¶ 33–36; *see also* Dkt. 180 ¶ 36.

Anderson met with Dizon about Akzin again on December 9, 2019. During that meeting, Anderson discussed those aspects of Akzin's behavior that made Anderson "believe that [Akzin] held some racial bias against" her. Dkt. 197-1 ¶ 37; Dkt. 150-15 ¶ 33(c). These included the fact that a Black co-worker accompanied Akzin to Anderson's welcome meeting on her first day at

---

[1] Defendants say that the Court should strike Anderson's response to defendants' Rule 56.1 statement, and her amended memorandum of law in opposition to defendants' summary-judgment motion. *See* Dkt. 198. Here's what happened: After defendants complained that Anderson's initial memorandum of law and 56.1 counterstatement failed to cite to any admissible evidence, she tried to clean things up with some amendments, which the defendants decried as too late and outside what the Court had authorized. There's some force to defendants' arguments, but because summary judgment is warranted even considering Anderson's improper filings, the motion to strike is denied as moot.

Amazon. Dkt. 150-15 ¶ 33(c).[2] Anderson also says that she complained to Dizon that Akzin stereotyped her as having a "passion point" for hip-hop music. *See* Dkt. 154-1 ¶ 6.

Around the same time, Hurwitz provided feedback on Anderson's job performance to Amazon's HR and Ryan Redington, an Amazon higher up who later became Anderson's manager. Dkt. 197-1 ¶ 48. Defendants say Hurwitz, rather than Akzin, delivered this feedback because the company was undergoing "organizational changes" and "[w]hen employees transition from one reporting structure to another within Amazon, members of management typically document areas of employee development to help facilitate that transition." *Id.* ¶ 47.

Anderson disputes this explanation. According to Anderson, her complaints against Akzin about discrimination were the real reason behind Hurwitz's involvement. *See id.* Anderson points to deposition testimony from Redington purportedly stating that Hurwitz was assigned to give Anderson's feedback because he relayed Anderson's complaints against Akzin. *See* Dkt. 197-2 at 7–9; Dkt. 182-4 at 108:16–21. Defendants respond that Redington didn't testify to that effect, instead saying that he didn't recall what he told Human Resources or Hurwitz beyond the fact that Anderson was "struggling with [Akzin] as a manager." *See* Dkt. 182-4 at 57:17–58:22. These struggles were reflected in a December 10, 2019 email thread between Boom and Redington. Boom asked—in reference to Anderson—whether Redington had spoken to Hurwitz. Redington responded that he had and that "she [Hurwitz] is talking with [Akzin]." He also observed that "it seems to be getting worse," and that in speaking with Hurwitz, they were working on a "a path forward soon." Boom responded that in speaking with HR, "it sounds like there's some real issues going on in that group overall." Dkt. 182-31.

Hurwitz provided her feedback the same day, and it was negative. In her feedback, Hurwitz stated that Anderson "struggled to produce … deliverables," "created a lot of churn in the organization," and failed to "take[] feedback on fundamental skills/support that will help her be successful at Amazon." Dkt. 150-20. Hurwitz noted that she had "personally witnessed" the churn Anderson created when Anderson "brought to the team an opportunity to rent out a space in New York for Amazon Music." According to Hurwitz, Anderson didn't provide an initial plan of how the team might use the space, didn't include the right stakeholders, and brought the opportunity to another manager before bringing it to her own. *Id.* Anderson disputes that this feedback accurately captured her performance record and says that it "do[es] not account for the fast-paced nature of the music industry." Dkt. 197-1 ¶¶ 49–50; Dkt. 180 ¶¶ 46–47.

In January 2020, due to further organizational changes, Anderson switched managers and started reporting to Redington on an interim basis. Dkt. 197-1 ¶ 52. (Anderson denies being told that it was an interim assignment. *See* Dkt. 180 ¶ 62.) While Anderson reported to Redington, he rated her initially as "High Value Minus." On February 20, 2020, in response to a request from HR (apparently coming from upper management) to review all employees with a High Value

---

[2] Defendants say this was innocuous, as new employees at Amazon are frequently paired with "buddies" to help in their transition, and the individual who joined Akzin was one of three who had been suggested as a potential buddy for Anderson. *See* Dkt. 150-14; *see also* Dkt. 148 at 11–12.

Minus rating to determine whether any should be downgraded to "Least Effective," Redington responded that "objectively [Anderson] is the closest of the group to LE." Dkt. 182-16. Anderson's rating was then changed to "Least Effective" in Amazon's internal performance review metrics. Dkt. 197-1 ¶ 53; Dkt. 150-22.[3] Her employee-facing review didn't inform her of the "Least Effective" rating but instead provided her with various suggestions for improvement. Dkt. 197-1 ¶¶ 6, 54. Anderson denies that she ever received this review. *Id.* ¶ 54.

In March 2020, Anderson switched managers again and began reporting to Tatiana Simonian (who as it turns out is the "whistleblower" referenced in Anderson's complaint). *Id.* ¶ 56. Anderson's skip-level manager now was Kirdis Postelle. *Id.* Simonian repeatedly provided feedback to Anderson about her work product. Defendants point to an instance in which Simonian voiced frustration with Anderson about her failure to meet a deadline that Simonian set several weeks earlier. *See id.* ¶¶ 62–65. Anderson admits that Simonian offered this criticism but denies that it reflected the full picture. *See* Dkt. 180 ¶¶ 64–68. Defendants next point to an instance in which Simonian directed Anderson to "route ideas through [her] … so [she] can make sure [they're] all aligned and on the same page" after Anderson discussed an event idea with a different team rather than with Simonian. Dkt. 150-35. Again, Anderson admits that Simonian made this request but says that Simonian's frustration was the result of a "misrepresentation of the circumstances." Dkt. 197-1 ¶ 66. Anderson also says Simonian's behavior "appeared retaliatory to [her]." Dkt. 180 ¶ 70.

On March 31, 2020, Human Resources emailed Redington, Simonian, Postelle, and Dizon that Anderson would be "auto-added to Focus" on April 1. *See* Dkt. 150-48. Redington testified that Focus was an internal process within Amazon, where "if someone is [rated Least Effective], we … put them into coaching through the Focus program." Dkt. 182-4 at 133:3–5.[4]

On May 12 and 13, 2020, Simonian, Dizon, and Redington corresponded about formally moving Anderson into Focus. *See* Dkt. 150-38. Redington noted that "[his] conversations with [Anderson] were about putting structure and process into events." *Id.* He also attached Hurwitz's feedback document from 2019 to his email. *See id.* Simonian said that Redington's feedback "echoe[d] what [Postelle] and [she] had seen." *Id.* Simonian observed that Anderson exhibited "[a] focus on one-off events vs. strategic development, [was] circumventing [the] chain of command[,] and [Anderson's] deliverables [were] not meeting the L6 bar" appropriate for Anderson's level of

---

[3] Anderson seems to attribute this re-evaluation to the company's "Unregretted Attrition" goals, which "incentivized performance management actions against employees." Dkt. 197-2 at 12. Anderson doesn't challenge these goals as being racially motivated, although she does say in passing that they "created systemic pressure on managers to exit employees, disproportionately impacting protected classes." *Id.*

[4] Anderson suggests that a "Least Effective" rating doesn't automatically require an employee to be added to Focus, but the deposition testimony she points to from Kim Costello doesn't support that "Least Effective" employees aren't automatically added to Focus; instead Costello merely noted that there could be a delay in going into Focus due to, for example, pre-Focus coaching or movements in leadership. Dkt. 182-6 at 98.

seniority. *Id.* Simonian said that she believed the last issue was the "primary issue" with Anderson's performance. *Id.*

Two days later, Simonian emailed Anderson, summarizing feedback she gave Anderson earlier that day. Postelle was included on Simonian's email. *See* Dkt. 150-37. Simonian started off by telling Anderson that she had "been very helpful with Twitch finances process management." Simonian noted that while this work was "essentially" below Anderson's seniority level, she commended her for "roll[ing] up [her] sleeves and stepp[ing] up to get the job done for the team during this time." Simonian went on to say that "[w]hile there has been some churn with delegation," the team was in a "good place" and that Anderson should feel "empowered to … take the lead to solve" any issues she saw arising. Finally, Simonian flagged a comment that Anderson had made at a team meeting. Simonian acknowledged that she didn't have the full context for Anderson's comment but encouraged Anderson, as "one of the most senior members of the team," to "model leadership and to consider the wider audience" of things she said. *Id.*

On May 26, 2020, Anderson was formally placed in Focus. Dkt. 197-1 ¶ 71. Consistent with Amazon's general approach in these circumstances, Anderson wasn't informed about her placement in this program. *See id.* ¶ 3; Dkt. 180 ¶ 91.[5] About a month later, on July 13, 2020, Simonian approached Anderson about whether Anderson would be interested in moving into a revamped position. Dkt. 197-1 ¶¶ 77–79. Anderson demurred and didn't commit to the role. *Id.* ¶ 80. On July 21, 2020, Simonian sent Anderson a job description of the role and sought her input on it. *Id.* ¶ 81. On July 28, 2020, Simonian yet again discussed the role with Anderson. *Id.* ¶ 82. Anderson again demurred. *Id.* ¶ 83.

On August 11, 2020, Simonian wrote to Dizon and another member of Amazon's HR team about her discussions with Anderson regarding the new role. Dkt. 150-31. She informed them that Anderson hadn't reviewed the job description "[f]or over two weeks" and that on a call about the job earlier that day, it "was apparent to [Simonian] that [Anderson] still had not reviewed the [job description]." *Id.* Simonian said that she went through the description "line by line" with Anderson on the call, offered to answer any questions that Anderson had about the role, and asked Anderson whether she believed Simonian's process in devising the role had been fair. *Id.* According to Simonian, "[Anderson] had no questions, offered no counterpoints and agreed it was fair." *Id.* Anderson then requested more time to consider the job, which Simonian denied. *Id.* Simonian closed her email to HR by saying, "[b]ased on [Anderson's] inability to take Ownership in contributing to the team needs or even review her new [job description] in a timely manner, I have pause about her performance." *Id.*

In September 2020, Simonian determined that Anderson hadn't met expectations and recommended moving Anderson to the second stage of Amazon's performance-management

---

[5] Anderson complains that she was not informed that she was in Focus for several months, "violating Amazon's performance management policies." Dkt. 197-2 at 12. She cites two exhibits for this proposition—the Focus documents for her and for another employee, Jamie Fullen—but neither refers to any such policies about notifying employees that they are in the Focus program.

process—Pivot. Dkt. 197-1 ¶ 87. Anderson disputes that she failed to meet expectations. *See* Dkt. 180 ¶¶ 83–87. On September 21, 2020, Anderson entered Pivot and was given the choice between leaving Amazon with a severance package or staying at the company and improving her performance. Dkt. 197-1 ¶ 88.

Anderson chose to stay. *Id.* ¶ 89. As a result, Anderson was placed on a performance improvement plan (PIP), which set specific goals for Anderson to meet. *Id.* ¶ 90. These included: "[d]eveloping and delivering weekly newsletters to stakeholders during business hours; [c]reating and presenting a revised livestreaming strategy document; [r]evising and expanding her experiential strategy document; and [d]eveloping a monetization plan for experiential events." *See id.*; *see also* Dkt. 150-39.

On November 23, 2020, Anderson was moved out of the PIP. Dkt. 197-1 ¶ 92. Defendants say that this was because Anderson successfully met her PIP goals; Anderson claims that Simonian prematurely ended the PIP when she realized that Anderson hadn't received sufficient feedback before being placed in the performance-management process. *Id.* ¶ 91; *see also* Dkt. 180 ¶ 95. After leaving the PIP, Anderson switched managers a fourth time and started reporting directly to Postelle. Dkt. 197-1 ¶ 93. Both sides agree that Anderson received positive feedback from Postelle about her work. *See id.*

Anderson resigned on February 15, 2022, informing Postelle that she was leaving Amazon for health reasons. *Id.* ¶ 104. Anderson had also accepted a higher-paying position with Snap, Inc., for which she had undergone a months-long interview process. *Id.* ¶ 105. Anderson's last day at Amazon was February 25, 2022. *Id.* ¶ 103. As detailed below, Anderson recorded conversations she had with her colleagues and supervisors at Amazon. The destruction of certain of those recordings, and revelations concerning the alleged "whistleblower" identified in Anderson's complaint, are discussed further in addressing defendants' sanctions motions.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

**I.    The Court grants defendants' motion for summary judgment.**

**A.  Summary judgment is warranted on Anderson's claims of racial discrimination.**

The Court analyzes claims of discrimination under § 1981 using the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (collecting cases). "Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (internal quotations and citations omitted). "If the plaintiff meets that minimal burden … [t]he burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct." *Id.* (internal quotations and citation omitted). "Upon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination." *Id.* A plaintiff "must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020).

### 1.  Placement in Amazon's performance-management program

Assuming Anderson has met her burden of making out a prima facie case, defendants offer a non-discriminatory reason for placing Anderson in their performance-management program (Focus, Pivot, and then a PIP): her poor performance. *See* Dkt. 148 at 28.

Anderson fails to show that her poor performance rating and subsequent reviews were a pretext for discrimination. Her rebuttal largely takes the form of disputing defendants' appraisals of her job performance. At this stage, that's not enough: "an employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent." *Ricks v. Conde Nast Publ'ns, Inc.*, 6 F. App'x 74, 78 (2d Cir. 2001); *see also Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely disagreeing with a supervisor's assessment of work performance, however, is insufficient to raise a triable issue of fact regarding pretext." (internal quotations and citation omitted)).

Anderson notes some positive comments received from managers during her time at Amazon. *See, e.g.*, Dkt. 183-18 (2020 Forte review with positive comments, as well as suggestions for growth and development); *but see* Dkt. 182-16 (recounting 2020 Talent Review: "[d]ifficult acculturation to the 'Amazon way;' not given effective management yet, but cannot tell if it's management or lack of commit"). But the mere fact that there were some positive comments to go along with the negative reviews isn't enough to create a triable issue of fact as to whether Anderson was discriminated against based on her race.

Anderson's other arguments don't move the needle. She first claims that defendants employed a "[d]iscrimination [l]aundering strategy." Dkt. 197-2 at 27. According to Anderson, defendants waited until she was supervised by two women of color—Postelle and Simonian—to raise issues about her job performance. Anderson claims defendants did this to make it harder for Anderson to bring a claim of race discrimination against her managers or to link any discipline to the complaints she made against Akzin.

To prove her theory, Anderson points to Simonian's statements during a phone call they had on April 13, 2021—a day before Simonian left Amazon. *Id.* at 28. Simonian said to Anderson that she "thought it was super racist" that Anderson was placed under Simonian's and Postelle's management. Dkt. 182-22 at 8. Simonian recounted that she told Redington:

> I told him before when I was switching teams I was like, don't you think it's a little bit racist that you put two black women under a black and brown woman and then you were like, oh, by the way, this one black woman is rated this and you have to focus her. Like doesn't it seem weird that you're kind of like pushing your problem, so to speak, off on another woman of color. Because you didn't want to handle it directly. Because I viewed that as racist.

*Id.*

These remarks don't support a claim of "discrimination laundering." On this call, Simonian certainly shared her gripes about Amazon's corporate culture and the process by which employees—Anderson included—are given feedback, but she didn't suggest that Anderson's performance reviews were contrived or that she was given poor reviews because of her race. In fact, as noted previously, Simonian echoed others' concerns about Anderson's performance, remarking on Anderson's "inability to take Ownership in contributing to the team needs." Dkt. 150-31. Simonian's grievance was instead about her personal situation, not Anderson's (which makes sense given the discussion occurred the day before Simonian left Amazon). Context bears this out. Just before Simonian tells Anderson what she said to Redington, Simonian says:

> [M]y executive coach was like, if they didn't give you [Simonian] the support you needed and you just outkicked your coverage, then [f***] 'em. Don't exit her. And I was like, cool. She's like, what are they going to do, knock you on your performance review for not exiting someone? F[***] them. And I was like, ok, thanks Deedee. And like, my executive coach has a PhD from Harvard in organizational communication. And she was basically just like, no, [they] set you [Simonian] up to fail. And they want you to fail because they don't want to take care of their own business.

Dkt. 182-22 at 8. Her remark that "it's a little bit racist" was directed towards the fact that she was assigned to manage Anderson and address Anderson's performance issues because she herself was a "woman of color." She says nothing about the reviews being borne out of racism or the delegation reflecting a motive to undercut a discrimination claim that Anderson herself might bring relating

to Akzin. This evidence doesn't support either discrimination against Anderson or discrimination laundering.[6]

Anderson next points to four comments that she says prove Amazon's actions against her were racially motivated. These comments are:

- Postelle saying, "they knew what they were doing when they put the black girl on the team with the other black girl";
- Postelle saying, "I'm not going to be the black girl that fires the black girl" during their first meeting;
- That Postelle claimed there were rumors going around about Anderson having an "attitude" and "being out there 'doing what she wanted to do'"; and
- Simonian saying, "I know Abs [Akzin] is not your fave."

Dkt. 197-2 at 28–29.

"In determining whether a remark is probative [of discrimination], [courts] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). "While … none of these factors should be regarded as dispositive, … this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff." *Id.* at 150.

As to the first two comments by Postelle, both were about race, but neither indicates racial animus on Postelle's or Amazon's part. *Cf. Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 727 (2d Cir. 2010) (holding summary judgment appropriate on § 1981 claim where "[t]he disputed remarks were … a purported concession that [plaintiff] was discriminated against; they were not themselves discriminatory"). To the contrary, Postelle testified that her remarks "really didn't have anything to do with her race," and instead were meant to comfort Anderson, given that she was among a group of employees reporting to Postelle with "sharp elbows." Dkt. 182-5 at 77:16–78:16. In that vein, Postelle stated that she intended to communicate that, "I was never going to be a black woman that came in somewhere and … fired black women or black people." *Id.*

The rumors to which Postelle allegedly referred also can't support Anderson's claim of discrimination. These rumors are inadmissible and cannot be considered on summary judgment. *See Henek v. CSC Holdings, LLC*, 449 F. Supp. 3d 35, 45 (E.D.N.Y. 2020) ("Unsubstantiated

---

[6] On these motions, neither Anderson nor defendants address the admissibility of Simonian's statements at trial. But they raise a host of issues: Anderson doesn't explain how Simonian's statements would be admissible over a hearsay objection, and Simonian wasn't deposed, isn't within subpoena range, and isn't going to testify at trial. She also didn't know she was being recorded, and indeed Anderson agreed on the call to keep Simonian's statements confidential. Dkt. 182-22 at 8.

confidence in the rumor mill is not evidence that can defeat a motion for summary judgment."). Even if the Court were to consider these rumors, they fall more on the side of petty slight than actionable discrimination. *See Sosa v. Loc. Staff, LLC*, 618 F. App'x 19, 20 (2d Cir. 2015) (holding that "the comment 'You're so street' is nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences" (internal quotations and citation omitted)). Anderson says these remarks invoke invidious racial stereotypes, "but in this case the plaintiff's 'subjective interpretation' of … 'critical but facially non-discriminatory terms does not, itself, reveal discriminatory animus,'" particularly when the remarks were made by unnamed sources with unknown decision-making power over Anderson. *Thelwell v. City of New York*, 2015 WL 4545881, at *11 (S.D.N.Y. July 28, 2015) (citation omitted), *aff'd*, 733 F. App'x 561 (2d Cir. 2018).

As to Simonian's comment, Anderson claims it was "meant to dredge up the complaints of race discrimination [Anderson] had made against Ms. Akzin and put [Anderson] on notice that Ms. Simonian was aware of it." Dkt. 197-2 at 29. But nothing on the face of Simonian's comment nor its context indicates that she had the intent Anderson ascribes to her or that her remark was meant to be racially motivated. *See* Dkt. 182-50 at 3 (Simonian stating "I know, Abigail was not your fav. But it's actually a bummer for experiential not to be on that side of the house."); *see also Desir v. Bd. of Co-op. Educ. Servs. (BOCES) Nassau Cnty.*, 803 F. Supp. 2d 168, 179 (E.D.N.Y. 2011) ("[A] plaintiff's subjectively held belief that comments are discriminatory is insufficient to support an inference of discrimination."), *aff'd*, 469 F. App'x 66 (2d Cir. 2012). Again, because Simonian was never deposed in this case and no declaration was submitted on her behalf, Anderson's speculation about Simonian's intent—where the statement itself reveals no bias—is not enough.

### 2.  *Failure to Promote*

Anderson also asserts that "but for her race, [she] would not have had limited opportunities and advancement" even after completing the PIP. *See* Dkt. 197-2 at 29. In support of that contention, Anderson relies on Postelle's failure to help Anderson secure a promotion while Postelle "made specific efforts … to assist several non-minority members … with efforts to advance." *Id.* at 31.

Again, even if Anderson could make out a prima facie case of discrimination, "the record clearly establishes that the defendants met their burden of articulating legitimate, nondiscriminatory reasons" for not promoting Anderson. *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 125 (2d Cir. 2012). Postelle testified that "[Anderson] was a great event producer. But I needed somebody that could really write docs and that wanted to be more of a strategist and … not an event producer. … [A]t the time, [Anderson] wanted to be outside producing events and not … necessarily in an office writing docs. … I didn't think that she was ready and [] I didn't think that she was particularly strategic." Dkt. 182-5 at 141:16–142:1. Postelle also provided Anderson with extensive advice on advancement and told Anderson that she was "[her] partner in this." *See* Dkt. 182-35 at 6–8.

Anderson does little to rebut this explanation. She says that poor performance can't explain why she wasn't promoted—but Postelle doesn't claim that Anderson was doing a bad job. She just says that Anderson didn't have the specific set of skills she was looking for in the person who would fill the "L7" role Anderson claims should have gone to her. Anderson also says that Postelle's unwillingness to promote her demonstrates that any encouragement Postelle gave her was empty, and that Postelle never intended to help Anderson move forward in her career. But as Postelle explained, that was because of Anderson's own interest in "producing events" rather than "writing docs." *See* Dkt. 182-5 at 141:16–23. "The court's role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Yu*, 494 F. App'x at 125 (cleaned up) (affirming grant of summary judgment on failure-to-promote claim where employer provided non-discriminatory explanation that plaintiff lacked the necessary skills).

Anderson also argues that she was treated differently from other similarly situated employees on account of her race. She points to defendants' promotion of Jamie Fullen. As Anderson tells it, Jamie Fullen is "a Caucasian colleague" of Anderson's, who had "documented performance issues" yet "received substantial support" from defendants and whom defendants "prepped for a promotion." Dkt. 197-2 at 14; *see id.* at 25–27, 30–31. Neither side denies that Fullen received considerable coaching from her managers and was promoted from an "L5" role to an "L6" role. Anderson also points in passing to Postelle's alleged efforts to help two more of her former co-workers, Katie Klein and Anthony Coorey, with their career advancement. Both Klein and Coorey are white. *See id.* at 31.

While Anderson points to evidence that Fullen suffered from performance issues, Fullen was not considered for the same promotion that Anderson sought. Instead, as Anderson acknowledges, Fullen—a more-junior L5 employee—was promoted to the same level of seniority Anderson already occupied—L6. *See Augustine v. Cornell Univ.*, 2018 WL 1474402, at *9 (S.D.N.Y. Mar. 26, 2018) (plaintiffs and comparators not similarly situated where plaintiffs "had no interest" in comparators' promotions, as "[t]hey all would have been lateral moves, rather than promotions"), *aff'd sub nom. Brown v. Cornell Univ.*, 758 F. App'x 226 (2d Cir. 2019). That matters because a plaintiff must be "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotations and citation omitted). Absent that baseline level of similarity, there's no way to show the sort of disparate treatment that can support a finding of discriminatory pretext. Anderson has presented no evidence that what defendants looked for in someone to fill an L7 role was the same as what they looked for in someone to fill an L6 role; instead, per Postelle's testimony, the record indicates that the qualifications for an L6 role differed from those for an L7. *See* Dkt. 182-5 at 141:16–23. As to coaching that Fullen received, Anderson hasn't pointed to evidence suggesting that any difference was based on race, and the record reflects that Anderson was in fact provided feedback and coaching during her time at Amazon; the differences between the type of coaching Fullen and Anderson received could easily be attributed to the different levels they occupied, with

Fullen an L5 and Anderson an L6. *See, e.g.*, Dkt. 182-24 (Anderson's Focus profile documenting feedback provided and noting that Anderson, an L6, was operating at an L5 level).

As for Klein and Coorey, Anderson presents no evidence regarding the similarities between them, other than noting that Klein was promoted from an L6 to an L7 position. *See* Dkt. 197-1 at ¶ 189 (simply noting Klein's and Coorey's race and Klein's promotion). Anderson fails to create a genuine issue of material fact that she, Klein, and Coorey are "similarly situated in *all* material respects." *Graham*, 230 F.3d at 39 (emphasis added); *see Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 405 (S.D.N.Y. 2010) (plaintiff's "speculation about [her] former colleagues' qualifications is . . . insufficient to raise an inference of discrimination"). Moreover, apart from noting the race of Klein and Coorey, Anderson points to nothing in the record to suggest that Postelle's alleged support of Klein and Coorey was because of their race. *See* Dkt. 197-1 at ¶ 189; *see also* Dkt. 197-2 at 31.

### B. Summary judgment is warranted on Anderson's claim of retaliation.

"Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis." *Fincher*, 604 F.3d at 720. "First, the plaintiff must establish a *prima facie* case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." If the employer succeeds at the second stage, then the plaintiff must show that the employer's action was, in fact, motivated by discriminatory retaliation. *Id.* "Retaliation claims under § 1981 require a showing that the protected activity was a 'but-for' cause of the adverse employment action." *Turner v. MTA Metro-North Railroad*, 2024 WL 1177227, at *9 (S.D.N.Y. March 19, 2024).

To establish a prima facie case of retaliation, "a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

There is no triable issue of fact on whether Anderson's placement in Amazon's performance-management program was the result of complaints of discrimination made against Akzin. When the Court denied defendants' motion to dismiss, the Court relied on Anderson's allegation that a whistleblower informed Anderson that she was targeted for termination because of those complaints. *Anderson*, 2024 WL 2801986, at *12. With the benefit of discovery, and as further discussed below, it is now clear that the supposed "whistleblower" was really Anderson's one-time manager Simonian (who Anderson accuses of retaliation), and that the allegations concerning her statements didn't coincide with the facts.

Starting with what Simonian actually said, nothing signals that Anderson was targeted because of her complaints. *See* Dkt. 182-22. Anderson highlights Simonian's statement that "the entire structure is corrupt" and Simonian's hypothetical that if Simonian were to complain about Dizon

(an Amazon HR manager), she'd be labeled as having "a problem again." *Id.* at 10. But neither of these statements is relevant to why Anderson was placed in Focus, Pivot, and eventually a PIP—particularly when Simonian herself was the person who evaluated Anderson's performance and recommended that Anderson be moved into Pivot.

The rest of the record provides insufficient support for causation and that defendants' non-retaliatory reasons for their actions—Anderson's poor performance—were a pretext for discriminatory retaliation. Anderson again focuses on Postelle's comment about not wanting to be the person to "fire[]" Anderson. Just as Postelle's comments don't evince discrimination, *see supra* at 9, they don't reflect retaliation either. Postelle didn't comment on Akzin's actions or suggest that what happened to Anderson was due to her complaints against her; instead, commenting on her own attitudes and actions, and to comfort Anderson, Postelle simply related that she wasn't going to be a "black woman that came in somewhere and … fired black women or black people." Dkt. 182-5 at 77–78. Postelle didn't suggest that Anderson had been retaliated against or that anyone in the process was going after her for making race-based complaints about Akzin.

Anderson also points to the fact that in late 2019, she was reviewed by Tami Hurwitz instead of Abigail Akzin, and that this followed shortly after Redington related to Hurwitz and HR Anderson's problems in Akzin's department. Anderson contends that this sequence, and Hurwitz's negative review, show retaliation. But what's missing is any evidence connecting the review, let alone Anderson's subsequent placement into Amazon's performance-management process (which occurred several months, and at least two managers, later), to any protected activity. Anderson doesn't dispute defendants' argument that at the time Hurwitz furnished her review, Anderson was slated to move to Redington's department, and that "[w]hen employees transition from one reporting structure to another within Amazon, members of management typically document areas of employee development to help facilitate that transition." Dkt. 148 at 10. So Anderson's argument seems to focus on the fact that Hurwitz, as opposed to Akzin, provided this feedback.

However, Hurwitz was Anderson's skip-level manager, and her review was supported by her own observations about Anderson's work—namely, that Anderson created "churn" within the organization and failed to follow Amazon's internal procedures. Dkt. 150-20. Anderson says that Akzin was "aware" of the review and "according to Ms. Hurwitz, likely provided input." Dkt. 197-2 at 17. Even if that is a plausible view of the evidence, without more, there is nothing retaliatory about the mere fact that Akzin—who was in fact Anderson's manager during the time in question—may have been consulted about Hurwitz's review. Dkt. 182-7 at 126:18–22 (Hurwitz: "So reading this, it looks predominantly like what I have seen. It's possible some of this reflected feedback that Abigail had shared with me about Ms. Anderson over time. But the majority of this looks like things that I would have personally witnessed.").

Anderson fails to point to other admissible evidence connecting her placement in Amazon's performance-management program back to her complaints against Akzin; that missing link is supplied by Anderson's speculation alone. *See Baldwin v. Goddard Riverside Cmty. Ctr.*, 53 F. Supp. 3d 655, 671 (S.D.N.Y. 2014) (granting summary judgment on retaliation claim where plaintiff failed to "link[] any change" in defendants' attitude to protected activity), *aff'd*, 615 F.

App'x 704 (2d Cir. 2015); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere ... speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

Finally, Anderson points to the temporal proximity between her complaints concerning Akzin and her placement in Amazon's performance-management process. As the Court previously noted, any argument based on temporal proximity fails because "the PIP came more than a year and multiple managers after [Anderson's initial] complaint about Akzin." *Anderson*, 2024 WL 2801986, at *12. Even if the Court were to look at the gap between Anderson's final complaint against Akzin in December 2019 and her formal placement in Focus five months later as the appropriate marker for determining temporal proximity, the five-month lag between the two is still too long to support a showing of retaliation, especially when Anderson ceased reporting to Akzin in 2019. *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (gap of five months between protected activity and supposed retaliation too long). Given the absence of any other evidence linking Anderson's complaints and her placement in Amazon's performance-management process, there is no triable issue on retaliation.

All in, the evidence tells a different story than Anderson's. Consistent with what the Court observed in its decision on defendants' motion to dismiss, putting the now-discredited allegations concerning the "whistleblower" to the side, the case "paints a picture of a run-of-the-mill workplace, maybe even one with more positivity than usual. And each time [Anderson] tried to quit, her bosses tried to convince her to stay. If there was a conspiracy to oust her, they weren't doing a very good job." 2024 WL 2801986, at *13. Indeed, after Anderson completed her PIP, defendants were happy to have Anderson continue at the company. As both sides acknowledge, Anderson received positive performance reviews from Postelle once Anderson started reporting to her directly. Anderson then made her own choice to leave for a higher-paying position with Snap. Anderson says that the job at Snap was a step down from the role she held at Amazon, *see* Dkt. 197-1 ¶ 105, and that but for defendants' discrimination and retaliation, she would have been promoted at Amazon and stayed there. But the evidence doesn't support that narrative.

### C. Summary judgment is warranted on the NYSHRL and NYCHRL claims.

#### 1. Discrimination

The Second Circuit has instructed district courts to "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (cleaned up). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.*

"The standard for a discriminatory act under the NYCHRL is more lenient than the federal standard. A plaintiff need only show that she was 'treated ... less well, at least in part for a discriminatory reason.'" *Stinson v. Morningstar Credit Ratings, LLC*, 2024 WL 3848515, at *22

(S.D.N.Y. Aug. 16, 2024) (internal quotations and citation omitted). "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." *Id*. Nevertheless, "the NYCHRL is not a 'general civility code,'" and Anderson must still show "that the conduct is caused by a discriminatory motive." *Id.* (internal quotations and citation omitted).

The NYSHRL was recently amended to render its standard for unlawful discrimination and retaliation closer to NYCHRL's. *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021). Courts have yet to resolve whether the NYSHRL's standards are coextensive with the NYCHRL, or whether the NYSHRL's standards are a middle-ground between federal and city laws. *See Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023). Neither party addresses this issue. Recent decisions by the Second Circuit and New York courts have implied that the standards for employment-discrimination claims under the two statutes are now largely the same. *See Valerio v. Metro. Transp. Auth.*, 2025 WL 686028, at *4 (2d Cir. Mar. 4, 2025); *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 107 (S.D.N.Y. 2024) (discussing New York courts' treatment of the statutes).

Regardless of the bar set by the NYSHRL, Anderson's claims fail under both city and state law. As addressed above, this case doesn't present a close call. There is no evidence of any discriminatory action, and nothing connecting Anderson's alleged discrimination to the adverse actions she claims. In short, Anderson has not raised a triable question of fact that she has been "treated less well [by defendants] at least in part because of" her race. *See Stinson*, 2024 WL 3848515, at *22. "Even under the NYCHRL, a plaintiff must prove that some forbidden factor, like race, factored into the adverse employment action of which [she] complains." *See Hill v. Bloomberg L.P.*, 2016 WL 1665599, at *12 (S.D.N.Y. Apr. 20, 2016). Anderson hasn't made that showing here.

### 2. *Retaliation*

New York City law prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). "To establish a retaliation claim under the NYCHRL, a plaintiff must show that: (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Menos v. Uncle Nearest, Inc.*, 2025 WL 917347, at *14 (E.D.N.Y. Mar. 25, 2025) (internal quotations and citation omitted). "Causation for a NYCHRL retaliation claim is met so long as the action was motivated at least in part by a retaliatory motive, which means that summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Id.* (cleaned up). Given the amendments to the NYSHRL, courts in this district have construed NYSHRL retaliation claims under the more permissive NYCHRL standard. *See id.* at *16.

As the Court explained in discussing Anderson's § 1981 claim, nothing in the record supports Anderson's claim of unlawful retaliation for her complaints against Akzin. *See Gioia v. Forbes Media LLC*, 501 F. App'x 52, 56 (2d Cir. 2012) (granting summary judgment on NYCHRL retaliation claim where "[s]hort of speculation, there is no evidence that [retaliation] played even a partial motivating role in the decision to terminate her"). There is no genuine issue of material fact warranting trial on Anderson's NYSHRL and NYCHRL claims for retaliation.

### D.  The motion to strike is denied.

Anderson has also moved to strike defendants' amended responses to her requests for admission and to exclude the expert report of Dr. Jonathan Kent under Rule 26(a)(2). *See* Dkts. 151, 156. Because the Court relies on neither in its analysis of defendants' summary judgment motion, the motion to strike is denied as moot. *See Faulkner v. Arista Recs. LLC*, 797 F. Supp. 2d 299, 306 (S.D.N.Y. 2011) (denying as moot motion to strike statements that were not relevant to summary-judgment analysis).

## II.  The Court declines to grant sanctions against either side.

In addition to defendants' motion for summary judgment, the parties have also filed a flurry of sanctions motions. Both sides have moved for sanctions under Rule 37. Defendants have also moved to sanction Anderson and her counsel under Rule 11. Long story short, the sanctions motions raise troubling questions concerning the conduct of Anderson and her counsel in the lead up to this case. Recordings were deleted, the complaint made dubious allegations concerning a whistleblower that were undermined when the cards were placed on the table, and the Court relied on those allegations in a prior decision denying defendants' motion to dismiss. The Court declines to impose formal sanctions on Anderson or her counsel here, but they are warned that the type of things that happened here should not happen again.

With that, the Court first addresses discovery sanctions under Rule 37. Rule 37(e) outlines the procedure for a motion for sanctions relating to the deletion of electronically stored information:

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

"A party seeking sanctions based on spoliation must establish by a preponderance of evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025) (citation omitted).

Defendants claim that Anderson knowingly destroyed recordings of her conversations with other Amazon employees because she knew that these recordings would undercut her claims of racial discrimination and retaliation. *See* Dkt. 170 at 22–24. Anderson admitted under oath that she deleted some of the recordings she made. Dkt. 149-1 at 233:2–6. According to defendants, Anderson knew, or should have known, that she had a duty to preserve any evidence relevant to this litigation. So defendants say they are entitled to an inference that the recordings Anderson deleted were harmful to her claims, and that dismissal is warranted, along with attorney's fees and costs. *See* Dkt. 170 at 24.

The Court finds that Rule 37 sanctions aren't warranted against Anderson and her counsel. As for sanctions under Rule 37(e)(2), defendants haven't shown that the reason Anderson deleted the recordings was to deprive defendants of information. *See Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018) ("Absent a showing of 'intent to deprive another party of the information's use in the litigation,' the sanctions enumerated under subsection (2) of Rule 37(e) are not available."). Defendants assert that Anderson must have intended to deprive them of information because she gave "evasive and noncommittal responses to Amazon's questions about whether she recorded [certain conversations]," she has "a history of misrepresenting key passages of recorded discussions," and she admitted that she destroyed some of the recordings she made. *See* Dkt. 170 at 23.

While this situation is troubling, the record before the Court doesn't meet the standard for sanctions. *See Hoffer v. Tellone*, 128 F.4th 433, 440 (2d Cir. 2025) ("[T]he 'intent to deprive' standard is 'both stringent and specific,' and contemplates 'not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence.'" (citation omitted)). It isn't clear that Anderson knew she was under an obligation to preserve the recordings as early as 2020: as Anderson points out, though she consulted with counsel in 2020 about her experiences at work, it wasn't until the end of 2021 that she formally retained counsel with the intention of suing Amazon. *See* Dkt. 191 at 13. Only then was she made aware of her obligations—and defendants don't say she deleted recordings after this point. As to the "evasive" responses that Anderson gave during her deposition, here's the entirety of the exchange in Anderson's deposition:

Q: Do you have a recording of this conversation?

A: I don't believe so.

Q: Why not?

A: I can't recollect why I don't have it.

Q: Did you destroy it?

A: I don't remember.

Dkt. 149-1 at 118:2–9. That Anderson didn't remember whether she had a recording of a particular conversation from four years ago isn't particularly telling of whether she deleted such recording (if it existed) to hamstring defendants in an eventual lawsuit. *See Barbera v. Grailed LLC*, 2025 WL 2098635, at *8 (S.D.N.Y. July 25, 2025) ("Absent additional evidence, however, the Court cannot conclude that the specific reason Plaintiff deleted documents here was to prevent Defendant from using them in this litigation.").

That leaves sanctions under Rule 37(e)(1). Under that provision, "the sanctions must be 'no greater than necessary to cure the prejudice.'" *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020) (quoting Fed. R. Civ. P. 37(e)(1)). To start, the circumstances surrounding defendants' motion undercuts a showing of prejudice. The Court informed the parties that it would "entertain any request for sanctions along with the defendants' motion for summary judgment." *See* Dkt. 121. But defendants didn't file their motion alongside their summary judgment motion; instead, only after Anderson moved for sanctions under Rule 37 and the Court denied defendants' request to stay briefing on Anderson's sanctions motion, *see* Dkts. 153, 157, 161, did defendants cross-move for Rule 37 sanctions, *see* Dkt. 170. So defendants largely seem to be reacting to Anderson's motion for discovery sanctions, rather than addressing prejudice they suffered. Defendants also focus on one conversation between Anderson and Postelle and ask the Court to speculate both that Anderson recorded the conversation and that she subsequently deleted it. *See id.* at 21–22. The Court declines to do so. Given that the prejudice to defendants from Anderson's destruction of the recordings is minimal, if any, the Court declines to impose sanctions under Rule 37(e)(1).

For her part, Anderson claims that defendants should be sanctioned under Rule 37 because defendants supposedly destroyed evidence of Anderson's complaints to human resources about racial discrimination. Anderson says that the absence of any documentation regarding her complaints shows that defendants destroyed the documents.[7]

Anderson fails to show that documents she alleges were destroyed once existed. "For sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence

---

[7] Anderson also alleges that defendants destroyed evidence of a co-worker's complaint about Anderson's discrimination. During her deposition, however, Anderson admitted that she wasn't sure whether her co-worker ever made such a complaint and had no evidence other than the co-worker's own representation that the co-worker had, in fact, complained to Human Resources. *See* Dkt. 149-1 at 224:11–225:25. In her summary-judgment papers, Anderson also refers to other issues, such as defendants' alleged failure to turn over a particular Forte rating of Anderson. Dkt. 197-2 at 11 n.1. However, her sanctions motion doesn't seek relief for these alleged issues, and any failure of defendants to follow an order should have been brought to the Court's attention during discovery.

actually existed and was destroyed. The party seeking sanctions must demonstrate the loss of discovery-relevant information." *Mastr Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 295 F.R.D. 77, 86 (S.D.N.Y. 2013) (cleaned up), *aff'd*, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013). Anderson says the documents had to have existed given Amazon's procedures for documenting complaints of discrimination. But defendants respond that Anderson framed her complaints as ones of generalized mistreatment and not discrimination, which explains the lack of formal documentation. *See* Dkt. 170 at 14–17. And as to the complaints that Anderson says she made explicitly about discrimination—for instance, that a Black coworker had accompanied Akzin to welcome Anderson and that Akzin had once commented that Anderson had a "passion point" for hip hop—Anderson doesn't show that they merited and would have received a full-blown investigation. *See Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (denying spoliation sanction based on "pure speculation about the existence of the [sought-after documents]"); *Adato v. Gala Tour, Inc.*, 2011 WL 4458852, at *10–11 (E.D.N.Y. Sept. 23, 2011) (denying spoliation sanctions where plaintiff failed to show documents existed); *see also Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (Gorenstein, M.J.) ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions."), *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013).

Finally, Rule 11: The Second Circuit has cautioned courts to impose sanctions under Rule 11 "with restraint and discretion." *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999). "Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012). "Rule 11 sanctions are an extreme measure." *Fleming v. Hymes-Esposito*, 2013 WL 1285431, at *11 (S.D.N.Y. Mar. 29, 2013); *see also Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004) ("Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion.").

The Court agrees with defendants that Anderson and her counsel's conduct in litigating Anderson's complaint raises serious concerns. Most importantly, Anderson and her counsel included—and bolded—in her complaint what they claimed were direct quotes and statements by a "whistleblower." *See, e.g.*, Dkt, 63 ¶¶ 137–38, 143, 190. As it turns out, there was no whistleblower (by any stretch of the imagination), and Anderson's complaint included alleged quotes that the purported whistleblower never said. What's worse is that the Court relied on these statements when denying defendants' motion to dismiss. There's a close question whether plaintiff's counsel violated Rule 11 in presenting the allegations in the complaint "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," Fed. R. Civ. P. 11(b)(1), or in falsely certifying that "the factual contentions have evidentiary support," *id*. § (b)(3).

Anderson says that she called Simonian a "whistleblower" to protect her from retaliation. She claims that some of the misstatements were "inadvertent" and says that others were meant as "characterizations" rather than "verbatim quotations" from recordings. *See* Dkt. 167 at 4. And she says that it was always understood that the recordings would be disclosed during discovery, thereby undercutting any suggestion that she or her counsel acted in bad faith. Further, Anderson claims that through the middle of 2024, she was under the assumption, based on discussions with Simonian, that Simonian was prepared to testify in this case on Anderson's behalf, and so presumably would back up Anderson's account. That is, even if handled sloppily, Anderson says she believed that Simonian would testify as to the gist of what she recounted about Simonian's statements in the complaint. Even if the Court is dubious about this story, defendants don't present evidence that Anderson is lying, and Simonian never served as a witness in this case to set the story straight.

Anderson and her counsel's conduct toes the line on what constitutes sanctionable conduct under Rule 11. But the Court will hold off on imposing the extreme measure of sanctions. *See E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 182 (S.D.N.Y. 2008) (holding that failure to withdraw false statements in various documents submitted to the Court did not "rise to the level of extraordinary circumstances to warrant Rule 11 sanctions"). The Second Circuit has cautioned courts that "Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy." *Pannonia Farms, Inc. v. USA Cable*, 426 F.3d 650, 652 (2d Cir. 2005). Here, the Court cannot undeniably say that Anderson and her counsel acted in bad faith: to their credit, they turned over the recording of the conversation relating to the whistleblower quotes and sought to amend Anderson's complaint when the misstatements became apparent. While Anderson and her counsel shouldn't have included the misrepresentations in her complaint to begin with, their actions after defendants raised the issue convince the Court that sanctions aren't warranted. *See New V & J Produce Corp. v. NYCCaterers Inc.*, 2014 WL 5026157, at *5 (S.D.N.Y. Sept. 29, 2014) (noting that Rule 11 "serves to punish only those who would manipulate the federal court system for ends inimicable to those for which it was created" (internal quotations and citation omitted)). The Court is also mindful that Anderson's counsel is a solo practitioner and that her pleadings and the proceedings in this case reflect a lack of substantial familiarity with federal practice and procedure. Bottom line, whether what happened in this case is the result of inadvertence, oversight, and sloppiness on the one hand, or bad faith conduct on the other, is unclear.

However, this type of conduct should not be repeated. In any case that Anderson or her counsel litigate in the future, courts and opposing counsel will be able to find this decision and defendants' recounting of Anderson's and her counsel's conduct in their briefing. This Court, and others, will be on high alert for any future maneuvering along these lines.

## CONCLUSION

For these reasons, defendants' motion for summary judgment is GRANTED, defendants' motion for sanctions under Rules 11 and 37 is DENIED, and Anderson's motion for sanctions

under Rule 37 is DENIED. Anderson's motion to strike defendants' amended responses to her requests for admission and to exclude defendant's expert report is DENIED as moot. The Clerk of Court is directed to terminate Dkts. 140, 144, 151, 153, 156, 163, 165, and 168 and close this case.

SO ORDERED.

Dated: September 30, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge